# TAB E

**Page 1:**

```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF ALASKA

EEOC,
      Plaintiff,
and

SHOTSAY POSCIRI,
      Plaintiff-Intervenor,

vs.

UNITED FREIGHT &
TRANSPORT, INC.,
      Defendant.

Case No. A05-122 CV


            DEPOSITION OF JANICE MANSFIELD,
               Pages 1-120, inclusive
               Commencing at 1:54 p.m.
               Thursday, December 8, 2005
                  Anchorage, Alaska


               Alaska Stenotype Reporters
                  511 West Ninth Avenue
                Anchorage, AK 99501-3520
                 Serving Alaska Since 1953

Rick D. McWilliams, RPR, Ret.     Telephone 907.276.1680
Fred M. Getty, RPR, Ret.          Email AkSteno@aol.com
                                  Fax 907.276-8016
```

Alaska Stenotype Reporters    1

**Page 2:**

```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF ALASKA

EEOC,
      Plaintiff,
and

SHOTSAY POSCIRI,
      Plaintiff-Intervenor,

vs.

UNITED FREIGHT &
TRANSPORT, INC.,
      Defendant.

Case No. A05-122 CV
```

            DEPOSITION OF JANICE MANSFIELD,
taken on behalf of the plaintiff, pursuant to notice, at
the law offices of Dorsey and Whitney, 1031 West Fourth,
Suite 600, Anchorage, Alaska, before Rosie S. Scott,
Certified Shorthand Reporter for Alaska Stenotype
Reporters and Notary Public for the State of Alaska.

Exhibit E
Page 1 of 10

2

**Page 3:**

```
               A-P-P-E-A-R-A-N-C-E-S

For EEOC:          U.S. EQUAL EMPLOYMENT OPPORTUNITY
                   COMMISSION
                   By:  Teri L. Healy
                        Molly Kucuk
                   909 First Avenue
                   Suite 400
                   Seattle, WA 98104
                   (206) 220-6916


For Shotsay
Posciri:           LAW OFFICES OF KENNETH W. LEGACKI
                   By:  Kenneth W. Legacki
                   425 G Street
                   Suite 920
                   Anchorage, AK 99501
                   (907) 258-2422



For the Defendants: DORSEY & WHITNEY
                   By:  William J. Evans
                        Wendy Leukuma
                   1031 West Fourth Avenue
                   Suite 600
                   Anchorage, AK 99501
                   (907) 276-4557




Also present:      Shotsay Posciri
                   Frank Monfrey



Reported By:       Rosie S. Scott, Certified
                   Shorthand Reporter
```

3

**Page 4:**

```
                    I-N-D-E-X


EXAMINATION BY:                                PAGE

   Ms. Kucuk                                     5

   Mr. Legacki                                  75

   Further by Ms. Kucuk                        112

   Further by Mr. Legacki                      114




EXHIBITS:

Exhibit 28, List of United Freight Female Drivers   65
Exhibit 29, List of People Dispatched to United
            Freight not hired                       69
Exhibit 30, UFT-1716 Document Packet                74
Exhibit 31, Gary Dixon Employment Application       82
Exhibit 32, Dan Tullis Employment Application       82
Exhibit 33, Dan Tullis Interview Checklist          86
Exhibit 34, Craig Merrick Interview Checklist      103
Exhibit 35, Perry Lemons Interview Checklist       106
```

4

**Page 13**

1  particular?
2  A.  No.
3  Q.  Or about Dan in particular?
4  A.  No.
5  Q.  Dan Tullis is who I'm speaking of?
6  A.  No, just the basic fact that Dan was according
7  to Mr. Smith, was a better driver, and that's why he
8  chose him over Shotsay.
9  Q.  And have you had any personal conversations
10 with members of the union that are not United Freight?
11 A.  No, I have not.
12 Q.  Can you explain your work history with United
13 Freight?
14 A.  I worked from May 1995 until November of 1998.
15 I left to take another position, and came back in
16 November of 2002.
17 Q.  And you're still employed with United Freight?
18 A.  Yes, I am.
19 Q.  And what position or positions did you hold
20 with United Freight between May of 1995 and November of
21 1998?
22 A.  I was office manager.
23 Q.  And do you still hold that position today?
24 A.  Yes, I do.
25 Q.  Have you held any other position within United

**Page 14**

1  Freight?
2  A.  No, I have not.
3  Q.  And can you explain your duties as an office
4  manager?
5  A.  I do all the accounting. I do some of the
6  billing. I hire the office personnel and hire drivers.
7  I do financials from accounts receivable on up to
8  financial statements, cash flow projections, oversee the
9  office when Mr. Monfrey is not in the office.
10 Q.  So quite a few responsibilities?
11 A.  Yes.
12 Q.  Is Mr. Monfrey frequently gone?
13 A.  No.
14 Q.  So you don't frequently have the opportunity to
15 oversee the office?
16 A.  No.
17 Q.  You mentioned that you hire both office
18 personnel and drivers?
19 A.  Correct.
20 Q.  Can you explain that?
21 A.  Office personnel we recently hired a part-time
22 person, so I hired her. Drivers we go through the
23 process with the union hall, and I go through the entire
24 process, and hire or not hire that particular person.
25 Q.  So can you take me sort of step-by-step on the

**Page 15**

1  hiring process for the drivers?
2  A.  Yes. It starts out with the call to the union
3  hall telling them how many drivers we hope to hire at
4  that particular time. The union hall sends potential
5  employees. I start out with a basic interview to get
6  their background. And if I'm satisfied with that, then I
7  have an interview checksheet that I fill out based on
8  what they tell me. I review their driver's record.
9      If everything is satisfactory, then I send them
10 on a road test with one of our drivers.
11     After -- at that point, after the road test
12 driver comes back I have the potential hiree in a
13 different location. And I confer with the road test
14 driver to see his opinion as to whether he felt there
15 would be a potential there for a good driver for United
16 Freight. Based upon that I either take it further and
17 give that person the rest of the paperwork, or tell them
18 that we won't be hiring them at this time and send them
19 back to the hall.
20 Q.  You mentioned that your first step is to call
21 the union and to request people -- request that they send
22 some drivers over?
23 A.  Right. That's not necessarily me, but someone
24 from the company calls.
25 Q.  Is it ever you?

**Page 16**

1  A.  Yes, it has been in the past.
2  Q.  And who else would it be?
3  A.  Mr. Adams, our dispatcher used to call and that
4  was changed in late 2002 to early 2003 to where either
5  Frank Monfrey or myself calls.
6  Q.  So was it Dana Adams that you're speaking of?
7  A.  Yes.
8  Q.  Did you say Adams?
9  A.  Yes.
10 Q.  And is that Dana Adams?
11 A.  Yes.
12 Q.  So does he never call anymore?
13 A.  No, he does not.
14 Q.  So now it's only you or Mr. Monfrey?
15 A.  Correct.
16 Q.  And when did that change take place?
17 A.  It was late 2002 or early 2003 after this --
18 there were two instances that came up out of Shotsay's
19 interview, and that was one with our hiring practices and
20 one was the grievance for discrimination.
21 Q.  But you made the change in 2002?
22 A.  I believe so. I'm sorry 2003. I was incorrect
23 on that. It was late 2003. It was after Shotsay came
24 out for her interview.
25 Q.  So you made the change late 2003?

Exhibit E
Page 2 of 10

**Page 17**

1  A. Or late 2004. That was an error on my part.
2  Q. Okay. Thanks for clarifying that. And what
3  was the idea behind switching from Dana to the two of
4  you?
5  A. Mr. Killian felt that Mr. Monfrey should be
6  making the calls. And Mr. Monfrey gave me that authority
7  also, in case he is not in the office at the time.
8  Q. But at the time of Shotsay's tests, would it
9  have been Dana that called?
10 A. Yes, it was.
11 Q. And at that time, when you -- when Dana would
12 call the union to request drivers, would he request --
13 how many drivers would he request?
14 A. Normally, he would request based on whatever
15 Mr. Monfrey told him, normally one or two more than what
16 we anticipated hiring.
17 Q. And was that a problem for the union?
18 A. We weren't aware that it was.
19 Q. You weren't aware that it was then?
20 A. No.
21 Q. Are you aware that it is now?
22 A. Yes.
23 Q. When did you become aware that that was a
24 problem?
25 A. When they spoke to Mr. Monfrey after Shotsay

**Page 18**

1  and Dan Tullis was interviewed, saying that we were
2  requesting more drivers than we needed, and we should not
3  be doing that.
4  Q. And the union had not brought that up before?
5  A. Not to my knowledge.
6  Q. Okay. So in the basic interview, is that the
7  interview checklist?
8  A. Yes, it is.
9  Q. And that's the basis of the driver's
10 experience?
11 A. Correct.
12 Q. And based on that you decide if they are
13 qualified to go ahead and continue on with the driver's
14 test?
15 A. Yes.
16 Q. Does anybody else review the -- any of the
17 information that the drivers come with?
18 A. No.
19 Q. You're the one that makes the decision?
20 A. Yes.
21 Q. What do you rely upon when you either give the
22 driver a job or do not?
23 A. The first top priority is whether they have the
24 Class A CDL with Haz Mat endorsement. They have to have
25 a current ICC medical card. And they have to have a

**Page 19**

1  clean driving record. If they don't have those three
2  things, it doesn't go any further. After that it's based
3  on the number of years experience. We request at least
4  three. We prefer five years of tractor driving
5  experience. And then after that it's based upon if they
6  have port experience and hostler experience and how well
7  they know the Anchorage area.
8  Q. Do you rely heavily on the road test?
9  A. Absolutely.
10 Q. Has there ever been a time when you disagreed
11 with the recommendation of the person administering the
12 test?
13 A. No.
14 Q. Do you ask them for a recommendation?
15 A. Yes, every single time.
16 Q. Every single time. Do they tell you -- what
17 would they tell you?
18 A. A lot of them will say satisfactory plus. For
19 instance, I can remember he was a great driver. He had a
20 big problem backing up. That's a big part of our
21 business, so that wasn't a very good thing to not be able
22 to do.
23    If they tell me they feel they have good
24 customer service, possibly. Every driver is different,
25 so I'm just trying to get some of the highlights.

**Page 20**

1     Hooking and unhooking the trailers, if they are
2  taking it apart, confidence doing that. Being able to
3  get around the port, particularly. If they have not had
4  any port experience. If they seem to have a handle on
5  how it works, and the basic Anchorage knowledge of the
6  area.
7  Q. So when the -- after the drive test and you
8  speak with the person who had administered the test, you
9  mentioned that you either give them the rest of the
10 paperwork or you send them away?
11 A. Correct.
12 Q. What is the rest of the paperwork?
13 A. When we do the initial interview, it's normally
14 just a three-year employment history. If it goes further
15 than that, then there's a full 10-year employment history
16 that we have to have including in the union time when
17 they were not working.
18    There's -- we have to send out three drug test
19 information sheets based on the previous employers, as
20 well as all employers for the past three years, driving
21 experience. So they have to fill out their name and
22 their approval to do that.
23    At that point, I believe -- let's see. At that
24 point, I believe that's all they're given.
25    I then send them on a drug test and give them a



Exhibit E
Page 3 of 10

**Page 29**

1  A.  Correct.
2  Q.  And he went with that?
3  A.  Correct.
4  Q.  Was there ever a time he didn't go with your
5  decision?
6  A.  No.
7  Q.  At United Freight, have you ever hired a female
8  driver?
9  A.  We called one back that had previously worked
10 and was laid off.
11 Q.  And who was that?
12 A.  Her name was Pamela Gabbert.
13 Q.  And when was that?
14 A.  She initially started just before I did in May
15 of 1995.  She was laid off in July of '95.  And then we
16 brought her back in either October or November of '96.
17 Q.  And how long did she stay?
18 A.  I believe it was approximately 10 months.
19 Q.  10 months?
20 A.  Uh-huh.
21 Q.  And why did she leave?
22 A.  She resigned.
23 Q.  Other than Ms. Gabbert, have you hired a female
24 driver?
25 A.  I have not hired a female driver, no.

**Page 30**

1  Q.  On the day that Shotsay and Dan Tullis took
2  their driving test, how many positions were open?
3  A.  It was uncertain at that time.  There were a
4  lot of variables.
5  Q.  What were the variables?
6  A.  We had one driver that was on suspension
7  because he had received a DWI in his personal vehicle.
8  We had another driver who had health issues and we were
9  not sure that he was going to be insurable, so that was a
10 potential reservation there.
11     We had another driver that was considering
12 leaving us to go to a position on the North Slope.  And
13 none of those were certain at that time.
14 Q.  When did you become certain about what would
15 happen to those three?
16 A.  Between October and December of that year.
17 Q.  Of 2003?
18 A.  Correct.
19 Q.  And who was the person who was -- who was the
20 driver who was on suspension?
21 A.  Eric Kjelland.  His last name is spelled
22 K-J-E-L-L-A-N-D.
23 Q.  And what eventually happened with Eric?
24 A.  He was terminated.
25 Q.  And the person with the health issues, was that

**Page 31**

1  Bill Smith?
2  A.  Yes, it was.
3  Q.  And he eventually was not able to work?
4  A.  Correct.
5  Q.  And the person who wanted to leave, who was
6  that?
7  A.  Tom Galloway.
8  Q.  And what happened with him?
9  A.  He did resign.
10 Q.  Do you remember when Eric was terminated?
11 A.  I believe it was officially December, but he
12 had been on suspension since -- no, that might not be
13 right.  It was sometime between October and December that
14 he had been on suspension the whole time.
15 Q.  So did you have -- was his space open so you
16 needed to fill his space while he was on suspension?
17 A.  We couldn't fill it until we knew the outcome
18 of whether he would be terminated or not.
19 Q.  So you were just short a driver during that
20 time?
21 A.  Correct.
22 Q.  And do you remember when Bill Smith left?
23 A.  I believe it was October.
24 Q.  And Tom?
25 A.  It may have been November.  I'm not sure of the

**Page 32**

1  exact date.
2  Q.  So can you sort of take me through the process
3  of how you determined when and how many potential drivers
4  you requested from the union on the day that Shotsay and
5  Dan did their driver's test?
6  A.  I did not request any drivers at the time, that
7  was Mr. Adams.  And that was based upon however many
8  Mr. Monfrey told him to.
9  Q.  So in the morning when Shotsay arrived, do you
10 remember what time she arrived approximately?
11 A.  I believe it was before 9:00.
12 Q.  And did you see Shotsay when she arrived?
13 A.  Yes, I did.
14 Q.  And did you speak with her?
15 A.  Yes, I did.
16 Q.  And when she arrived, how many spots did you
17 think were open?
18 A.  We weren't sure.  There were too many things
19 that I just told.  We didn't know for sure.
20 Q.  So were you sure at any time during that day?
21 A.  No.
22 Q.  It wasn't until later?
23 A.  Correct.
24 Q.  Okay.  Did any of those issues -- these issues
25 with Eric, with Bill Smith, or with Tom Galloway, did any


Exhibit E
Page 4 of 10

**Page 33**

```
 1  of those arise that day?
 2     A.  No.
 3     Q.  When did those issues arise?
 4     A.  I don't recall.
 5     Q.  Prior to?
 6     A.  Yes.
 7     Q.  Prior to the day that they came in to do their
 8  tests?
 9     A.  Yes.
10     Q.  And had United Freight hired another driver?
11     A.  Yes, we did.
12     Q.  And who was that?
13     A.  Gary Dixon.
14     Q.  And do you remember when Gary was hired?
15     A.  The previous week -- late in the week.
16     Q.  And who makes the decision when -- who makes
17  the decision to hire people, when you decide how many
18  positions you have open, when you should start calling
19  the union to ask for more people?
20     A.  Mr. Monfrey does.
21     Q.  Do you have any involvement in that?
22     A.  Not as a real -- he normally talks to either
23  Dennis Smith our lead driver, or John Schneider our shop
24  steward.
25     Q.  So he doesn't discuss it with you necessarily?
```

**Page 34**

```
 1     A.  No.
 2     Q.  Did he discuss it with you during this
 3  situation?
 4     A.  We had discussed the variables of the unknown.
 5     Q.  Did you ever, at any point, discuss the fact
 6  that today we know we need one driver, or today we know
 7  we need two?
 8     A.  Yes.  For instance, Gary Dixon was hired
 9  because we had a driver retiring.
10     Q.  Somebody separate from these three people we've
11  discussed who had retired?
12     A.  His name is Art Almon, A-L-M-O-N.
13     Q.  So when Gary Dixon was sent out, you were --
14  United Freight was sure that you needed one position?
15     A.  Correct.
16     Q.  What information do you specifically provide to
17  the person who is administering the drive test?
18     A.  I don't.  I give them the forms and they
19  already know what we're looking for, and they have the
20  checklist to check off, so I don't give them specific
21  instructions.
22     Q.  So you're not the person to tell them to go out
23  and do the driving test?
24     A.  I tell them to, yes.  I give them the form and
25  say this is -- I introduce them to prospective employee.
```

**Page 35**

```
 1     Q.  Are you the person who calls the person who
 2  will administer the test and say, we need somebody to do
 3  a test.  Can you come out and do it?
 4     A.  No, our dispatcher does that.
 5     Q.  Dana?
 6     A.  Yes.
 7     Q.  So your job is just to hand them the checksheet
 8  and introduce them to the driver?
 9     A.  Correct.
10     Q.  And you don't discuss with the person who is
11  going to administer the test anything that had come up in
12  that checksheet?
13     A.  No, I don't.
14     Q.  And then they come to you in the post test?
15     A.  Correct.
16     Q.  And you have a conversation?
17     A.  Correct.
18     Q.  At the time that Bill Smith was administering
19  the test to Shotsay and to Dan, did he know -- did you
20  tell him, it's unclear how many positions we're going to
21  need?
22     A.  No.  That's not their -- they don't need to
23  know that.
24     Q.  Did he ever know that there was going to be a
25  choice between Shotsay or Dan?
```

**Page 36**

```
 1     A.  Not necessarily.  He knew that he was road
 2  testing a second driver when he took Mr. Tullis out, but
 3  he did not necessarily know we were hiring one or we were
 4  hiring two.
 5     Q.  So when Bill Smith returned from testing Dan,
 6  did you say -- who do you recommend?
 7     A.  Yes, I believe I did ask that because we were
 8  uncertain of how many drivers we were going to hire.
 9     Q.  So if you were uncertain how many you were
10  going to hire, why did you ask?
11     A.  Just to get his recommendation as to who he
12  would think would be a better driver for United Freight.
13     Q.  And what was Bill Smith's answer to you?
14     A.  That he felt Dan Tullis would be a better
15  driver for various reasons.
16     Q.  What were the various reasons?
17     A.  He felt that Mr. Tullis was more comfortable
18  in the truck.  He had more confidence and that he was
19  faster.
20     Q.  Did Mr. Smith tell you that Shotsay passed her
21  driver's test?
22     A.  Yes.
23     Q.  Did you have a discussion with Mr. Smith after
24  Shotsay's test, before Dan's test?
25     A.  No, I don't believe I did because I think he
```


Exhibit E
Page 5 of 10

**Page 37**

1 was -- I don't know. I don't remember.
2   Q. But you remember having the conversation
3 after --
4   A. After Mr. Tullis'.
5   Q. Would it have been normal for Bill Smith to
6 come in and talk with you directly after testing Shotsay?
7   A. Not if I had another driver waiting.
8   Q. Did he know in the morning that there was going
9 to be another driver waiting?
10  A. No, he did not.
11  Q. What might have happened then? If there was
12 another driver he didn't know it yet, you weren't ready
13 to have the conversation yet about Shotsay's test?
14  A. When he came back -- and I don't recall if Dan
15 Tullis was waiting there or not -- but I think he may
16 have been simply because I don't remember talking to him
17 specifically about Shotsay, only about both of them.
18  Q. So Bill would have walked in, and instead of
19 having the conversation with you, he would have seen
20 there was another person waiting for a test?
21  A. Right. I would have given him the paperwork
22 for the second road test and said, "This is Mr. Tullis.
23 Take him out on the road test."
24  Q. So when you spoke with Bill, after Dan's test,
25 he recommended Dan?

**Page 38**

1   A. Correct.
2   Q. Did he say that Shotsay had passed?
3   A. Yes.
4   Q. Did he recommend her for hire?
5   A. He said she was a good driver. He didn't
6 recommend or not recommend.
7   Q. Just when asked to compare them he chose Dan?
8   A. Correct.
9   Q. So he didn't make any statement of, you know,
10 we should not hire her?
11  A. No, absolutely not.
12  Q. And the things he brought up that separated Dan
13 from Shotsay were comfort, confidence, and driving
14 faster?
15  A. Yes.
16  Q. Was there anything else that you can remember?
17  A. No.
18  Q. And what did you do after you had that
19 conversation with Bill Smith?
20  A. Reviewed their paperwork. I believe I told
21 both of them that I would be getting back to them later
22 and reviewed their paperwork. And based on Bill's
23 recommendation, and the applicable experience, I went
24 with Mr. Smith's recommendation that Mr. Tullis be hired.
25  Q. The paperwork that you're talking about

**Page 39**

1 reviewing, was that paperwork that they completed after
2 their tests?
3   A. It's just the interview checksheet and the
4 application. And I don't know if they filled it out
5 before the road test or after.
6   Q. What is your normal practice?
7   A. It depends if I have a driver that gets back
8 right away to go on the road test, and we just do the
9 interview checksheet. If they have time to -- you know,
10 the driver is 20 minutes away, then I'll give them the
11 three-year application to work on while they're waiting.
12  Q. So you're not sure which paperwork you
13 reviewed?
14  A. No, I'm not.
15  Q. With Dan and Shotsay. When did you make a
16 decision?
17  A. I believe it was that afternoon.
18  Q. Did you speak with Mr. Monfrey before making
19 your decision?
20  A. No, I did not.
21  Q. Why did you believe you needed to make a
22 decision if you weren't necessarily sure how many spots
23 you had?
24  A. I don't recall at the time. I may have had the
25 impression that we were going to hire one. I honestly

**Page 40**

1 don't recall.
2   Q. Did you believe at that time that you would --
3 on that day when you were looking over their paperwork,
4 was it in your mind that you needed to hire somebody now,
5 or was the idea that you would be hiring one or two or
6 maybe even three people later?
7   A. I believe it was sometime in the near future.
8   Q. And after you made your decision, what did you
9 do?
10  A. Mr. Monfrey and I talked. And it was at that
11 time that he decided not to hire anybody that day or
12 probably that week.
13  Q. Why did he make that decision?
14  A. Because of Dan Tullis.
15  Q. What did you speak about when you spoke with
16 Mr. Monfrey?
17  A. I told him that we had had two drivers in that
18 day, and that this was their experience, and that this
19 was Mr. Smith's recommendation, which I agreed to.
20  Q. And was Mr. Monfrey also looking to hire just
21 one person who had won out in the hiring call?
22  A. I don't recall.
23  Q. But you do you recall saying, "I would
24 recommend Dan over Shotsay?"
25  A. If we were hiring one driver, yes.


Exhibit E
Page 6 of 10

**Page 41**

1  Q.  Was there a discussion about the fact that
2  Shotsay is a woman?
3  A.  No.
4  Q.  Was that unusual?
5  A.  No.
6  Q.  Do you have any women drivers that come?
7  A.  No.
8  Q.  So -- but nobody said, "Hey, it's interesting
9  we have a woman today?"
10  A.  No.  We just look at the qualifications.  We
11  don't care whether they're male or female.
12  Q.  So you spoke with Mr. Monfrey, and you
13  suggested -- you recommended Dan.  And then right in that
14  conversation Mr. Monfrey said, "We're not going to hire
15  anyone anyway?"
16  A.  I believe so.
17  Q.  And how did he tell you to proceed at that
18  point?
19  A.  I don't know if he -- I think he told me that
20  we would close the call until we found out what some
21  unknowns would be -- were going to be -- what the
22  outcomes were going to be.
23  Q.  And then what did you do after that?
24  A.  Went back to my work.
25  Q.  And what did you tell -- did you contact either

**Page 42**

1  Dan or Shotsay or Bill?
2  A.  I believe I called both of them and told them
3  that we were not hiring at that time -- or hiring either
4  one of them at that time.
5  Q.  Do you remember -- and these were phone calls,
6  right?
7  A.  Correct.
8  Q.  Do you remember what you specifically told
9  Shotsay on the telephone?
10  A.  Not specifically, but just that we were not
11  going to hire at that time.
12  Q.  Did you make it clear that you might be hiring
13  in the future, or did it sound more definite like, we're
14  not hiring you?
15  A.  I don't believe I made it definite sounding
16  either way.  It's just that at that time we were not
17  hiring anyway.
18  Q.  And did you give her any reason?
19  A.  No.
20  Q.  And what did you say to Dan?
21  A.  The same thing.
22  Q.  And at that point, was the open call at the
23  union closed?
24  A.  I don't know if it was done that day or that
25  afternoon, but it was right in that area.

**Page 43**

1  Q.  Did you make those telephone calls to Dan and
2  Shotsay the same day of the test?
3  A.  I don't believe so.  I think it was the day
4  after.
5  Q.  So the calls were probably the day after.  And
6  then the call -- the open call was closed either the day
7  after the test or perhaps the --
8  A.  The day after.
9  Q.  The day after that?
10  A.  Correct.
11  Q.  So at that point, you just went about your
12  business?
13  A.  Correct.
14  Q.  Thinking that there was going to be no hire?
15  A.  At that time, correct.
16  Q.  And did that ever change?
17  A.  Yes, it changed a couple of weeks later when we
18  called.  Mr. Monfrey wanted to find out if it was okay
19  with the union hall if we called Mr. Tullis to hire him.
20  Q.  And why would Mr. Monfrey need to call the
21  union hall to ask permission to do that?
22  A.  Because when normally, when a call is closed
23  that's it.  Either you have hired or you haven't hired.
24  So this was an unusual circumstance where we knew since
25  they might be there later, so we kind of put Dan on

**Page 44**

1  reserve to when the time was needed.
2  Q.  Who did you tell you put Dan on reserve?
3  A.  I don't know that I told anybody specifically.
4  It was just something that Frank and I had discussed that
5  Mr. Tullis would be a good candidate.
6  Q.  Did you discuss that the day of the driver's
7  tests?
8  A.  Possibly.  I don't recall.
9  Q.  But the call was closed and therefore, you knew
10  you would sort of be going around the rules that are
11  normally set out, and that's why Mr. Monfrey called?
12  A.  Correct.
13  Q.  And what did the union say?
14  A.  They say that was fine, that you go ahead and
15  hire Mr. Tullis.
16  Q.  And when did you hire Mr. Tullis, or did you?
17  A.  Yes, we did and it was mid October.
18  Q.  And did you consider hiring Shotsay when you
19  decided that you needed another driver?
20  A.  Not at that time.
21  Q.  And why not?
22  A.  Because a few days after we told the union hall
23  and Shotsay that we were not hiring her, they put
24  political pressure to hire her anyway, even though he did
25  not want to at that time.



Exhibit E
Page 7 of 10

**Page 45**

1  Q.  So the union was putting pressure on United
2  Freight to hire her?
3  A.  Correct.
4  Q.  And that was the reason that you didn't hire
5  her in mid October when you needed --
6  A.  He felt he was being pressured on hiring and he
7  was not in agreement with that.
8  Q.  So he didn't hire her?
9  A.  Correct.
10 Q.  Because of the pressure from the union?
11 A.  Correct.
12 Q.  Had the union filed a grievance?
13 A.  I believe the grievance was filed after
14 Mr. Tullis was hired.
15 Q.  But you and Mr. Monfrey were both aware that
16 there were problems brewing?
17 A.  Yes.
18 Q.  At the union?
19 A.  Yes.
20 Q.  After the driver's test and before Tullis was
21 hired?
22 A.  Yes.
23 Q.  Is it your opinion that you would have ever
24 considered hiring Shotsay again?
25 A.  There was no reason why we wouldn't have had

**Page 46**

1  she come out at time when she was better qualified than
2  other drivers that we talked to.
3  Q.  Do you know who at the union was putting
4  pressure on?
5  A.  I believe it was Mr. Killian.
6  Q.  And how was he putting pressure on?
7  A.  I believe it was a phone call to Mr. Monfrey
8  saying that she was a well-qualified driver, had lots of
9  experience, and that she was a friend of the system, and
10 that he would greatly appreciate her being hired.
11 Q.  She was a friend of the union?
12 A.  Of certain people in the union.
13 Q.  So it was all almost as if Killian was asking
14 for a personal favor?
15 A.  Correct.
16 Q.  So when you and Mr. Monfrey -- did Mr. Monfrey
17 discuss these calls with you that he received from
18 Mr. Killian?
19 A.  Briefly, yes.
20 Q.  And what was his opinion of it?
21 A.  He was very upset.  He didn't like being told
22 that he had to hire somebody.  And that was the
23 impression he was getting.
24 Q.  Was it Mr. Monfrey's opinion that Shotsay was
25 not qualified?

**Page 47**

1  A.  No.
2  Q.  Now, just to clarify, you mentioned that on the
3  day of the tests, you and Mr. Monfrey decided --
4  Mr. Monfrey decided not to hire anyone?
5  A.  Correct.
6  Q.  And the call was closed?
7  A.  Correct.
8  Q.  And was the call closed?  When the call was
9  closed, that meant it was closed for both Shotsay and
10 Dan?
11 A.  Correct.
12 Q.  But you were, in your mind, keeping it open for
13 Dan?
14 A.  Correct.
15 Q.  And why only one?
16 A.  Because we knew that Dan had the -- he had
17 worked for a competitor.  He had the port experience.  We
18 felt he would be a very good candidate.  Shotsay did not
19 have the hostling experience around Anchorage, and she
20 did not have the port experience.
21 Q.  Okay.  So your decision initially not to hire
22 her was based on comfort, confidence and Dan driving
23 faster?
24 A.  And the experience.
25 Q.  Okay.  And the experience?

**Page 48**

1  A.  Correct.  All those factors came into play.
2  Q.  I'm only asking because you didn't mention the
3  experience previously when I asked what factors you
4  relied on when you decided --
5  A.  I believe I did because I said we prefer that
6  the minimum three, and preferably five years
7  tractor/driving experience.
8  Q.  And how many years did Shotsay have?
9  A.  I believe it was twenty-five or in that area.
10 Q.  So she had the experience?
11 A.  She had the driving background.  She did not
12 have the experience applicable to our business.
13 Q.  And that would be port knowledge?
14 A.  The port knowledge and the Anchorage area
15 knowledge and the hostler.
16 Q.  She didn't have hostling knowledge?
17 A.  Not in Anchorage.  I believe it was in the
18 Lower 48 she had some, and I'm not sure how much.
19 Q.  But at that time -- on the day of the exam, you
20 still believed she was qualified for the position?
21 A.  She was qualified as far as driving, yes -- as,
22 as far as her driving experience.
23 Q.  And if there had been two positions open that
24 day, would she have been hired?
25 A.  Very good possibility.

```
 1  service.  I don't recall without looking more closely,
 2  but I know that normally, when it is not meeting
 3  expectations it's because they're not performing up to
 4  our expectations.
 5       I mean, we expect our drivers to be able to do
 6  a certain number of loads, which I don't know which
 7  number it goes by each day.
 8       Q.  There's quota basically?
 9       A.  I don't know that it's a quota, but it's what
10  we expect them to be able to do.
11       Q.  And you still work at United Freight, correct?
12       A.  Yes, I do.
13       Q.  And Mr. Monfrey talked about this case?
14       A.  Yes.
15       Q.  When is the last time you talked about it?
16       A.  This morning.
17       Q.  What time?
18       A.  Around 8 o'clock.
19       Q.  And what was discussed?
20       A.  He filled me in on some of the discussions
21  yesterday during the depositions.
22       Q.  So he told you what was said in the
23  depositions?
24       A.  Not word by word, but he gave me an overview of
25  it.
                    Alaska Stenotype Reporters         97
```

```
 1       Q.  And before that, when is the last time you
 2  talked?
 3       A.  Tuesday when we were here in this office.
 4       Q.  And that's when Bill Smith was here?  Was he in
 5  that meeting?
 6       A.  He was here for the first hour or so, and then
 7  he left and then it was Mr. Monfrey and myself and Wendy
 8  and Bill Evans.
 9       Q.  During the time period Mr. Smith was in the
10  meeting, can you tell me what was discussed?
11       A.  His road test of both Shotsay and Dan Tullis,
12  and what his opinion was, where they went, how long it
13  took, to the overview of what he felt about both drivers.
14       Q.  Anything else?
15       A.  Not that I recall.
16       Q.  And there was a meeting before with Mr. Smith.
17  I think it was like the week before you said.
18       A.  A week before.
19       Q.  Could you tell me about that meeting.
20       A.  That was just the initial interview with
21  Mr. Evans and Wendy to talk to Bill and find out his part
22  of this -- the road test and what he did.
23       Q.  Do you recall what else was said?
24       A.  Basically the same thing.  He just gave them an
25  overview.
                    Alaska Stenotype Reporters         98
```

```
 1       MR. LEGACKI:  Can we have five minutes, please?
 2  Off record.
 3       (Off record.)
 4  BY MR. LEGACKI:
 5       Q.  You -- do you have a specific recollection of
 6  Mr. Monfrey coming to you and telling you about that
 7  phone call?
 8       A.  Not specific, no.
 9       Q.  Did you discuss this recently with Mr. Monfrey
10  about this phone call?
11       A.  I'm sorry?
12       Q.  Did you recently discuss this thing with
13  Mr. Monfrey about the phone call?
14       A.  It's come up in some of the meetings with some
15  of the attorneys, but not specifically him and I.
16       Q.  So you specifically recall it was Mr. Killian
17  putting pressure on Mr. Monfrey?
18       A.  That's the best of my recollection, yes.
19       Q.  Didn't Mr. Monfrey say that Mr. Jones was going
20  to make it go away?
21       MR. EVANS:  Objection; lack of foundation,
22  facts not in evidence.
23  BY MR. LEGACKI:
24       Q.  Did Mr. Monfrey ever tell you that Mr. Jones
25  was going to make this grievance go away?
                    Alaska Stenotype Reporters         99
```

```
 1       A.  He didn't say he was going to make this go
 2  away.  I believe he said that he thought that there was
 3  no substance to it and that it would go away.
 4       Q.  There was no substance to it?
 5       A.  I'm not sure those were the exact words, but
 6  something to that effect.
 7       Q.  When did Mr. Monfrey tell you that?
 8       A.  I don't recall.
 9       Q.  Is that before or after the phone call from
10  Mr. Killian?
11       A.  I believe it was after because the grievance
12  wasn't filed until later.  And I assume that's what
13  you're referring to when you say, "this go away," you're
14  talking about the grievance that was filed with the
15  union.
16       Q.  Were you aware that the union wanted to make a
17  deal with Mr. Monfrey to have Shotsay hired?
18       A.  After Mr. Tullis was hired, yes.
19       Q.  Can you tell me about that?
20       A.  They wanted us to hire Shotsay, put her above
21  Mr. Tullis in seniority, give her no probation and give
22  her back pay.  I know of those things.
23       Q.  Why was that rejected?
24       A.  Because it's unfair.  We hired -- we did not
25  not hire Shotsay because she was a woman.  We did not
                    Alaska Stenotype Reporters        100
```



Exhibit E
Page 9 of 10

**Page 101**

1 hire her because she did not have the qualifications that
2 we were looking for.
3   Q.   We know you hire people when they don't have
4 the qualifications, right? We've already established
5 that, correct?
6   A.   When we have no other applicants available that
7 is correct.
8   Q.   Well, Mr. Dixon didn't have the qualifications?
9   A.   Mr. Dixon was a complete different case. He
10 was a personal friend of Mr. Monfrey's.
11   Q.   But we've already established that even though
12 somebody does not have the qualifications they can still
13 be an excellent employee, correct?
14   A.   Yes, that is true.
15   Q.   Do you know Perry Lemons?
16   A.   Yes, he's one of our current drivers.
17   Q.   And do you remember his experience?
18   A.   No.
19   Q.   How about Craig Merrick?
20   A.   He is -- he was hired and terminated.
21   Q.   Why was he hired?
22   A.   Why was he hired?
23   Q.   Yes.
24   A.   Because he was the best applicant when we were
25 looking for somebody at that time.

**Page 102**

1   Q.   Why would Craig Merrick be hired over Shotsay?
2   A.   Because Shotsay did not apply for that call.
3   Q.   Well, if the offer was made, would you have
4 hired Shotsay when she was qualified, if she wanted to be
5 hired?
6   A.   Under the union -- under union conditions
7 under -- with back pay and higher seniority and no
8 probation period, that's how they wanted us to hire
9 Shotsay.
10   Q.   But she had more experience than Mr. Merrick or
11 even Mr. Lemons, right?
12   A.   It wasn't a factor at that time because she did
13 not apply at that time.
14   Q.   Are you saying when Mr. Merrick applied that he
15 was the only one from the hall that applied for this job?
16   A.   I don't recall. I don't believe he was the
17 only one.
18   Q.   Who else? Do you know?
19   A.   No, I don't.
20   Q.   Did you put that on the list of your names on
21 who got hired and stuff like that?
22   A.   He was hired so, yes, he would have been on the
23 hire list.
24   Q.   Do you have that?
25   A.   I don't.

**Page 103**

1   Q.   And why was he terminated, by the way?
2   A.   I don't recall. You would have to look at the
3 file.
4   Q.   Now, Mr. Merrick only had three months
5 experience in Alaska; is that correct?
6   A.   I don't know without looking at it.
7       (Exhibit 34 marked.)
8 BY MR. LEGACKI:
9   Q.   Would you take a look at that for me, please.
10   A.   Okay.
11   Q.   What does this -- does he meet the requirements
12 that dispatch has requested?
13   A.   He meets the requirements. It's not as much as
14 we like, but what you don't seem to understand is that we
15 have to deal with who we get from the union hall. We
16 have to pick the best person that we feel is right for
17 the job at that time. It doesn't always work out.
18 Sometimes it works out and sometimes it doesn't.
19       In this case he had worked for Carlile for
20 three months, which does the local hostling. He had
21 worked in the port and he had hostling experience.
22   Q.   He worked in the port? Where did you see that?
23   A.   But not worked in port, but knew the port.
24   Q.   Near the port?
25   A.   No, he knew the Anchorage Port.

**Page 104**

1   Q.   He knew?
2   A.   Yes, it says, "Knowledge of Anchorage Port,
3 yes."
4   Q.   How did he -- Carlile doesn't go to the port,
5 does it?
6   A.   Yes, I believe.
7       THE WITNESS: Frank, doesn't Carlile go to the
8 port?
9 BY MR. LEGACKI:
10   Q.   I'm asking you if you know?
11   A.   I believe they do.
12   Q.   And he only worked there for two months?
13   A.   I have three months. And I don't know which
14 one is right. One place I've got two and one place I've
15 got three, so I'm not sure.
16   Q.   Well June and July, right?
17   A.   Yeah, June '03 to 8-03.
18   Q.   And he got fired from there?
19   A.   Yes, for not tying down loads, which we don't
20 have to tie down loads very often.
21   Q.   Okay. Here's a guy who's only been in
22 Anchorage for two months. It says he's only worked in
23 Anchorage two months?
24   A.   It appears to be, yes.
25   Q.   And Shotsay has been here for how many years?

Exhibit E
Page 10 of 10