# TAB F

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

EEOC,
    Plaintiff,

and

SHOTSAY POSCIRI,
    Plaintiff-Intervenor,

vs.

UNITED FREIGHT &
TRANSPORT, INC.,
    Defendant.
_____

Case No. A05-122 CV



HAND DELIVERED

JAN 0 ? 2006

DORSEY & WHITNEY L.L.P.
ANCHORAGE
at 4:30 P M

COPY

DEPOSITION OF FRANK MONFREY,

Pages 1-149, inclusive

Commencing at 9:44 a.m.

Friday, December 9, 2005

Anchorage, Alaska

Alaska Stenotype Reporters
511 West Ninth Avenue
Anchorage, AK 99501-3520
Serving Alaska Since 1953

Rick D. McWilliams, RPR, Ret.    Telephone 907.276.1680
Fred M. Getty, RPR, Ret.    Email AkSteno@aol.com
    Fax 907.276-8016

Page 1

## Page 2

1    IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF ALASKA
3    EEOC,
         Plaintiff,
4
     and
5
     SHOTSAY POSCIRI,
6        Plaintiff-Intervenor,
7    vs.
8    UNITED FREIGHT &
     TRANSPORT, INC.,
9        Defendant.
     _____
10   Case No. A05-122 CV
11
12
13
14
15        DEPOSITION OF FRANK MONFREY,
16   taken on behalf of the plaintiff, pursuant to notice, at
17   the law offices of Dorsey and Whitney, 1031 West Fourth,
18   Suite 600, Anchorage, Alaska, before Rosie S. Scott,
19   Certified Shorthand Reporter for Alaska Stenotype
20   Reporters and Notary Public for the State of Alaska.
21
22
23
24
25

## Page 3

1         A-P-P-E-A-R-A-N-C-E-S
2
3    For EEOC:    U.S. EQUAL EMPLOYMENT OPPORTUNITY
                  COMMISSION
4                 By: Teri L. Healy
                      Molly Kucuk
5                 909 First Avenue
                  Suite 400
6                 Seattle, WA 98104
                  (206) 220-6916
7
8    For Shotsay
     Posciri:     LAW OFFICES OF KENNETH W. LEGACKI
9                 By: Kenneth W. Legacki
                  425 G Street
10                Suite 920
11                Anchorage, AK 99501
                  (907) 258-2422
12
13   For the Defendants: DORSEY & WHITNEY
14                By: William J. Evans
                      Wendy Leukuma
15                1031 West Fourth Avenue
                  Suite 600
16                Anchorage, AK 99501
                  (907) 276-4557
17
18
19
20   Also present:    Shotsay Posciri
                      William McCormick
21
22
23
     Reported By:     Rosie S. Scott, Certified
24                    Shorthand Reporter
25

## Page 4

1                      I-N-D-E-X
2
3
     EXAMINATION BY:                          PAGE
4
5    Mr. Legacki                              5
6    Ms. Healy                                136
7
8
9
10   EXHIBITS:
11   Exhibit 36, Formal Letters Exchanged between Frank
12   Monfrey and the Union Regarding Shotsay Posciri    27
13   Exhibit 37, 11-26-03 Frank Monfrey Letter in
14   Response to Michael Jones                          52
15   Exhibit 38, UFT-01161 Document Notes of 02-10-04   82
16   Exhibit 39, 10-22-04 EEOC Interview of Frank
17   Monfrey                                            122
18   Exhibit 40, 12-8-04 Letter to Omar Verduzco        131
19   Exhibit 41, 12-28-04 Letter to Omar Verduzco       134
20   Exhibit 42, United Freight Financial Information   144
21   Exhibit 43, United Freight Financial Information   144
22
23
24
25

## Page 5

1    Anchorage, Alaska, Friday, December 9, 2005,
2            FRANK MONFREY,
3        called as a witness herein on behalf of the
4        plaintiff, having been duly sworn upon oath
5        by Rosie S. Scott, Notary Public, was
6        examined and testified as follows:
7                EXAMINATION
8    BY MR. LEGACKI:
9        Q.  Sir, would you please state your name for the
10   record and spell your last name for the record?
11       A.  Frank, F-R-A-N-K, M-O-N-F-R-E-Y.
12       Q.  And you've sat in through the last four or five
13   depositions, so I take it you know what we're doing here?
14       A.  I have a pretty good idea.
15       Q.  Have you ever been deposed before?
16       A.  No, sir.
17       Q.  Have you ever been sued before?
18       A.  No.
19       Q.  I'm dying to know -- Janice, yesterday, talked
20   about you got a phone call saying there was political
21   pressure to hire Shotsay. Could you tell me about that?
22       A.  I can tell you a little bit about it, Ken.
23   Very strange things happened in and about that time. For
24   20 years we had been in business there, never been
25   questioned about a hiring hall practices, or who we hire,

2 (Pages 2 to 5)

Alaska Stenotype Reporters  

### Page 6

1   or what we did, or who we rejected. But all of a sudden
2   I have two Teamster's representatives in my office, one
3   questioning my "hiring hall practices." I felt we
4   resolved that fairly easily. I asked him what he wanted
5   and he gave me a list and I said, okay. Now we have
6   something new. I told him I'd never seen a policy. He
7   said, "Well, it should have been this way all the time."
8   I asked, "Where is that at? I don't know anything about
9   that. We've been doing it this way for 20 years."
10          Anyway, we resolved that issue. But in the
11  process, they bring me a letter to point out how they
12  want me to hire Shotsay. And, you know, it probably --
13  the union, in my history, some 17, 18 years of contract,
14  has predominately done things along that nature where
15  they, you know, "strong arm" you into doing things for
16  them that -- you know, favors or whatever they are. And
17  it's a holdout from 25 years or 30 years ago when Jesse
18  Carr was running the state of Alaska and that's the way
19  it was, and that's fine. But this is, you know, the 21st
20  Century here and business isn't done that way anymore --
21  not around me anyhow.
22          Essentially, they said that Ms. Shotsay was a
23  friend of Mr. Kenny's newly elected secretary/treasurer,
24  that they needed me very badly to bring her on and they
25  gave me a letter that said we want you to do this and

### Page 7

1   you're going to do it and here's how you're going to do
2   it. You're going to give her her job back, her seniority
3   ahead of Mr. Tullis, you're going to give her backpay and
4   she'll be here with no probation. I said absolutely not.
5   And I refused to do it.
6       Q.  So it was not a phone call?
7       A.  It was in my office.
8       Q.  It was in your office.
9       A.  They came together. The first time in --
10  actually, in my history, ever that I had ever seen a
11  dispatcher come into my office with an issue. This was
12  just unheard of. That's business agent work. It's their
13  job to manage me and my contract and make sure things are
14  smooth between the two people.
15      Q.  So you're saying that Mr. Jones and Mr. Killian
16  came into your office and said because Ms. Posciri --
17  Shotsay here -- knew Mike Kenny and that you had to hire
18  her?
19      A.  Absolutely.
20      Q.  When was the election?
21      A.  Somewhere in that time frame. It had been big
22  stuff. It was a big deal. There was a whole new change
23  in guard there. It means absolutely nothing to me. I
24  don't deal with those people. As a matter of fact I've
25  seen Kenny one time in my life. You know, I saw Jerry

### Page 8

1   Hood twice in my life. That stuff doesn't mean anything
2   in my daily business, you know, none.
3       Q.  **Okay. So was that meeting in the office that**
4   **you had in November is when this conversation occurred?**
5       A.  I think so.
6       Q.  **Okay. Let's go -- can I get your background?**
7       A.  How far do you want to go?
8       Q.  **Let's go all the way. You mentioned --**
9       A.  I went to Catholic Military school for nine
10  years. I was raised in San Antonio, Texas. I graduated
11  with honors from college. I was an all American athlete
12  in college. I worked 17 -- almost 18 years in the
13  petroleum refining business. I resigned as a senior
14  level manager. I've got over 20 years in management
15  experience.
16          I've been trained, versed and rehearsed on all
17  issues of discrimination. I have no record of ever doing
18  that, no desire, no care.
19          I have been with this company as president for
20  five years. My owner that I work for wanted to retire.
21  I took a lighter load in my life. I didn't want to have
22  that big one at 45. And if I make it three more weeks
23  here until Christmas Day I'm going to have it made.
24  Okay? So that's my background.
25          Largely management, largely negotiations,

### Page 9

1   largely merger acquisitions, hiring. I've hired hundreds
2   of people. I've fired hundreds of people. I've had as
3   many as 150 women working under myself in various jobs.
4   Fantastic.
5       Q.  **So you're going to be 45 on Christmas?**
6       A.  Yes, sir, Christmas Day. I'm going to quit
7   smoking that day. It's going to be a good day for me.
8       Q.  **Do you want to take a bet on that one?**
9       A.  You know, I'm really -- I've got a three-year
10  old. I'm really serious about this.
11      Q.  **Okay.**
12      A.  Discrimination is not a part of my life, sir.
13  I'm going to tell you why. I have -- essentially was
14  raised with three sisters, a lovely mother who today,
15  turned 82-years old. I spoke with her this morning. I
16  have a lovely wife, six daughters and one son who's grown
17  and gone. Sensitivity training is in my life every
18  minute of every day, and I love those girls. And so
19  that's how I was raised.
20          I was also raised a very staunch Catholic
21  Italian. Italian men always respect, always respect
22  their mothers and their wives. That's how I was raised.
23  I want to put that to rest right now.
24      Q.  **So you were raised in San Antonio, Texas?**
25      A.  Yes, sir.

Page 10

1   Q. And where did you go to school?
2   A. Which school?
3   Q. College.
4   A. I went to Western Texas College out in West
5   Texas and I graduated from Howard Payne University.
6   Q. From what university?
7   A. Howard Payne University -- private university.
8   Q. And you said you were an athlete in college?
9   A. Golf. I was an all American golfer.
10  Q. Was that at Payne?
11  A. Both, junior college and senior college level.
12  Q. And then you went into the oil patch?
13  A. No.
14  Q. Refining business?
15  A. I went into the refining business. I moved to
16  Alaska in 1983 and subsequently went to work for Tesoro.
17  That's where I started. I started right down here on the
18  docks. My first job -- I applied for a marketing
19  position, but they said in order for -- what we want to
20  do with you is we want to put you down here in the
21  warehouse and get you familiar with the products you're
22  going to sell. I was a young kid. I was 23-years old.
23      So I was out there running the fuel truck down
24  at the dock, pumping fuel in the tugs at 2 o'clock in the
25  morning, lubrications, et cetera. I did that for 18

Page 11

1   years essentially moving different companies.
2       When I left, I left the refining position.
3   That's been a large part of my background.
4   Q. So what were your positions with Tesoro?
5   A. Tesoro I was a sales rep. I became the -- I
6   don't remember what we called it then. It was like -- we
7   had three plants that -- in Kenai and Fairbanks and
8   Anchorage that we sold lubricating products out of,
9   antifreeze, lube oils, those kind of things. I managed
10  all those plants, all those people. I was probably age
11  25, so I've been a manager since age 25.
12      I left there after almost four years to start
13  my own business. I built a company by the name of Alaska
14  Lube and Fuel right down here in the Port. I went to
15  work for Harbor Enterprises, Dale Lindsey. I'm sure you
16  know his name. We had a joint venture agreement there.
17  Inevitably we parted company and was -- that company was
18  bought by Petro Star, Arctic Circle Regional Corporation.
19  I spent 10 years with them.
20  Q. So you spent 10 years with Petro Star?
21  A. Yes. And in that process I was -- at first I
22  was the president of Alaska Lube and Fuel, and then I was
23  the president of Sourdough Fuel in Fairbanks for five
24  years. Then I was brought back to Anchorage and was made
25  vice-president of marketing. I ran all of those

Page 12

1   terminals -- all of our terminals in Washington, Alaska.
2   And then I was promoted to chief operating officer. And
3   that's when I left -- well, I did for several years and
4   then I left.
5   Q. And then you went over to --
6   A. Right here.
7   Q. United Freight?
8   A. Yeah.
9   Q. Okay. So you wanted to get out of the rat
10  race, that's why you went over to United Freight.
11  A. I was gone over three weeks a month flying all
12  over the country. I dealt with most every major airline
13  in the country that flew and landed in Anchorage. I sold
14  fuel. That was a big part of our business. I did
15  government contracting with the military for jet fuel, et
16  cetera. I mean, I was gone constantly, and that just
17  didn't work. I think I have been on an airplane four
18  times since then.
19  Q. Now, when you dealt with Mike Jones for this
20  particular grievance, would you consider it was a cozy
21  relationship with him. Where he said we're just going to
22  drop the thing; we're just going to go through with it?
23  A. No. I don't have -- first of all, I don't have
24  a relationship with Mike Jones. I barely know him. I
25  mean, what do you -- say that again. I'm telling you --

Page 13

1   I probably didn't answer your question. I'm telling you
2   I don't really know the man that well. We're not friends
3   or nothing. You said cozy relationship, that I don't --
4   Q. Regarding this grievance here, it sounded
5   like --
6   A. Well, first of all, I'm shocked. I mean, I
7   don't know none of this. I don't know anybody here. And
8   I have a grievance filed on me and someone to say that my
9   company -- okay, now I wasn't involved in the hiring
10  process, but I'm the president, so everything stops here.
11      My company discriminated against someone. That
12  doesn't happen on my watch. That will not happen on my
13  watch by anybody. Okay? So I'm shocked, you know. And
14  I think that -- I think that what was happening -- I
15  mean, this is only because, you know, we've spent all
16  this time reviewing this thing, that something --
17  something was occurring between Mike Killian and Mike
18  Jones. What it was I'm not real sure, and I don't really
19  care.
20      But all of a sudden, here's this discrimination
21  thing. And where did this come from? I don't know. I
22  have no idea where it came from. But, you know, he did
23  say he didn't feel that this was right. It was almost
24  like he was being pushed to do this from somebody. And
25  the first statement that was made is that I have -- I say

Page 14

1  "I", but you have to understand, my company -- has a
2  habit of not hiring woman.
3       I said, "Mike, you never send me any. I mean,
4  not only could I not find a woman truck driver, I can't
5  get a qualified one out of your hall. And you won't give
6  me the right to go out on the street." All my
7  competitors and my customers have that double standard --
8  not a double standard, but that double clause in the
9  contract where the first hire that they want to make
10 comes out of the hall. The second one they get the
11 option. They can go out on the street and find anybody
12 they want, and bring them in there and hire them. As
13 long as they either are, or sign up to be a Teamster
14 member. They won't give that to me. I don't why.
15      That gives me the flexibility to, you know, if
16 somebody comes to me or talks to me from one of my
17 customers like Pacific Alaska Fowarders, and say, hey,
18 how do you like the job over there, and I know he wants a
19 job, people think he's a good driver, or she's a good
20 driver, or whoever we're talking about, beautiful. I
21 want that person. I don't have options.
22      That contract binds everything I do in my life.
23 Everything. It's like having handcuffs on. Although I
24 will tell you, that in all of my years of working that --
25 and this has become somewhat of a philosophy -- that most

Page 15

1  corporations would be far better off to have a contract
2  like that to operate on than having all these gray
3  things -- I mean environments. There's no gray areas in
4  the contract. I like that. My people know what to do.
5  I know what to do. We know the boundaries, and we all
6  follow them.
7     Q.  And it's also good because you don't have to
8  worry about benefits too much because the union is taking
9  care of that?
10    A.  Yeah, it's all done.
11    Q.  They generally send qualified people over
12 there?
13    A.  Negotiating union contracts if very difficult.
14 But, you know, as times change, and we get -- now, it's
15 2006 coming up here pretty quick, finally we're starting
16 to see some little bitty changes in philosophies of how
17 they -- you know, allowing us to have some flexibility.
18      If I want to start a person at 6 o'clock in the
19 morning and, you know, and pay them straight eight hours
20 from there -- because that's what my public wants. My
21 customers are very demanding in this day and age.
22 They're not like they were 25 years ago, you know, you go
23 down to the Port and Horizon opened at 8:00 closed at
24 noon, opened back up at 1:00, and they would close at
25 5:00. If you want to come at 5:01, tough luck buddy.

Page 16

1  Today they've got to stay open. They've got to stay
2  open. The environment is changing a little bit,
3  thankfully.
4     Q.  Tesoro, did they have union drivers?
5     A.  No, Tesoro was all nonunion. We had union
6  drivers under Sourdough Fuel, which was one of my
7  subsidiary companies at Petro Star in Fairbanks. I had
8  24, I think.
9     Q.  Sourdough Fuel or Sourdough Trucking?
10    A.  No, sir, Sourdough Fuel.
11    Q.  Fuel?
12    A.  Yeah. It used to be there was two companies,
13 Sourdough Express and Sourdough Fuel and they spun off,
14 owned by one man. One family member took this one and
15 then they sold to Petro Star.
16    Q.  Will you agree with me that this whole thing
17 about Port experience is pretty much of a nonentity?
18    A.  No, sir, I wouldn't agree with that.
19    Q.  You wouldn't?
20    A.  No.
21    Q.  Why is that?
22    A.  Well, it's my experience that the absolute
23 congestion and paperwork nightmare that exists going in
24 and out of that Port on a daily basis for our company,
25 and for our people, and knowing that, and having some

Page 17

1  knowledge of it, even if it's small is a great thing.
2  It's a bonus to me, because what I will say to you is
3  that, very honestly, the vast majority of the people that
4  come to us don't have that experience. As a matter of
5  fact, the people that we get sent over from the hall, I
6  have more experience than they do in some cases, you
7  know. So what you got a CDL. I could care less.
8       That port thing does mean something to me. It
9  does mean something to me if I had somebody that worked
10 at one of my competitors, or worked for one of my
11 customers because they're in that same kind of thing.
12 You know, they do that same kind of thing.
13      The customer service thing, backing up to the
14 doors, being nice to the dock people, and all that kind
15 of stuff, it's a bonus is what I would say because not
16 everybody has it.
17    Q.  I guess I got confused there.
18    A.  Okay.
19    Q.  Port experience versus --
20    A.  Would you like to rephrase your question?
21    Q.  Port experience versus customers -- open up the
22 doors and stuff like that?
23    A.  Yeah.
24    Q.  So we're talking two different areas?
25    A.  No, we're not. I mean, it's all part of my --

Page 18

1  it's all part of the mechanism in which my company runs
2  by. Okay? All of that is important; being able to
3  cruise through the port, and cruise through the paperwork
4  and the gates, and cruise out to those customers, they're
5  all tied together, you know.
6        Yes, you're correct, it's not the size of the
7  Port of Tacoma, or the Port of LA -- and I've been to all
8  of them. Whatever. We don't live there. We live here.
9  Okay? And driving down there, that's easy. Driving here
10 is a nightmare. If you've got a truck coming up here
11 right now with this road and with this ice and the stuff
12 that we have here, very different work.
13       So what happens over there stays there. What
14 happens here to me is important. And I put value on that
15 if I can get it. It puts somebody right up there.
16    Q.  **The people who drive the trucks and actually do**
17 **the actual work, they -- do you agree with me, listening**
18 **to testimony, they all say there's really nothing to it**
19 **once you pick it up in a couple of shifts? It's routine?**
20    A.  Well, that may be true, and I'm not going to
21 refute that because I really don't know. I've never
22 physically done it. But we're not talking about that.
23 What we're specifically talking about is Candidate A,
24 Candidate B, and Candidate C, all fairly equal, all meet
25 most of the requirements, but this one has done it once

Page 19

1  before. That person has got an automatic -- went right
2  up to the top. That's how it works.
3     Q. **Even though they may not be a good enough**
4  **driver, or not as good --**
5     A.  Who cares. I don't care, Ken. I've got
6  120 days. That's why I don't get involved in the hiring.
7  If I actually cared and I was worried about it, I would
8  do the hiring myself. I'm certainly well qualified.
9        So if -- I just don't care. There's only two
10 things in that contract that I, as an employer have any
11 latitude. One is I can legally reject any employee I
12 want that is sent over -- or candidates that are sent
13 over to me -- A.
14       B, I can, for no reason, let that person go
15 within a 120-day probationary period. That's it. The
16 rest of it is handcuffs. That's what we do, A, B, C.
17       I shouldn't say handcuffs. It's a good thing.
18 I do believe that. It's black and white. There's
19 nothing else in there except those two little things for
20 me. So that's why I don't care. I don't care who comes
21 to work for me. I don't care where you came from, which
22 color it is, you know, male or female. I could care
23 less.
24       I just hope that they will -- you know, they
25 will do the job and make it. It's so important. It's so

Page 20

1  hard to make it. When somebody gets to that 120th day,
2  the next morning there's a big doughnut party down there,
3  all the employees gather around. It's a big thing. Made
4  the probation because most don't make it.
5        If you go down the road and you hit a truck I
6  don't care if it was your fault or not. Have a nice day.
7  It makes them think, and it makes them go very slow
8  through that process for 120 days and they learn the
9  whole thing.
10       I'm very lenient with giving -- when I say
11 latitude. The first 30 or 60 days, you know, I give you
12 time to get through. And it takes -- I've found, my
13 personal experience, I found that to learn the entire
14 system, it includes the port, and it includes the
15 customers, and it includes the paperwork. And it
16 includes our paperwork system.
17       A minimum of 45 days to get real comfortable as
18 well. At that time, now or thereafter, I'm going to
19 start looking at your production -- getting anything done
20 today, you know.
21    Q.  **In fact, that's how you negotiated the reduced**
22 **scale, right -- 85 percent for 120 days?**
23    A.  Precisely, precisely.
24    Q.  **Because there's a learning curve?**
25    A.  You bet there is. You bet there is. That's

Page 21

1  exactly why that's in there.
2        Now, I'm not the guru who did that. That
3  started some 20 years ago, but, yeah.
4     Q. **So when you have that contract, it's**
5  **anticipated that you're going to be hiring people who may**
6  **not have port experience, and it's going to take a couple**
7  **of shifts to understand how to work it?**
8     A.  Yeah, because like I said earlier, it's hard to
9  get qualified people, period, out of that hall.
10    Q.  **And we talked a little bit about -- you**
11 **mentioned about the ports in Los Angeles and Long Beach,**
12 **Seattle and Tacoma and so forth. There's really no**
13 **comparison between the size and the --**
14    A.  It's not about size.
15    Q.  **I'm sorry?**
16    A.  It's not about size. It's about conditions.
17       MR. EVANS: Let him finish his question before
18 you answer.
19       THE WITNESS: I'm sorry. I apologize.
20 BY MR. LEGACKI:
21    Q.  **But do you agree with me that as far as the**
22 **layout and so forth, that they're much more complex, and**
23 **much more confusing than the Anchorage Port?**
24    A.  Okay.
25    Q.  **Okay. And the difference between --**

## Page 22

1    MS. HEALY: Is that a "yes"?
2    THE WITNESS: I'm sorry. I apologize again.
3  Yes, it's a "yes".
4  BY MR. LEGACKI:
5    Q.  And so you state the big difference is that we
6  may have some inclement weather as compared to these
7  other docks?
8    A.  We certainly do have inclement weather compared
9  to those docks.
10   Q.  Okay. An expert or good experienced truck --
11 Alaska truck driver would help, right?
12   A.  Sure.
13   Q.  They would know how to drive in the inclement
14 weather?
15   A.  Presumably.
16   Q.  And you would want somebody who drives the
17 streets of Anchorage versus somebody who just drives the
18 highway, because driving the streets of Anchorage is
19 different than driving the highway, right?
20   A.  Of course it is, and also driving the streets
21 of Anchorage versus driving on dirt roads and ice roads
22 and stuff is far different. There's no traffic.
23   Q.  You agree traffic is less up here than some of
24 the big cities like, you know, Seattle and Long Beach and
25 the harbors and stuff like that?

## Page 23

1    A.  I don't agree because I don't really know. I
2  mean, I've never seen that activity on a day when there's
3  ships going in and out of there, so I can't answer the
4  question. I assume maybe, but...
5    Q.  Well, LA -- you've been to LA?
6    A.  Yeah, but not to the docks.
7    Q.  Have you been on the freeways in LA?
8    A.  I refuse to. I did it one time and I'll never
9  go back. There's nothing in LA for me.
10   Q.  How many times have you been to LA?
11   A.  Once. I never went back.
12   Q.  How many times have you been to Seattle?
13   A.  A million.
14   Q.  Have you ever seen trucks on the freeway in
15 Seattle?
16   A.  Yeah.
17   Q.  And the Seattle freeways are pretty
18 congested -- very congested?
19   A.  Uh-huh.
20   Q.  And you've got a big 40 to 50-foot trailer,
21 it's kind of difficult to drive under those conditions,
22 isn't it?
23   A.  Maybe, can be.
24   Q.  And the streets, you know, and the city itself,
25 Seattle, it's kind of congested as well, right?

## Page 24

1    A.  Yes, sir.
2    Q.  And Anchorage is not nearly as congested as
3  Seattle, correct?
4    A.  Well, I disagree with that. It's per capata.
5  It's a very close environment. We've grown outrageously
6  in the last five or six or seven years, and it's very
7  congested here for the size of our environment.
8    Q.  And you've driven in Seattle in rush hour
9  traffic?
10   A.  Yeah -- yes, sir.
11   Q.  And do you know how it's stop and go on most --
12 the entire daytime; is that correct?
13   A.  Uh-huh.
14   Q.  You have to say yes or no.
15   A.  Yes, sir. I'm sorry.
16   Q.  And Anchorage is not stop and go all the time,
17 is it?
18   A.  Not all day, no, but in rush hour it is.
19   Q.  All right. So will you agree with me that
20 since the Seattle area is pretty much congested all day
21 long -- stop and go traffic all day, that kind of
22 indicates it's more congested than Anchorage because it's
23 only congested maybe during rush hour?
24   A.  I really can't answer that. I mean, I don't
25 drive a truck. I don't know. I say, yes, it probably

## Page 25

1  is.
2    Q.  And so would you kind of agree with me that
3  after you're an Alaskan driver who's been driving in
4  inclement weather and has also the experience of driving
5  in congested traffic like in Seattle, Portland, Los
6  Angeles, and New Orleans and so forth, probably has got a
7  good feel of how to drive?
8    A.  I would imagine so.
9    Q.  You heard Killian the other day -- you sat
10 through his deposition, correct?
11   A.  I sure did.
12   Q.  Did you -- was he telling the truth?
13   A.  No, sir.
14   Q.  Could you tell me where he was not telling the
15 truth?
16   A.  No, sir, not without reading back everything
17 that he said.
18   Q.  Well, you just said he didn't tell the truth.
19 What do you remember that he didn't tell the truth on?
20   A.  Well, there's a few things. One in specific
21 would be this imaginative hiring hall procedures. Show
22 me them. What are they? I've never seen them.
23   Q.  Where else did you disagree with the testimony?
24   A.  I disagree strongly with his statement about
25 not trusting me and me being a liar, for a great reason.

Page 26

1  Number one -- well, there's just one reason --
2  Mike Killian doesn't know me. He's only seen me one time
3  in his life. He spoke to me the day he was in my office
4  with Mike Jones. The second time in his life he ever saw
5  me was right here. We didn't speak.
6       Q.  Where else do you disagree with him?
7       A.  Well, again, I disagree with all of his
8  comments that related to me personally, trying to trick
9  him by, you know, ordering more applicants than I have
10 jobs for. That's -- I mean, I may do that, and I do it
11 for a good reason. I'm not trying to trick anybody. If
12 I was trying to trick him I wouldn't tell him. So I
13 don't agree with that.
14      Beyond that I would have to see some other
15 things he said. But I was appalled. I'm sorry.
16      Q.  Appalled?
17      A.  With just his entire testimony. There is some
18 reason -- and this is part of my thing -- I mean, there's
19 some reason that after all the years we've been in
20 business, no dispatcher has ever come to my company. And
21 all of a sudden, he's there, and he's pressuring me, and
22 he's trying to change the world. And he's in there with
23 Mike Jones and I'm just dumbfounded. I don't know you,
24 and really, I don't owe you anything. I don't deal with
25 you. I deal with the business agent or the president of

Page 27

1  the union if necessary. Okay? So it's all just a
2  mystery to me.
3       Q.  Anything else you can recollect?
4       A.  No, sir.
5       Q.  Let's go through the grievance document first,
6  if we could.
7            MR. LEGACKI: Let's have this marked.
8            (Exhibit 36 marked.)
9            MR. EVANS: And that's repeating one of the
10 documents we already have in.
11           MR. LEGACKI: I'm sorry.
12           MR. EVANS: It's all right.
13           MR. LEGACKI: What I did here is I have the
14 correspondence between the union and Frank.
15           MS. HEALY: Why don't we just attach this as an
16 exhibit.
17           MR. EVANS: It's Exhibit 7. We can make it a
18 separate exhibit.
19           MS. HEALY: This one has several more pages.
20           MR. EVANS: Yeah, that's fine.
21           MR. LEGACKI: It's the correspondence.
22           THE WITNESS: Can I go to the bathroom?
23           MR. LEGACKI: Sure. Off record.
24           (Off record.)
25 BY MR. LEGACKI:

Page 28

1       Q.  So this is my understanding. This is the
2  formal letters that were exchanged back and forth
3  between the union and you regarding the grievance --
4  Shotsay's grievance; is that correct?
5       A.  It is, yes, sir.
6       Q.  The first one is dated October 2nd 2003?
7       A.  If you're asking for a confirmation, yes.
8       Q.  For the record, we have to go through that.
9       A.  I understand.
10      Q.  I mean, I may ask what appears to be a stupid
11 question, but we have to because a jury may be reading
12 this, so we have to explain it to somebody who may not
13 know what we're really talking about, although we all
14 know what we're talking about there. So that's why we
15 have to go through the elementary stuff.
16      So you got this letter on October 2nd, 2003.
17 And it states, "Dear Frank, please consider this a formal
18 notice of Step I grievance being filed by the Teamsters."
19 And this is signed by Mike Jones?
20      A.  Yes, it is.
21      Q.  Okay. And it says, "Shotsay was dispatched on
22 September 19, 2003 to fill the second of two driver
23 openings the company had requested be filled through the
24 union's hiring hall. The company, however, refused to
25 hire her;" is that correct? Is that what it says there?

Page 29

1       A.  That's what it says.
2       Q.  And then it goes onto, "Ms. Breaux -- that's
3  Shotsay's maiden name -- "work history is impeccable. It
4  includes experience driving tractor-trailers and pulling
5  freight. She has logged over 20,000 hours of driving
6  time over the last 10 years and has a clean driving
7  record. Her work history is extensive in comparison to
8  the three members who were recently dispatched to the
9  company. Her driving time exceeds that of both other
10 candidates referred." When you read that paragraph, what
11 did you think?
12      A.  Well, I didn't know what he was talking about.
13 I mean -- and I mean, I wouldn't say I didn't know what
14 he was talking about. I didn't know what he was
15 referring to here. You know, three other candidates and
16 she was better than them. I don't know what he's
17 referring to at that time.
18      Q.  And this is October 2nd, right? And Shotsay
19 was not hired on September 23rd, so this is about two
20 weeks later. Does this letter come out of the blue, I
21 take it?
22      A.  Say again.
23      Q.  Did this letter come out of the blue?
24      A.  Yeah, absolutely.
25      Q.  Did you have any idea what the issue was before

Page 30

1  you got this letter?
2     A.   No, no. Absolutely not.
3     Q.   When you got this, what did you do next?
4     A.   I can't remember. I don't know what I did.
5  I -- I don't know what I did.
6     Q.   Okay. Then it goes on, "There are currently
7  no female drivers in the employ of the company. Further,
8  the company has a history of not hiring female drivers.
9  In dispatching Ms. Breaux, the union furnished a
10 qualified worker to fill a company's position. The
11 company has a contractual obligation to select an
12 applicant on a nondiscriminatory basis." What was your
13 reaction to that paragraph?
14    A.   The first thing I did was talk to Janice
15 because I wasn't involved in this hire. I mean, by that
16 time, I may or may not have known that she was even
17 there. So it's -- you know, at this juncture of this
18 letter, it's all a mystery to me at this time.
19    Q.   And Mike Jones, "Would you please schedule a
20 meeting to resolve this issue." And did you call him up?
21    A.   Well, I'm sure I did, yeah. I'm sure I did. I
22 would have to. By law I've got to respond to this -- by
23 contract law.
24    Q.   Do you recall that conversation? What was
25 discussed?

Page 31

1     A.   No, sir, there's no way I can recall that.
2     Q.   Did you check Shotsay's record to see whether
3  or not he was telling the truth about all her experience?
4     A.   I may have.
5     Q.   You don't know?
6     A.   I probably did inevitably, because I would have
7  had to respond to this at some point in time.
8     Q.   Okay. And then you responded on the next page
9  here on 10-06-03?
10    A.   That's correct.
11    Q.   Okay. And you said, "Dear Mike, in response to
12 your formal notice of Step I grievance." And the next
13 paragraph, "The company disagrees with your position in
14 this matter. Due to uncertainties with two other drivers
15 of the company, the company made a decision to only hire
16 one driver. We had interviewed three individuals, prior
17 to Ms. Breaux being dispatched for an interview and
18 selected one of the candidates to fill the one position.
19 And for the reasons stated above we closed the call. At
20 that time, there were no other positions available."
21      So on 10-6, the call was closed then; is that
22 right?
23    A.   Yes, sir.
24    Q.   Okay. And what does that mean to you?
25    A.   Closed call?

Page 32

1     Q.   Yes.
2     A.   Closed. They won't send any more candidates
3  over to me. And I've either done whatever I was going to
4  do or made my selection. It's one of those two things.
5     Q.   You closed it? They don't close it, right?
6     A.   Our office has to close it, yes, sir.
7     Q.   Okay. And so you say -- and by October 3rd
8  you're closing the call because you've already got the
9  one person you want?
10    A.   That's correct.
11    Q.   Okay. Now, Mike testified about a telephone
12 call he had with you, where Shotsay came back and said --
13      MR. EVANS: Can you clarify which Mike you're
14 referring to?
15      MR. LEGACKI: I'm sorry. Mike Killian.
16 BY MR. LEGACKI:
17    Q.   He testified the other day that he called you
18 up, and we went through that list where you said the --
19 send me a third driver, a third candidate because we have
20 three positions open?
21    A.   When did he call me? Help me here.
22    Q.   Let's look at Exhibit Number 3, if we could. I
23 have that here.
24      Remember I asked Mike Killian about this and
25 this document. And this is the dispatch record from the

Page 33

1  union to United Freight, right?
2     A.   I guess so. I never see this stuff.
3     Q.   And I'm looking at this here, "number of people
4  to be dispatched, per Frank, on 9-22."
5     A.   Yeah, it says three.
6     Q.   First it was two, and then he said that he was
7  talking to you, and then he asked -- you asked him how
8  much Dana had said to send over. He said, two. You said
9  that, no, we're going to hire a third. Make it three.
10 Send three people over.
11    A.   I wouldn't have said we were going to hire
12 three at that time, but I would have said to send three.
13 I could imagine myself saying that, yes, sir.
14    Q.   There was a discussion about how many slots
15 you had open over there you -- how many positions?
16 You've got to reject them first before you --
17    A.   Well, that's his rule.
18    Q.   Okay. So -- but he says he asked you well, how
19 many positions you got open. And you said I got three
20 positions open.
21    A.   That's correct.
22    Q.   So you had three open slots, and that's why you
23 asked him to send a third person?
24    A.   That's correct.
25    Q.   And when did it close from three down to one?

### Page 34

1  A. It never did. It went from three to zero.
2  Where do you get three to one? I don't follow you.
3  Q. Well, the call asked for people. You had two
4  positions opening. And Gary Dixon got hired from one,
5  right? He was dispatched and got hired?
6  A. No, no, no. I have to look a little harder
7  here. What day is 9-22?
8  Q. Monday.
9  A. That call -- that's a different call. I mean,
10 this is not necessarily -- I mean, let me think this
11 through, because Gary Dixon was hired the week before.
12 We had three candidates come. We opened the call the
13 week before. We had three candidates show up. Two
14 had -- I don't think they would have made it out of the
15 yard, their experience was so poor, and Gary Dixon showed
16 up. And they hired him -- I hired him.
17       Then the call is still open, and I'm guessing
18 here that -- I'd be guessing, that Dana would have called
19 him and asked for more drivers at my request, of course,
20 but would ask for more drivers, so we said two. And then
21 when he called me because he was upset with me, I said
22 three. I want to hire three more people. So that's how
23 I got three on the 22nd.
24 Q. Right. The call was open on 9-18-03. All
25 right. And on the call, initially, there was two --

### Page 35

1  number of people to be dispatched was two because you had
2  two openings, right?
3  A. Okay.
4  Q. Okay. And you're right, on 9-18, two people
5  were sent out, Dana Gross and Ray Buckalew. Do you see
6  at the top there?
7  A. I guess. I trust you.
8  Q. Gross had no hazard endorsement and Buckalew
9  failed the driving test?
10 A. Okay.
11 Q. And then on 9-19 at 10:00 a.m., Gary Dixon goes
12 out there on that call, right?
13 A. Okay.
14 Q. And you know Gary. And you say, "Hey, Gary,
15 how are you doing?" And you hired Gary, right?
16 A. No. Actually -- well, yeah, I do know Gary,
17 but actually, he came in and did all his paperwork, his
18 test and everything. I saw him on the way out the door.
19 I said, what are you doing here? He said he had just
20 applied for -- did the driving test and stuff. I said
21 great and have a nice day.
22 Q. Well, did you say to hire him then?
23 A. Janice asked me if we were hiring. I said,
24 yeah, hire him. That's fine.
25 Q. Oh, you didn't say to hire this guy --

### Page 36

1  A. And then spring him in, no way. I wouldn't do
2  that for anybody.
3  Q. Okay. I'm confused here. I thought Janice
4  said she was ordered from you to hire him.
5  A. No, she didn't have orders from me to hire him.
6  He had already done his stuff. And she says to me, we
7  have a candidate here that looks pretty good. And -- but
8  I mean -- let me back up a minute.
9        I ran into him in the hallway not knowing he
10 was there.
11 Q. Okay.
12 A. But he had already done all his stuff. I
13 remember asking what are you doing here? And I thought
14 maybe he just came by to say hi or maybe he was looking
15 for work or whatever. People do that sometimes. He
16 said, "I just went through the process here. I'm trying
17 to fill that position for you." I said, "Okay. I
18 thought you lived in Fairbanks. That's the last time I
19 saw you was five or six years ago." He said no and I'm
20 here.
21       Anyway, when I talked to Janice later I said,
22 "You had this Gary Dixon in here. And she said, yeah, he
23 looks okay and stuff." And she said, "I think I want to
24 hire him." I said for her to hire him. I knew who he
25 was and that was fine. That was the end of it.

### Page 37

1  Q. Okay. Then the next call was Shotsay at 3 p.m.
2  but she didn't show up until the 22nd because it was so
3  late in the afternoon, which was on a Friday. Do you see
4  that?
5  A. I do.
6  Q. So that's the second slot. Shotsay was there
7  to fill the second slot, correct?
8  A. That's correct.
9  Q. And then -- but before 10 o'clock the next day
10 you have a phone conversation with Mike Killian?
11 A. Right.
12 Q. And you say --
13 A. Not on Saturday.
14 Q. I'm sorry, the next business day is Monday,
15 which would be 9-22?
16 A. Yeah, he called me early in the morning.
17 Q. And he said I'm sending over Shotsay?
18 A. No, he never talked names to me. He never
19 talked names to me.
20 Q. So he said he was sending over another person?
21 A. I think he said he was sending two people, but
22 that's not why he called me. I don't actually think he
23 said a damn thing to me about it. What I think he said
24 to me was he was mad because my dispatcher told him that
25 he wanted more candidates at my request.

Page 38

1  We filled the position. I thought I needed a
2  couple more people. And I'm sure I instructed Dana to
3  get some more people over here, you know. And then when
4  he called me -- like I said, this is the first time I
5  ever talked to this guy. He calls me and he's upset
6  about my practices and says, "well, are you going to hire
7  people or not?" I said, yeah and to send me three. I'm
8  still operating under my old way of doing things.
9  Q.  So if he had said -- well, you told him there
10 was actually three positions open?
11 A.  You bet.
12 Q.  That there was actually only one more position
13 open and you told him to send out more people because you
14 wanted to compare?
15 A.  Say that again. You got me that time.
16 Q.  Okay. How many positions were open at the
17 time, one or two?
18 A.  I don't know. I mean, there was -- we called
19 and had a vision of hiring two, but we had a tremendous
20 amount of confusion going on in our lives at that time --
21 very serious things. And we weren't sure how many
22 inevitably we would hire.
23 Q.  What do you mean by --
24 A.  I had potentially five individuals leaving my
25 company in a short period of time. That had never

Page 39

1  happened.
2  Q.  What was going on?
3  A.  Retirements, I had -- this has been testified
4  to before -- medical issues, drug testing issues. I had
5  another potential retirement, and then I had a guy who
6  wanted to quit me. This never happened before, and this
7  is going into my Christmas season. This is a -- all
8  intents and purposes, this is a catastrophe for me.
9  Okay? There's no question about that. I can't be
10 without five drivers, not this time of year. So there's
11 a lot of confusion at that time.
12 Q.  This is September, so you said you started
13 getting the Christmas goods and stuff like that? You
14 have to audibly say yes or no.
15 A.  Yes, yes, absolutely.
16 Q.  And so you said there was potentially five
17 openings?
18 A.  Yes. I mean, there could have been potentially
19 five openings. I mean, I was real sure -- well, I
20 shouldn't even say that. I was pretty sure there would
21 be three. And there had already been one because one
22 retired on the 30th. I knew that was happening.
23 Q.  And what were the other two?
24 A.  I'm sorry?
25 Q.  The other two positions? You said definitely

Page 40

1  three. You had three positions?
2  A.  Well, the -- again, like I said, I wasn't sure,
3  but things were leading in that direction. I was still
4  in the middle of investigation on Bill Smith's DOT issue
5  with his health and pace maker, and my insurance company,
6  and the DUI drug testing with this fellow name Eric.
7  Q.  Merck?
8  A.  Eric.
9  Q.  Oh, Eric. And that got cleared up or did Eric
10 get canned or what?
11 A.  Inevitably, but it didn't happen that day.
12 Q.  So was the purpose of asking these people was
13 because -- to see if they passed the test, and if these
14 other guys fell through, you could call them in; or were
15 you planning to hire them that time? Like on 9-22 were
16 you planning to hire three people?
17 A.  No. Mostly I think what we were doing was
18 seeing what was out there and getting prepared to do what
19 we were going to do. I mean, we did -- I would think
20 that we probably had intentions of hiring someone that
21 day, but as the day progressed for me, more confusion
22 entered into the workplace for me in reference to these
23 two very important issues, the DOT issue and the
24 insurance issue. And I wasn't getting timely information
25 back from the underwriter, which you know can be quite

Page 41

1  difficult at times. The DOT was sketchy. You know, I
2  think it was worded such that they -- I almost want to
3  say they suggest, or don't recommend that if you have
4  that, that you drive. Okay?
5  So know I've got a lot of issues on my hands.
6  Bill Smith is very emotional. He doesn't know what is
7  going to happen to him. I've got to get clarification
8  somewhere. So it didn't happen.
9  So I think inevitably what happened is the two
10 candidates came in and Janice did her job and called me
11 up and said that they think they found somebody there.
12 What are we going to do? I said we're going to do
13 nothing. Close the call, and that's where it ended.
14 Q.  So when you asked for the three people to come
15 on the 18th, or when the call was opened on the 18th --
16 A.  Right.
17 Q.  -- you thought you had three slots open?
18 A.  I thought I might.
19 Q.  And then -- and one of things was because you
20 didn't actually have three slots yet, because you were
21 waiting to hear from your underwriter and from the DOT,
22 correct?
23 A.  That's correct.
24 Q.  You did have one slot open already, though?
25 A.  Yes, because I had a retirement.

### Page 42

1  Q. That's the one Gary Dixon got hired for. Okay.
2  So you had one definite and two maybes?
3  A. That would be correct.
4  Q. And when did Bill Smith retire?
5  A. I don't know. I don't know the date. It was
6  later on.
7  Q. How much later, do you know?
8  A. I would be guessing to tell you the answer. A
9  month.
10 Q. Okay. So was there a deadline on that DOT
11 regulation?
12 A. No, there's no deadline.
13 Q. So how did it come about or where was it
14 decided that Bill couldn't drive for you anymore?
15 A. If I remember, Ken, I think we got what we
16 considered inevitably a fairly accurate assessment as to
17 what that meant.
18   We talked to our insurance company and they
19 talked to their underwriter on that subject as well,
20 because there's obviously a huge insurance liability.
21   Bill and I had talked personally and I think --
22 because it was a very emotional time for him. And Bill
23 was a star employee for me. And you take someone with
24 that many years and say, by the way, you're done. It was
25 hard. So we worked -- you know, we talked a lot together

### Page 43

1  about that subject. And he came to the conclusion -- I
2  mean, I vaguely remember him coming to me one morning and
3  saying, "You know, I talked to my wife and this really
4  might be the best thing for me. Forget about whether I
5  can or I can't. And I think it will do my health well to
6  leave," so we let him go.
7  Q. Do you recall when that conversation took
8  place?
9  A. No, sir, I don't. I'm going to suspect it took
10 place sometime in October maybe. I don't know. I'm sure
11 it was late September or October. It was the same time
12 frame.
13 Q. So Shotsay was sent on the 22nd and Dan Tullis
14 was sent out on the 22nd, but neither of them were hired
15 at that time?
16 A. No.
17 Q. And so then you closed the call?
18 A. That's right, that's right.
19 Q. Was there a subsequent conversation from Mike
20 Killian about why Shotsay was not hired right around that
21 time after you closed the call?
22 A. There might have been. I don't think that I'm
23 pulling here. I don't think that that necessarily was
24 the conversation we had as much as it was, why didn't I
25 hire anybody, you know, because he obviously was becoming

### Page 44

1  unhappy with me at this juncture.
2  Q. He thought you were manipulating their system?
3  A. I mean, you show me a man or a woman that can
4  manipulate the union hall, I want to meet them. I want
5  to meet them.
6  Q. When did you tell Mike, to the best of your
7  recollection, that you were probably going to hire Dan
8  but not right now; we're going to hire him later on?
9  A. It probably was shortly thereafter I had
10 learned from Janice that I had a potential candidate.
11   I passed that on to him. And I said, you know,
12 if we did hire, Janice tells me it will be this fellow
13 Dan." Again, I don't know who it is, you know. And
14 that's that.
15 Q. So you're saying -- well, when we do need to
16 hire in the future, we're going to hire this Dan, but
17 not --
18 A. We'd like to, yeah.
19 Q. We'd like to?
20 A. Yeah, we think we'd like to. But again --
21 Q. And was there a discussion about you confirmed
22 to Mike that you were not hiring Shotsay, but you were
23 going to hire Dan, correct?
24 A. I don't recall making that statement, not a
25 confirmation of any kind. I wouldn't have done that. I

### Page 45

1  don't think.
2  Q. What do you mean you would not have done that?
3  A. I don't think I would have said that. I might
4  have alluded to Janice's comment to me that this
5  candidate was better, you know, for whatever reason. And
6  I may have alluded that to them, but I don't know that I
7  would have said I'm going to definitely do this. I
8  didn't know how many people I was going to need. I still
9  didn't know where I was in terms of requirements.
10 Q. But what does that mean to you when you say
11 close the call?
12 A. Don't send me any more applicants.
13 Q. Okay. And so when they open the call that
14 means a whole new batch comes in?
15 A. Correct.
16 Q. And you knew that -- that a whole new batch of
17 people would be coming --
18 A. Right.
19 Q. -- the certain people that they sent
20 previously --
21 A. Could be because we don't -- we didn't reject
22 them and say that they can't come back. We said we're
23 not hiring them at this time. That by all means come
24 back.
25 Q. But you also know that Dan Tullis when the

### Page 46

    call opens up again, he may not be the one with the most
    seniority? It could be Harry, Joe or --
    A.   I could care less about seniority, Ken. It
    means nothing to me. And I'm going to tell you why.
    Mostly because that's information that I never know.
    That is not provided to me when a candidate comes over to
    see us. We're not provided with their seniority hiring
    hall date is what you're referring to in the union.
    That's not provided to us. Never has been, ever.
    Q.   Well, did you know that they sent over the most
    senior as far as time?
    A.   It doesn't matter. That most senior person
    could have been in there for six months. If that was the
    only person in the hall. So what does it really matter?
    That's my point. I don't have any knowledge of it. I
    don't care. I'm being very candid with you.
    Q.   I understand. But when they send somebody
    over, you may not be getting like Dan Tullis or anybody
    else. You're probably getting a whole new group.
    A.   Okay.
    Q.   Did you think you would be getting the same
    group that you had before?
    A.   I don't think at all, period. I'm not involved
    in it. I don't care. I made that pretty clear here I
    think that, you know, I say open a call, bring me -- you

### Page 47

    know, tell them we need five people, four people, six
    people. I'm done. That's all we do.
        They come in, they go through the process.
    Janice most always makes the decision. Like I said I've
    got this leeway. Next week if I see them spinning tires
    in the yard, tell the lead driver to tell them to have a
    nice day.
    Q.   So you discussed with the assessment -- on your
    10-6 letter, you disagreed with the October 2nd
    allegations, that the company has a history of not hiring
    female drivers and you were discriminating against
    Shotsay?
    A.   Well, I don't think that says that here, does
    it?
    Q.   When? I'm sorry. Exactly. You didn't
    respond -- deny that you were discriminatory in that
    letter, did you -- on your 10-6 letter?
    A.   Well, I disagreed with his position on that.
    It says that in Paragraph 2, sentence 1. That's my
    answer to it. I disagree with your position on this,
    period. That's pretty clear.
    Q.   Right. So you disagreed that you were
    discriminating?
    A.   Yes, sir.
    Q.   Let's go to the October 31st letter. It says

### Page 48

    from the Teamsters to you regarding your hiring Dan
    Tullis after the job call was closed. And they were
    saying that you violated the collective bargaining
    agreement by going around the call out, right?
    A.   That's what he's alleging here, yes.
    Q.   You laugh. You say that's what they're
    alleging.
    A.   This was written by Mike Jones. This was
    instigated by Mike Killian.
    Q.   How do you know that?
    A.   Because Mike Killian was in my office shortly
    thereafter telling me about how -- using words, like he
    used the other day about how I'm circumventing the hiring
    hall system. What does circumventing the hire hall mean?
    I'd like an answer to that. Going outside of it to bring
    in people? I would very much like an answer to that.
    Q.   So this October 31st letter is saying that the
    company recently hired Dan Tullis after close of job call
    on September 18, 2003, and prior to requesting a new job
    call on October 16th; is that right?
    A.   That's what it says.
    Q.   Okay. So did you have another job call on
    October 16th?
    A.   I don't know. From memory I don't know.
    Q.   It looks like you were trying to recollect.

### Page 49

    A.   I said I don't know, sorry.
    Q.   But you think Jones was misstating the facts
    here when he says that you hired Dan Tullis between the
    close of September 18th and the new job call on
    October 16th?
    A.   I don't know about those -- I mean, I know the
    September 18th date. I don't know the October 16th date.
    The only thing I know that he -- that is wrong here is
    that I violated this -- or whatever it says here -- I'm
    skipping back and forth here.
    Q.   Article V of the collective bargaining
    agreement?
    A.   Right. They gave me the permission to do that,
    so how, therefore, am I violating anything?
    Q.   Who gave the permission?
    A.   Mike Killian did. On the telephone I asked
    him, "Can I take someone that's been through my testing
    procedures and all that stuff and bring that individual
    without going through the call process, and bring him in
    and give him the opportunity." He said absolutely.
    Absolutely. That's the other thing that he lied about
    the other day, because he said that he never would do
    that. He did it twice.
    Q.   Twice. What was the other times?
    A.   We'll get to it later. You will. I'm sure.

### Page 50

1  You have a big stack of stuff over there. Mine is coming
2  by the way.
3       MS. HEALY: Yours is coming?
4       THE WITNESS: I'm just teasing. I knew that
5  would get you. Sorry about that.
6  BY MR. LEGACKI:
7     Q.  Then he goes, "Teamsters Local 959 views the
8  company's recent offer of employment to Dan Tullis as a
9  breach of the understanding expressed in your letter of
10 October 6, 2003." And that's the one we just read.
11      Did you ask about that? What was the breach of
12 the understanding in your letter?
13    A.  I don't know. I assume that we had decided
14 only to hire one driver, and that's what I told him in
15 this letter and we closed the call. That's the only
16 thing I can make out of that.
17    Q.  So were you hiring Dan outside the call
18 procedures?
19    A.  Well, I guess. Like I said, I don't know what
20 this date here of October 16th is. I mean, I don't know
21 if I had a call open -- if I opened a call and then
22 called and asked -- I mean, that kind of makes more sense
23 to me, but I had opened a call and then made the phone
24 call, and asked if I could pick him up, after being
25 reminded by Janice that he, you know, he had passed

### Page 51

1  everything, and he looked like a pretty good candidate.
2     Q.  Did you respond to this October 31st letter?
3     A.  Well, I'm sure I did.
4     Q.  In writing I should say.
5     A.  Yeah, I don't know. I don't know. I'm sure I
6  did because I would have had to. Well, maybe not. I
7  don't know. I better stop. I don't know.
8     Q.  And then next you had November 18, 2003.
9     A.  Right.
10    Q.  And this is an offer to settle with Shotsay; is
11 that correct?
12    A.  That's correct.
13    Q.  This one was written after there was -- a
14 meeting was held where this was discussed about bringing
15 her back, correct?
16    A.  Say that one more time, sir.
17    Q.  This is a writing of a settlement offer. I'm
18 putting in a settlement offer in writing, after a meeting
19 was held in your office to try to talk about bringing
20 Shotsay back?
21    A.  My memory of that suggests that that was
22 brought to that meeting. We didn't have a meeting and
23 then came back with the letter.
24    Q.  Okay. So this letter was brought to the
25 meeting and then was discussed?

### Page 52

1     A.  Yes, sir.
2     Q.  And this is after the second call on October
3  16th; is that correct?
4     A.  This letter? I'm thinking it says
5  November 18th.
6     Q.  Right. And then he had a call on October 16th
7  where you asked for two more drivers?
8     A.  I don't know. I mean, I don't know that.
9     Q.  And after November 18th, you wrote a letter to
10 Mike Jones on November 26th, correct?
11    A.  Probably.
12      (Exhibit 37 marked.)
13 BY MR. LEGACKI:
14    Q.  And that is Exhibit Number 37. So this is a
15 response to the November 18th letter that you received,
16 right?
17    A.  Yes, sir.
18    Q.  Okay. And it says, "I received your letter
19 dated November 18, 2003. And you received it in the mail
20 on November 20th of 2003. In that letter you propose
21 terms to resolve matters related to United Freight's
22 decision not to hire Ms. Shotsay Breaux. As you recall
23 we discussed the same proposal at a meeting on Friday,
24 November 14, 2003. And I told you at that time that
25 United Freight would not accept the proposal." And then

### Page 53

1  you also agree that the union does not have -- or you
2  state that the union does not have a valid grievance; is
3  that correct?
4     A.  Yes, sir.
5     Q.  And then it says, "To be clear, United Freight
6  rejects the union's offer to resolve this matter on the
7  terms you propose and rejects any suggestion that
8  Ms. Breaux or the union has a pending grievance to
9  resolve;" is that correct?
10    A.  Yes, sir.
11    Q.  Okay. And then you state, "I think it's
12 important to clearly set forth the facts and
13 circumstances of United Freight's contact with
14 Ms. Breaux." You said, "On or about September 18, 2003
15 we called the union hall to request a list of qualified
16 and available drivers as possible candidates to fill two
17 driver positions at the company." And is that right?
18    A.  Yes, sir.
19    Q.  But there was only one that was open, right,
20 because you had a retirement?
21    A.  Right.
22    Q.  So you didn't have two?
23    A.  Okay.
24    Q.  Okay. You only had one opening. You didn't
25 have two?

**Page 54**

1   A.  I had more openings, but I didn't fill them.
2   Q.  What do you mean you didn't fill them? You
3   only hired Gary Dixon, right?
4   A.  That's correct.
5   Q.  So you only had one position. You didn't have
6   any other positions to fill, correct?
7   A.  Ultimately, I had no positions to fill,
8   correct.
9   Q.  I'm sorry?
10  A.  Ultimately, I had no positions to fill.
11  Q.  What do you mean by that?
12  A.  I closed the call. I didn't hire anybody.
13  Q.  But when -- on September 18th, you state here,
14  two possible candidates to fill two driver positions at
15  the company. Were there two driver positions at the
16  company to fill, or were there only one?
17  A.  There might have been two.
18  Q.  Okay. I thought you said there was only one.
19  There was a possibility of others, but there was only one
20  because you had a retirement?
21  A.  That's what ultimately happened, is what I
22  said.
23  Q.  Okay. So I'm sorry, I may have misheard. I
24  thought you said that you definitely had one retirement
25  and that was when Gary Dixon was hired. So you

**Page 55**

1   definitely hired him and put him to work, right?
2   A.  That did happen, yes.
3   Q.  And then I thought you said you weren't sure
4   about the other positions. There was a state of flux
5   because you didn't know about what the insurance company
6   was going to do in one, you didn't know about Smith's
7   retirement, so you were trying to figure out -- you
8   didn't have anything concrete at that time?
9   A.  And I closed the call.
10  Q.  So you didn't have two driver positions to fill
11  at that time, did you?
12  A.  Ultimately.
13  Q.  At that time, on September 18th, did you have
14  two positions?
15  A.  On September 18th, I did.
16  Q.  What was the other position?
17  A.  There was another driving position available,
18  we thought, maybe two.
19  Q.  You thought? But I thought there was only one
20  with the retirement, the other one was maybe.
21  A.  There was more than one maybe.
22  Q.  I'm just reading this here. This was drafted
23  by the attorneys that you had at Bankston; is that
24  correct?
25  A.  Correct.

**Page 56**

1   Q.  And this is after they spoke to you and they
2   took notes and they ghost wrote this thing for you for
3   your signature?
4   A.  Correct.
5   Q.  And you -- I take it you read it before you
6   signed it, right?
7   A.  I did.
8   Q.  Okay. In response the union sent over --
9   okay -- five people. So when the five people were sent,
10  there were not two driver positions open, was there?
11  A.  I think I've already testified to that, that
12  there were more than one potential position available.
13  Q.  Oh, potential. But this says driver, so this a
14  misstatement because it doesn't say potential driver
15  positions?
16  A.  Okay.
17  Q.  Okay. In response the union sent five people.
18  "Each of the individuals were asked to complete our
19  standard employment application." It states, "I then
20  reviewed the applications and made a decision to give a
21  driving position to three applicants, including Shotsay."
22  That's not true, is it?
23  A.  No. "I" is in the context of us, the whole
24  company. I never do the review to hire. We've already
25  established that this letter is written because I'm the

**Page 57**

1   president of the company and ultimately, I am responsible
2   for everything. This is not written in the context to
3   suggest that I personally reviewed these things. "I" as
4   my company and my appropriate person reading those.
5   Q.  What was your degree in?
6   A.  My degree? I never told you.
7   Q.  I know. What was your degree in?
8   A.  Marketing and management.
9   Q.  So when you say "I" you mean it was actually
10  Janice who reviewed the applications and made a decision
11  to give the driving test to three applicants?
12  A.  Yes, sir.
13  Q.  So she makes the initial determination whether
14  or not they fit the requirements that the company sent to
15  the hiring hall?
16  A.  She does.
17  Q.  "The driving test was administered by one of
18  our most senior and experienced drivers, Bill Smith.
19  Following the driving test Mr. Smith reported back to
20  me." But Smith did not report back to you, did he?
21  A.  No, sir, Janice.
22  Q.  "That two of the applicants were good drivers,
23  but that Ms. Breaux was slow." Okay. And what -- then
24  you go on to say, "In my experience," and you have "my"
25  there. "A slow driver is one that hesitates or drives

Page 58

1  slowly because of a lack of experience." Is that -- now
2  when you say "my" in that sentence, are you talking about
3  you personally or the company?
4      A.  The company.
5      Q.  Okay. So in the company's experience a slow
6  driver is one that hesitates or drives slow because of a
7  lack of experience?
8      A.  That's right.
9      Q.  But if you look at the application, you see
10 that Shotsay has over a million miles, and you had a
11 letter dated October 3rd, saying that she had
12 20,000 hours in the last 10 years, so that indicates that
13 she had plenty of experience, correct?
14     A.  It does.
15     Q.  Okay. So that -- her experience, it's not a
16 true statement about Shotsay? She had a lot of
17 experience?
18         MR. EVANS: Objection to the characterization.
19 It doesn't say that's a statement about Shotsay.
20         MR. LEGACKI: I'm sorry?
21         MR. EVANS: Objection to your characterization.
22 He's not saying that's a statement about Shotsay.
23 BY MR. LEGACKI:
24     Q.  Well, he says, "A driver that hesitates lacks
25 experience". But that was not the case with Shotsay, was

Page 59

1  it? She had plenty of experience?
2      A.  On paper, yes.
3      Q.  And then you put, "I therefore understood
4  Mr. Smith's comment that Ms. Breaux was slow to indicate
5  that she did not display a level of experience and
6  confidence when operating the vehicle during the driving
7  test." You have again "I therefore understood." That's
8  not what Mr. Smith said, did he? He testified she was
9  just a little bit slower?
10     A.  Right. That's correct.
11     Q.  It didn't say that she lacked confidence, did
12 it?
13     A.  No, that's my words or whoever's words.
14     Q.  And he never said that she did not display a
15 level of experience and confidence when operating the
16 vehicle because he thought she had the experience to
17 drive the truck fine, didn't he?
18     A.  Correct.
19     Q.  So that's not a true statement there in that
20 letter, is it?
21     A.  No, not now it isn't.
22     Q.  I'm sorry?
23     A.  Not now.
24     Q.  And it wasn't then either, was it?
25     A.  I don't know how to answer that.

Page 60

1      Q.  Is there anywhere in this letter that states
2  that when I put I, I mean the company?
3      A.  Spells that out for you?
4      Q.  In the letter, does it spell it out when I say
5  I -- it's a generic for me representing the company?
6      A.  I would have to read the whole thing, but I
7  don't think it does.
8      Q.  And, in fact, it says, "Dear Michael." This is
9  a letter to Mike Jones, because you're saying, dear Mike,
10 so it's a personal letter from you to Mike; is that
11 correct?
12     A.  That's correct.
13     Q.  Page 2, "I later learned that Mr. Smith had
14 also talked to a former co-worker of Ms. Breaux who
15 concurred with this assessment of her driving." Do you
16 see that?
17     A.  I see that.
18     Q.  Now, when you say "I" there, are you referring
19 to the company, or are you referring to yourself?
20     A.  I'm referring to the company.
21     Q.  You say -- who in the company later learned
22 that Mr. Smith had also talked to a former co-worker?
23     A.  What are you asking me?
24     Q.  Which person in the company or what individual
25 later learned that Mr. Smith had also talked to a former

Page 61

1  co-worker of Ms. Breaux who concurred with the assessment
2  of her driving, that she was too slow?
3      A.  I don't know the answer to that.
4      Q.  So that's not a true statement though, is it?
5      A.  It is not.
6      Q.  And then you stated that after going through
7  the process, you only had one opening and you did not
8  hire either Ms. Breaux or Mr. Dan Tullis; is that
9  correct?
10     A.  Correct.
11     Q.  Now, I have a question here. Why is it that
12 you make the reference, we did not hire either Ms. Breaux
13 or the second male applicant. Why was the word "male"
14 put in there?
15     A.  I don't know. I don't know.
16     Q.  Is that because on October 2nd the issue was
17 raised that you were probably being discriminatory?
18     A.  More than likely.
19     Q.  And then we go on. "I then received your
20 letter of October 2nd 2003, indicating the union was
21 pursuing a grievance on behalf of Ms. Breaux and alleged
22 that United Freight had discriminated against her and had
23 a history of not hiring female drivers;" is that right?
24     A.  That's what it says.
25     Q.  So you knew on October 2nd, that there was an

### Page 62

1  issue raised that you were discriminating against a
2  woman; is that correct?
3      A.   Right, that's correct.
4      Q.   "I responded by a letter dated October 6th
5  2003, and denied the unfounded allegations." Is that
6  correct?
7      A.   Yeah.
8      Q.   And that's what that letter -- we talked about
9  that?
10     A.   Correct.
11     Q.   And you said that even though it doesn't
12 specifically state we didn't discriminate, you just
13 said --
14     A.   I denied it, correct.
15     Q.   Then we go down to the next paragraph.
16     A.   May I take a break?
17          MR. LEGACKI:  Absolutely.
18          (Break was had.)
19 BY MR. LEGACKI:
20     Q.   We're looking at Exhibit Number 37 and we're on
21 Page 2. In paragraph -- which is marked Number 4, "I
22 then received your letter October 2nd, indicating that
23 the union was pursuing a grievance on behalf of
24 Ms. Breaux and alleged that United Freight had
25 discriminated against her and had a history of not hiring

### Page 63

1  female drivers." And we just went through that, but you
2  remember getting that letter saying you were
3  discriminating. And you, on October 6th say, "no, we're
4  not discriminating against her"?
5      A.   That's correct.
6      Q.   The next paragraph, "Approximately three weeks
7  later I realized we needed a second driver after all.
8  Rather than going through the entire process, which we
9  had just completed, I asked my dispatcher, Dana Adams, to
10 call the hall and find out if our second choice,
11 Mr. Tullis was still available. And if so, whether it
12 would be acceptable for us to hire him without going
13 through a new call;" is that correct?
14     A.   Yes, sir.
15     Q.   Okay. And then it says, "We were informed that
16 the union hall had no objection to us make Mr. Tullis an
17 offer of employment under those circumstances." Now, you
18 put here in this letter, Dana Adams called. You didn't
19 talk to Mr. Killian, did you?
20     A.   Yes, I did afterwards, I believe, but Dana did
21 make the call.
22     Q.   "We were informed," now the company -- "we"
23 means the company, right?
24     A.   Yes, sir.
25     Q.   We were, not you individually, but we the

### Page 64

1  company, which means Mr. Adams, right?
2      A.   Yes, sir.
3      Q.   "Were informed that the union hall had no
4  objection to us making Mr. Tullis an offer of employment
5  under these circumstances;" is that right?
6      A.   Yes, sir.
7      Q.   Okay. On the basis of that statement, we made
8  Mr. Tullis an offer and he was hired on October 16th,
9  2003." So you don't say there anywhere that you talked
10 to Mr. Killian?
11     A.   No.
12     Q.   But now you say you have a recollection that
13 you talked to him?
14     A.   Well, it's difficult with so much time passed.
15 I do remember one thing, and that was I asked Dana to
16 make the call and ask the question. That much I know was
17 factual.
18     Q.   So Dana made the call?
19     A.   Yes, and he reported back to me that there was
20 no objections.
21     Q.   But he didn't say I talked to Killian. You
22 don't know who he talked to there, do you?
23     A.   No, he would have had to have talked to
24 Killian. He's the dispatcher. That's the only person he
25 could have asked that question to.

### Page 65

1      Q.   So when you said I talked to Killian -- when
2  you earlier said I talked to Killian, when you said "I",
3  do you mean the company or you personally talked to
4  Killian?
5      A.   The company.
6      Q.   I'm sorry?
7      A.   The company.
8      Q.   The company. Okay. You made an offer to hire
9  Mr. Tullis on October 16th. You had a letter from the
10 union claiming that you were discriminating against
11 Shotsay on October 2nd. Why didn't you ask for Shotsay?
12     A.   Janice's recommendation was to -- from back
13 then was that Mr. Tullis was the better candidate at that
14 time.
15     Q.   But you had a letter from the union talking
16 about her impeccable driving record, that had this 20,000
17 hours of experience in the last 10 years. She had her
18 own company. She had all these positive comments --
19 about Shotsay -- and actually indicated that she was the
20 better driver than Tullis?
21     A.   Those were their words.
22     Q.   And then you go on, "Needless to say, I was
23 shocked to receive your letter dated October 31st, which
24 alleged that United Freight violated the hiring call
25 provisions or the agreement by hiring Mr. Tullis, and

| Frank Monfrey | Deposition | December 9, 2005 |

Page 66

1  once again raised the issue regarding Ms. Breaux." And
2  then you have, "You and I discussed the matter on
3  November 5th, 2003, at which time I explained the
4  sequence of events set forth above which led to United
5  Freight's decision not to hire Ms. Breaux and to later
6  hire Mr. Tullis after the call had closed;" is that
7  correct?
8     A.  Yes, sir.
9     Q.  Okay.  So this discussion of November 5th, was
10 that in person or by phone?
11    A.  I can't remember that. I can't remember that.
12    Q.  You explain, "The sequence of events which lead
13 to United Freight's decision not to hire Ms. Breaux and
14 to later hire Mr. Tullis after the call had closed. At
15 that time you made an oral representation to me that the
16 union considered the Breaux matter closed and that you
17 would not be pursuing it." So on November 5th, you were
18 told that the grievance was going to be dropped?
19    A.  Yes, sir.
20    Q.  "I recall you saying the active issue was what
21 you termed a hiring hall issue," and United Freight's
22 pattern of not following normal hiring practices."
23        Now, could you tell me about that conversation,
24 please?  What do you mean by hiring hall issue?
25    A.  Will you repeat what you said before? I guess

Page 67

1  what you're reading --
2     Q.  I'm asking you to explain what you mean by that
3  sentence.
4     A.  "I recall you saying the active issue was what
5  you termed the hiring hall issue?"
6     Q.  Yes.
7     A.  Yes, that's exactly what he said.
8     Q.  Can you tell me what he said given the
9  substance of this?
10    A.  The union had an issue with my hiring hall
11 practices, essentially.
12    Q.  Of asking for more people to come out and pick
13 and choose them?
14    A.  Yes.
15    Q.  "I also described our call to the union hall
16 regarding Mr. Tullis and the unique circumstances of his
17 hire." Can you tell me about that one?
18    A.  Well, the unique circumstances refer back to
19 Paragraph 5, whereby our dispatcher requested him without
20 having an open call.
21    Q.  So it was a unique circumstance for him to get
22 hired the way he did?
23    A.  According to them. But then again I'd never
24 done it before either.
25    Q.  You say, "I also described our call to the --

Page 68

1  now, when you say "I" here, are you meaning you
2  individually, or the company?
3     A.  The company.
4     Q.  So was the company calling Mr. Jones?
5     A.  Mr. Killian.
6     Q.  I'm sorry?
7     A.  Mr. Killian is the dispatcher.
8     Q.  "I also described our call." I thought you
9  were having a conversation with Mr. Jones and you were
10 referring to, "I described our call to the union." You
11 described to Mr. Jones the call to the union; is that
12 right?
13    A.  Yes.
14    Q.  Okay. When you say "I" there, meaning you?
15    A.  I described it to Jones.
16    Q.  Right. "Our" is the company?
17    A.  Correct.
18    Q.  But "I" is you individually?
19    A.  Correct.
20    Q.  "I also described our call to the union hall
21 regarding Mr. Tullis and the unique circumstances of his
22 hire." So you're telling Mr. Jones -- describing to him
23 the unique circumstances of which the company hired
24 Mr. Tullis, correct?
25    A.  Correct.

Page 69

1     Q.  Can you tell me what those unique circumstances
2  are?
3     A.  Paragraph 5 where Dana Adams made a call to the
4  union dispatcher to ask if we would hire Mr. Tullis
5  because he had been through our system and was a
6  candidate, and that's what I'm referring to.
7     Q.  So if need be -- you went through the --
8  with -- outside the normal process to hire him, correct,
9  because you didn't go through a call?
10    A.  That's not true. There's no process. There's
11 no written process. It's unique -- it became unique at
12 this juncture, but there's no written process.
13    Q.  I guess I don't understand. What do you mean
14 by -- my understanding of what you're saying, unique
15 circumstances means that you went outside the call system
16 at the union hall, which you knew exists. You closed the
17 call, and this is before the call opened up again on the
18 16th, you hired Mr. Tullis?
19    A.  That's correct.
20    Q.  That's unique, isn't it?
21    A.  According to them that was unique. All I did
22 was pose a question, can I do it? The answer was yes.
23 They now say it's unique, so I am repeating that.
24    Q.  You're not saying -- you don't think it's
25 unique?

18 (Pages 66 to 69)

Alaska Stenotype Reporters

Exhibit  F
Page 18 of 38

Frank Monfrey                Deposition                December 9, 2005

### Page 70

1   A.  I'm just using his words.
2   Q.  And I understand you were able to confirm with
3   the dispatcher and you were given the go ahead to hire
4   him without an open call?
5   A.  Correct.
6   Q.  So it's a possible to hire somebody from the
7   union without an open call?
8   A.  Well, it was then. I can't answer that today,
9   if it is today. We were allowed to do it.
10  Q.  Okay. And then the next paragraph, "I told you
11  when we talked on November 5th, United Freight is willing
12  to continue a dialog with the union about the hiring
13  practices issue. I am also willing to review any new
14  hiring rules the union wants to propose." So it sounds
15  like you were amenable to talk and negotiate and get
16  things straightened out?
17  A.  Absolutely.
18  Q.  "However, the situation with Mr. Tullis was
19  unique and does not support your allegation that United
20  Freight has a pattern of abnormal hiring hall practices."
21  So the fact that you hired Tullis outside the call system
22  was unique, right?
23  A.  According to them, yes.
24  Q.  Not according to you? I thought you said the
25  situation with Mr. Tullis was unique. You're admitting

### Page 71

1   that it was unique.
2   A.  That's what it says in there, but those were
3   their words. I mean, they described it as unique. I
4   don't think it was unique. I made a call and asked a
5   question and got an answer.
6   Q.  But it's not unique to hire somebody outside
7   the call?
8   A.  I don't know. I can't answer that.
9   Q.  How many other times have you done it?
10  A.  I believe we did it again later on when we
11  finally made another call. We had some --
12  Q.  October 6th?
13  A.  Much later.
14  Q.  So it's not unusual to say, hey look, you know,
15  I want John Doe. You know, he tested before and he
16  passed and we have another opening, so would you send
17  John over. So it's not that unusual was it?
18  A.  It was to them I guess.
19  Q.  But it's not to you?
20  A.  No.
21  Q.  Did you have any problem doing that?
22  A.  Would I have any problem doing it?
23  Q.  Yes.
24  A.  Not if it was allowed.
25  Q.  Okay. And if it was allowed you would like to

### Page 72

1   do that because you don't have to waste time testing
2   somebody, right?
3   A.  If I've already done the testing, of course.
4   Q.  Similarly -- and this is on November 26th.
5   "The union's allegations regarding sexual discrimination
6   against Ms. Breaux are not supported by any evidence.
7   United Freight had a legitimate, non-discriminatory
8   reason for not offering her a driving position;" is that
9   correct?
10  A.  Yes, sir.
11  Q.  Now, I'm looking at -- now, looking at your
12  previous letter there, your November 26th letter, you
13  state there was a meeting on Friday November 14, 2003; is
14  that correct?
15  A.  That's what it says, yes, sir.
16  Q.  And at that meeting was Jones and Killian?
17  A.  I can't answer that. I'm not clear on the
18  dates.
19  Q.  I thought the dispatcher, Killian just came to
20  your office and you said this never happened to you
21  before?
22  A.  I did have a meeting with him and Jones. It
23  was the first time he had ever come to my office, yes.
24  I'm not positive about that date.
25  Q.  Is that the meeting that you were talking about

### Page 73

1   that's referenced there, on the meeting of November 14th?
2   A.  I don't know. I'm going to say, yes, as I read
3   further. I'm sorry. It's not clear to me.
4   Q.  And we had Mike here?
5       MR. EVANS:  Mike?
6   BY MR. LEGACKI:
7   Q.  Mike Killian's deposition. And, in fact, we
8   asked him to go through his contemporaneous notes.
9       MS. HEALY:  It's in the second half of
10  Exhibit 6.
11  BY MR. LEGACKI:
12  Q.  Exhibit Number 6 that's attached to it, is
13  UFT-01440. And we talked about this with Mike. And he
14  made some notes on December 10, 2003, in response to your
15  letter there, we were just talking about. And he says
16  that there was a discussion about settling the Shotsay
17  grievance?
18      MR. EVANS:  Which exhibit is it?
19      MS. HEALY:  It's the second half of Exhibit 6.
20  Okay. Go ahead. Thank you.
21  BY MR. LEGACKI:
22  Q.  And he says that he recalled you stating, as
23  president of the company, it would not be an easy thing
24  to do to settle a grievance because you had to save face
25  with the company?

19 (Pages 70 to 73)

Alaska Stenotype Reporters       Exhibit F
                                 Page 19 of 38