Frank Monfrey                                    Deposition                                    December 9, 2005

Page 74

1   A.   Where are you reading that?
2   Q.   Para 1 is his rebuttal to your letter. And
3   it's down here. "I engaged in the discussion encouraging
4   settlement." This is what Mike Killian wrote in response
5   to your letter. "Frank did not tell us he would not
6   accept the proposal. Frank did not make any statements
7   regarding the validity of the grievance." He's
8   contradicting your letter.
9        And he goes on to say, "I engaged in the
10  discussion encouraging settlement. Further, I was under
11  the impression that he was strongly considering settling,
12  however, under lesser terms. Frank told us he would wait
13  for our written proposal (you intended to personally
14  deliver it that day) and would respond back to us the
15  following Monday. Frank expressed a personal concern in
16  that he would have to retract his current position on the
17  grievance and announce it among his employees, stating
18  that in his position as president running the company,
19  that would not be an easy thing to do."
20  A.   That's not true.
21  Q.   That's not true?
22  A.   No, sir.
23  Q.   Let's go back. At the meeting, did you make
24  any comments regarding the validity of the grievance on
25  that November 14th meeting?

Page 75

1   A.   I'm sure I did.
2   Q.   And what did you say?
3   A.   I can't recall.
4   Q.   Okay. And then -- but there was discussion of
5   settlement of Shotsay's grievance, correct?
6   A.   It was brought to my attention, yes.
7   Q.   I'm sorry?
8   A.   They brought it with them, yes.
9   Q.   Was it in writing at that time, or was it --
10  A.   I can't say for sure if it was in writing at
11  that time. I believe it was, but it might not have been.
12  Q.   "I was under the impression that he was
13  strongly considering settling." Were you considering
14  settling?
15  A.   Absolutely not.
16  Q.   Why is that?
17  A.   Because of the manner in which it was presented
18  to me.
19  Q.   What do you mean?
20  A.   Well, we discussed earlier, the manner in which
21  it was presented to me was not in a -- it was more of a
22  "you're going to do this" manner. Is that clear?
23  Q.   You mean they were trying to strong arm you?
24  A.   Exactly. But I didn't use that word. It was
25  "you need to do this." You're going to do this, and this

Page 76

1   is how we're going to do this. I never strongly -- to
2   say I strongly was considering it was never an option.
3   Q.   Well, if they didn't try to strong arm you,
4   would you consider it -- settling this grievance?
5   A.   It would have had a different tone. I can't
6   answer that for sure. It was a long time ago -- but not
7   under these terms.
8   Q.   What do you mean the terms?
9   A.   The terms that were presented to me that day.
10  Q.   And he says, "I was under the impression that
11  he was strongly considering settling, but under lesser
12  terms." Would you have settled under lesser terms?
13  A.   Well, there's two answers to that question. I
14  would say that had not there been this forceful nature
15  taking place in my office, and we -- there was -- if that
16  element didn't exist at all, then there might have been
17  other conversation. But I can't say for sure because
18  none of that occurred.
19  Q.   Now, there was another call in October; is that
20  correct?
21  A.   Say again, please.
22  Q.   There was another call in October?
23  A.   I think there was, yes.
24  Q.   October 20th?
25  A.   I think there was.

Page 77

1   Q.   And two guys were sent over, were actually
2   hired by the company, Mr. Merck and Mr. Lemons; is that
3   correct?
4   A.   I'm not going to say because I don't know for
5   sure.
6   Q.   You don't know if they worked for you or not?
7   I thought Janice said, yeah, we hired the two of them?
8   A.   Okay. Then we hired them.
9   Q.   So I guess what we did is, the application of
10  Merck and Lemons was marked 35 and 36. And I went
11  through these applications yesterday with Janice.
12  A.   Yes, sir.
13  Q.   And one had no port experience and did not --
14  well, Merck was 34 and Lemons was 35. They are
15  applications, and we went through them. And we talked
16  about Mr. Merck only being in Anchorage for two months;
17  is that correct?
18  A.   I remember that, yes.
19  Q.   And Mr. Lemons -- it's even questionable
20  whether or not he had ever been in the Port before. He
21  worked for a moving company. It was not clear whether or
22  not if he worked in the Port system.
23  A.   I remember your conversation, yes.
24  Q.   And this is the call in October. It looks like
25  Mr. Lemons filled out the application the 17th and

20 (Pages 74 to 77)

Alaska Stenotype Reporters       Exhibit F
                                  Page 20 of 38

Page 78

1  Mr. Merck filled it out on the 20th of October.
2       If you called and you hired these two
3  individuals, my question is: If you hired Mr. Tullis and
4  these two individuals, why did you not hire Shotsay? Why
5  did you not request her since she already took the test
6  and passed the test and was a good driver?
7    A.  She wasn't there.
8    Q.  Well, did you call and ask for Shotsay?
9    A.  No.
10   Q.  I guess that's my question. Why is it you --
11 in a unique circumstance hired Mr. Tullis, it said,
12 outside the call. He already passed -- you said the
13 reason why you asked for Tullis was because he passed the
14 test -- the road test, right?
15   A.  I don't remember saying that.
16   Q.  You don't remember saying that's why you asked
17 for Dan Tullis, because he passed the road test and
18 Janice said he was okay?
19   A.  Absolutely not.
20   Q.  So why did you specifically request Dan Tullis?
21   A.  My recollection is Dan Tullis was requested
22 because of his working for one of our competitors and
23 some experience that he had that the other candidate did
24 not have that day.
25   Q.  I'm sorry. After -- the first call was closed

Page 79

1  in September. And before the second call in October, you
2  called the union and said we want to hire Dan Tullis
3  because we tested him before and we don't want to go
4  through the testing process again. We know what he is.
5  And they said okay, you can hire him?
6    A.  The company made that call, yes.
7    Q.  I'm sorry?
8    A.  The company made that call, yes.
9    Q.  My question is why did you not make the same
10 call for Shotsay, because you tested her the same time as
11 Dan Tullis?
12      MR. EVANS: Asked and answered.
13 BY MR. LEGACKI
14   Q.  Why did you not call outside of the hiring
15 call? Why did you not call the union and say, hey, we
16 tested Shotsay and she passed and we have this extra
17 position, why can't we -- can we hire her?
18   A.  At that time we were hiring one driver.
19   Q.  Well, you hired Mr. Merck and Mr. Lemons.
20      MR. EVANS: Objection; lack of foundation and
21 facts not in evidence.
22 BY MR. LEGACKI:
23   Q.  Janice, yesterday -- correct me if I'm wrong --
24 she said they hired both. In fact, Mr. Lemons is still
25 working for you?

Page 80

1    A.  He does work for me.
2        MR. EVANS: You might want to check the
3  sequence of the hiring before you jump to any
4  conclusions. Just so we don't have -- one of them
5  replaced the other. One was hired and fired and then the
6  other one was hired. I just don't want us to waste a lot
7  of time looking for that.
8  BY MR. LEGACKI:
9    Q.  Why was not Shotsay called right -- why did you
10 open up the call again and ask for either Merck or
11 Lemons? Why not call and say, can we have Shotsay, like
12 you did with Tullis?
13      MR. EVANS: And that's been asked and answered.
14      THE WITNESS: I've already answered that.
15 BY MR. LEGACKI:
16   Q.  I guess I don't remember. What's the answer?
17   A.  There was only one position available during
18 that call.
19   Q.  Right. I know. Why didn't you ask for Shotsay
20 rather than open the call?
21   A.  Because according to Janice, Dan Tullis had
22 more experience in what we do and had worked for one of
23 our competitors and he therefore was a better candidate
24 at that time.
25   Q.  So these guys weren't at this call that we're

Page 81

1  talking about. The October call?
2    A.  I don't know.
3    Q.  I'm sorry?
4    A.  I don't know. I didn't do this. I didn't hire
5  them.
6    Q.  Will you agree with me that these two
7  individuals had less qualifications than Shotsay,
8  Mr. Merck and Mr. Lemons?
9    A.  No.
10   Q.  You would not? How are they -- which one of
11 these two had better qualifications than Shotsay and how
12 did they have better qualifications?
13   A.  They were not compared to Shotsay.
14   Q.  I'm asking -- will you agree with me though,
15 that even though they were not compared, that Shotsay had
16 better experience than Mr. Merck?
17   A.  No, I will not.
18   Q.  Why not?
19   A.  Because I'm not familiar with that.
20   Q.  You're not familiar with what?
21   A.  Their background.
22   Q.  Well, these -- did the company -- did you or
23 the company check to see and compare Shotsay's experience
24 to either Mr. Merck or Mr. Lemons?
25   A.  I can't answer that.

Page 82

1  Q. So after Shotsay tested and passed the test on
2  September 22nd, is there any particular reason you didn't
3  call the union and say another opening came up. Can we
4  have Shotsay because we tested her and she's okay. Is
5  there any reason why you did not do that?
6  A. I can't answer that. I don't know.
7  Q. But you did it for Dan Tullis, right?
8  A. For the reasons that Janice stated that he had
9  a better suited background for our job at that time.
10      MR. LEGACKI: Let me mark this, please.
11      (Exhibit 38 marked.)
12 BY MR. LEGACKI:
13  Q. This is United Freight Exhibit UFT-01161. And
14 this is a letter that you wrote and there are some of
15 your notes dated February 10th 2004. And you put this
16 chronology together; is that correct?
17  A. That's correct.
18  Q. Okay. And we went through it previously.
19 September 17th, the first call to hiring hall for two
20 drivers. Two were sent and they were not qualified. And
21 then on 9-18, it was a Thursday, a driver showed up, Gary
22 Dixon. And we know that Gary Dixon was hired. And then
23 on Friday you made a call for three more drivers to
24 interview. And somewhere along there, there's a
25 conversation between you and Killian. And you change

Page 83

1  from two to three.
2      On Monday, Dan Tullis and Shotsay showed up and
3  Tullis was apparently more qualified because he had prior
4  Port experience; is that correct?
5  A. That's what it says, yes.
6  Q. But no further action was taken at that time
7  due to uncertainties of two of our existing drivers.
8      9-23, which is a Tuesday. We decided to hire
9  Gary Dixon and closed the call because there was
10 confusion over the future of Eric and Tom G. Who's Tom
11 G?
12  A. Tom Galloway.
13  Q. And who is Tom Galloway?
14  A. He's a driver.
15  Q. What was the confusion about him?
16  A. He was considering leaving me.
17  Q. Okay. So you had Eric, who had insurance
18 problems; you had Tom Galloway, who was thinking about
19 leaving; and then you also had Smith, who had a DOT
20 problem?
21  A. That's correct.
22  Q. Okay. So there was actually three people,
23 other than the guy that retired? Who retired?
24  A. I believe his name was Art.
25  Q. Art. So Art retired and that's who Gary Dixon

Page 84

1  replaced, right?
2  A. Timing wise, yes.
3  Q. And then we had Eric who was still a question
4  mark. We had Tom Galloway who was thinking about
5  leaving, and then we also had Smith who was -- had to
6  retire because of his heart?
7  A. That's correct.
8  Q. And then Shotsay was told she did not get the
9  job by Janice. Since the 9-22 test precluded that if we
10 were to have hired that day, Dan Tullis would have been
11 hired for the reasons stated above, right?
12  A. Correct.
13  Q. On 10-2, a grievance was filed by the union for
14 violation of the hiring hall practices and
15 discrimination, correct?
16  A. Correct.
17  Q. And 10-6 the company responds to the letter.
18 And uncertainty of the two existing drivers, the call had
19 been closed; is that correct?
20  A. Correct.
21  Q. On 10-16 the company made a call to the hall
22 for four drivers. The hall sent a total of six. The
23 first one that showed up was disqualified due to prior
24 poor work with our company. The second person came, took
25 the paperwork and was never heard from again. Four more

Page 85

1  people were sent and ultimately Craig Merck was hired and
2  Perry Lemons was the second good prospect, correct?
3  A. Correct.
4  Q. So you hired Craig Merck. Why didn't you ask
5  for Shotsay?
6      MR. EVANS: Asked and answered.
7  BY MR. LEGACKI:
8  Q. On 10-16, why did you not ask for Shotsay at
9  that time since she had passed the test?
10 A. She didn't show up. She had the opportunity.
11 It was open call.
12 Q. Okay. And on 10-17 the company closed the
13 call. On 10-17 the company asked the dispatcher if we
14 could hire a person who passed all of our tests, but was
15 not hired at the time we closed on 9-23. We're talking
16 about Dan Tullis, right? The hall said that was not a
17 problem. Why did you not ask for Shotsay? Why did you
18 ask for Dan Tullis and not for Shotsay?
19     MR. EVANS: Asked and answered repeatedly.
20 BY MR. LEGACKI:
21 Q. Because you thought Tullis was better,
22 according to Janice?
23 A. Exactly.
24 Q. And then on 10-19 Dan Tullis started with the
25 company. On 10-31-03, the union sent a letter filing a

Page 86

1  two-step grievance about Shotsay; is that correct?
2   A.  That's correct.
3   Q.  11-2, terminated Craig Merck and asked the hall
4  to bring me in a candidate from the 10-16 call, Perry
5  Lemons. They again said okay, correct?
6   A.  Correct.
7   Q.  Why is it that you didn't ask for Shotsay, but
8  you wanted Perry Lemons?
9   A.  She wasn't a candidate.
10  Q.  Well, she passed your test before. She showed
11 up on the call before and passed the test.
12  A.  It was a whole different call.
13  Q.  I guess I'm confused here. So maybe it's my
14 confusion here. I'm sorry. The 10-16 call on which
15 Lemons initially -- Perry Lemons was a second good
16 prospect, that call was closed, correct?
17  A.  Yes.
18  Q.  And that was closed on 10-17, correct?
19  A.  Yes.
20  Q.  But then on 10-31 -- strike that. On 11-02,
21 you call the hall and say -- you didn't ask to open up
22 the call, you just say can we hire this guy named Perry
23 Lemons who we tested on 10-17, right?
24  A.  Correct.
25  Q.  My question is: Why did you not ask for

Page 87

1  Shotsay? Why did you ask for Perry Lemons?
2   A.  Perry Lemons was on the last call.
3   Q.  But Shotsay was on the call before, wasn't she?
4   A.  That would be correct.
5   Q.  Why didn't you ask for her?
6   A.  We didn't.
7   Q.  I know you didn't. My question is why didn't
8  you?
9   A.  We didn't. I mean, it was a Dan Tullis and
10 Shotsay comparison. Dan Tullis was the better candidate
11 for Janice and we moved forward from there. And there
12 was another open call. And Shotsay never showed back up.
13 She had the opportunity to do that.
14  Q.  Well, why didn't you call back and say -- you
15 had a grievance pending, right?
16  A.  Yeah, we would have, uh-huh.
17  Q.  And the grievance was pending and Shotsay --
18 and this is before the "strong arm tactics" in November,
19 correct?
20  A.  That would be correct.
21  Q.  So this is before any offer to settle or any,
22 what you consider strong arm tactics, you could have
23 said, hey, yeah, Shotsay passed. We can solve this
24 grievance. Bring her over. She passed the test. She
25 was good.

Page 88

1   A.  I have no answer.
2   Q.  And you knew from the union that she had an
3  impeccable driving record with over 20,000 hours
4  experience in the last 10 years, right?
5   A.  At that time I may have known that.
6   Q.  And you knew that you had a candidate who
7  wanted to work there, who had a lot of experience in
8  Anchorage, who had a great driving record. Why didn't
9  you ask for her rather than Perry Lemons?
10  A.  The candidates that went to work there, once
11 they have come through there, and if they don't get hired
12 or we don't hire at that time, never stop asking.
13  Q.  I'm sorry. I misunderstood that.
14  A.  Candidates that come through there, whether
15 they're hired or not and they try, they never stop asking
16 if they truly want to work there. They never stop
17 calling and asking.
18  Q.  Well, what does a grievance tell you? Does the
19 grievance tell you that a person wants to work there?
20  A.  Absolutely not. The grievance had nothing to
21 do with her wanting to work there.
22  Q.  Well, you can resolve the grievance -- what
23 would be the remedy for the grievance? You have a
24 grievance. What's the remedy?
25     MR. EVANS: Objection. Vague and ambiguous.

Page 89

1     THE WITNESS: I don't know how to answer that.
2  BY MR. LEGACKI:
3   Q.  If the union files a grievance and is saying,
4  hey look, you didn't hire this person and you should
5  have, what's the remedy?
6   A.  The grievance was filed in light that it is
7  saying that I discriminated is incorrect.
8   Q.  Okay. So what's the remedy for discrimination?
9   A.  I can't answer that. What do you mean?
10  Q.  How do you cure the discrimination? By hiring
11 a person, right?
12  A.  No, I don't think so.
13  Q.  What do you mean?
14  A.  I think you have to go through and see the
15 grievance through. I mean, I've never been presented
16 with this kind of a problem in my life, ever, in any
17 contract I've ever had. As a matter of fact, in 18 years
18 this is only the second grievance I ever had filed on me
19 from any company I worked for. Grievances are brand new
20 to me in this environment.
21  Q.  Well, did you consult with somebody. Did you
22 consult with Fitzpatrick since we got this grievance
23 filed what do we do?
24     MR. EVANS: Who's Fitzpatrick?
25 BY MR. LEGACKI:

## Page 90

1  Q. I'm sorry. The owner of the company, did you
2  call him and say you got this grievance filed?
3  A. No. Bill McCormick?
4  Q. Bill McCormick. I'm sorry.
5  A. It's an operational thing. He's never
6  involved.
7  Q. Did you consult with a lawyer when you got the
8  grievance filed?
9  A. We did.
10 Q. And was there any discussion about we can have
11 this whole thing go away just by hiring her? Because we
12 need a good driver and she's got an impeccable record.
13 She's a great driver. Why don't we just hire her and let
14 this whole thing go away?
15 A. That didn't happen.
16 Q. Because she filed a grievance?
17 A. No, it just didn't happen.
18 Q. Well, you knew -- you hired Dan Tullis by
19 circumventing -- as everybody calls them, unique
20 circumstances -- under unique circumstances you hired Dan
21 Tullis, right?
22 A. According to the union, yes.
23 Q. Right. And you're not adverse to not going to
24 the union and the hiring call to hire somebody, correct,
25 like you did Dan Tullis, right?

## Page 91

1  A. Not that time. I tried it.
2  Q. After you got away with it -- with Dan Tullis,
3  why did you not try to do the same thing for Shotsay?
4  A. Dan Tullis and Shotsay were compared on that
5  day and he was the better candidate per Janice. And that
6  became the next available job and we asked for him and
7  got him.
8  Q. Well, you already hired Merck before you hired
9  Tullis, correct?
10 A. No, I don't think so.
11 Q. I may be mistaken here. On 10-16, Craig Merck
12 was hired, according to your notes there at the top of
13 the page, right?
14    MR. EVANS: It says ultimately he was hired.
15    MR. LEGACKI: I'm sorry?
16    THE WITNESS: I don't believe he was hired that
17 day. I believe Dan Tullis was hired first.
18 BY MR. LEGACKI:
19 Q. Dan Tullis was hired first. Okay. So after
20 you hired Dan Tullis in that unique circumstances and you
21 had another call booking up, why didn't you try to get
22 Shotsay hired?
23    MR. EVANS: Objection; asked and answered for
24 the 15th time.
25 BY MR. LEGACKI:

## Page 92

1  Q. Before you hired Merck, and before you hired
2  Lemons, why did you not try to use the unique
3  circumstances to hire Shotsay?
4     MR. EVANS: Asked and answered repeatedly.
5  BY MR. LEGACKI:
6  Q. I'm confused here. Could you answer that
7  please?
8  A. I believe I have answered it. Dan Tullis was
9  compared to Shotsay in a different call, and he was the
10 next candidate that we -- he had passed our test and he
11 had the qualifications we asked for. We hired him.
12 Q. Okay. And so did Shotsay -- Shotsay passed.
13 A. It's irrelevant. There was another open call.
14 She had the opportunity to come back out like anybody
15 does.
16 Q. So did Tullis -- and he didn't come back out,
17 in the open call, did he?
18 A. We didn't have a call.
19 Q. Okay. I guess that's the point.
20    MR. EVANS: I'm going to instruct him not
21 answer the same question for the 15th time.
22 BY MR. LEGACKI:
23 Q. Let me just summarize then. Shotsay passed the
24 driving test September 17th, as did Dan Tullis. You
25 then, on 10-16, made another call -- I'm sorry -- you

## Page 93

1  hired Tullis before October 16th, after Shotsay and
2  Tullis -- on September 22nd they passed the driving test,
3  both Shotsay and Tullis. Between September 22nd and
4  October 16th, you hired Dan Tullis, correct?
5  A. Correct.
6  Q. Okay. And you did it without going through the
7  hall, and without going through a call, correct?
8  A. That's correct.
9  Q. So then on 10-16 you called the hall again and
10 said, we need some more drivers. We already hired Dan
11 Tullis, but we need another driver. And you went to the
12 hall for a call, correct?
13 A. Correct.
14 Q. And they sent Mr. Merck, correct?
15 A. I believe so, that's correct.
16 Q. But also, at that same time, Perry Lemons,
17 passed the test, correct?
18 A. Correct.
19 Q. The call was closed. You did not hire
20 Mr. Lemons, correct?
21 A. Correct.
22 Q. The call was closed. Merck did not work out.
23 You called the hall again in unique circumstances,
24 without going through an open call, and asked if you
25 could have Lemons, correct?

### Page 94

1  A. Correct.
2  Q. And in no time you considered calling and
3  asking for Shotsay?
4  A. She didn't come to the call.
5  Q. I'm sorry?
6  A. She didn't come to the call.
7  Q. Okay. But she did go to the September call.
8  She didn't come to the October call that was closed. You
9  didn't go back and open up the call again to give Shotsay
10 a chance, did you?
11 A. It was open.
12 Q. I thought on 10-17 the call was closed?
13 A. It was, but it was open prior to that.
14 Q. What was that?
15 A. It was open prior to that.
16    MR. LEGACKI: Should we take a lunch break now?
17    MR. EVANS: That would be best.
18    (Break was had.)
19 BY MR. LEGACKI:
20 Q. So we talked about -- going back, we talked
21 about the hall being closed on -- the second call being
22 closed on October 17. And then on 10-31 you got the
23 second step of the grievance, correct?
24 A. That's correct.
25 Q. And then on November 2nd you terminated Craig

### Page 95

1  Merck; is that correct?
2  A. That's correct.
3  Q. And you asked again for a unique circumstance,
4  not to have to open a new call, and you brought in Lemons
5  from the previous call?
6  A. That's correct.
7  Q. And Lemons was in the 10-16 call?
8  A. That's correct.
9  Q. So now we are talking over two weeks later
10 after the 10-16 call was closed, you asked not to have to
11 go to a new call but bring in somebody else, right?
12 A. That's correct.
13 Q. And then on 11-4, Mike Jones and John Synder
14 met with you; is that correct?
15 A. That's correct.
16 Q. Okay. And who is John Synder?
17 A. Shop steward.
18 Q. And where does he work?
19 A. For United Freight.
20 Q. It's for the record.
21 A. I understand.
22 Q. So he is a truck driver himself, right?
23 A. Yes, sir.
24 Q. And they meet regarding -- with the grievance
25 procedure for discussion relative to United Freight's

### Page 96

1  hiring practices, correct?
2  A. Correct.
3  Q. Can you tell me about that conversation?
4  A. No, other than it was a formality in working
5  toward the -- through the grievance procedure.
6  Q. Okay. Was the issue of discrimination brought
7  up then?
8  A. No, sir.
9  Q. Was the issue of hiring Shotsay brought up at
10 that time?
11 A. No, sir.
12 Q. So what new formulated guidelines were agreed
13 to?
14 A. In hiring -- for the hiring hall, they're
15 listed on the very bottom here.
16 Q. So we agree that the new guidelines had to be
17 set, right? But the 14th you finalized what the
18 grievances are?
19 A. Correct.
20 Q. On 11-8 Mike Jones requested a meeting. Why
21 did he do that?
22 A. To discuss this -- just these guidelines
23 here -- present these guidelines.
24 Q. Okay. And why did he want Mike Killian there;
25 do you know?

### Page 97

1  A. Union dispatcher.
2  Q. And so the reason why Mike Killian was there
3  was to finalize the procedures for the hiring hall for
4  United Freight on the calls, correct?
5  A. No, it was to present the new procedures to me
6  for these job calls.
7  Q. Okay. So that was the reason why Killian was
8  there then?
9  A. Correct.
10 Q. Do you know if it was any other reason?
11 Because earlier you said you didn't understand why a
12 dispatcher would come to your office.
13 A. I don't. I still don't know why.
14 Q. He's the dispatcher, right?
15 A. Correct. But it's union business. And union
16 business is conducted between the business agent and the
17 company. Never in my history has there ever been any
18 involvement from anyone else.
19 Q. But there's a problem with the dispatch, so
20 they wanted to get the dispatcher there to make things
21 run smoother, to make sure we're all on the same page; is
22 that correct?
23 A. I guess.
24 Q. Well, why did he say he wanted to bring Mike
25 Killian?

Page 98

1  A. He didn't say, other than to discuss these
2  issues.
3  Q. On 11-14 you put, "Mike Jones, Mike Killian,
4  and myself had a meeting for resolution. A resolution to
5  dispatching procedures was concluded as referenced to the
6  grievance," correct?
7  A. Right.
8  Q. And so then we -- they list -- you list down
9  here what the grievance was?
10 A. Yes, sir.
11 Q. Also we just discussed the use of Tom Galloway
12 on a temporary basis. Now, who is Tom Galloway?
13 A. Tom Galloway was a former employee, one of the
14 employees that quit. Now he's coming back, or in the
15 future will be coming back.
16 Q. So he's not going through the hiring hall?
17 A. No.
18 Q. So they said, all right, I'll let you bring Tom
19 back. You don't have to have a call, right?
20 A. Right.
21 Q. Okay. So this is the third person now that you
22 didn't have to go through a call to bring him in, right?
23 A. But different than the other two.
24 Q. Because he was a former employee?
25 A. Correct.

Page 99

1  Q. And you talked about the dismissal of Eric?
2  A. Correct.
3  Q. And why was Eric dismissed?
4  A. For a DWI that he received, driving record
5  infraction, that under the circumstances, my insurance
6  company deemed him uninsurable. That was the reason.
7  Q. So was there a new opening at this time?
8  A. I don't know. I don't believe so.
9  Q. On 11-18 the company received a settlement
10 proposal on the Shotsay grievance on which you say
11 technically had been over with, right?
12 A. That's correct.
13 Q. So I'm confused here. On 11-14, on your
14 notations here, you mention nothing about a settlement
15 talk being conducted at that time.
16 A. That's right, not in these notes, no.
17 Q. I'm sorry?
18 A. Not in these notes, no.
19 Q. And why did you prepare these notes?
20 A. Just to keep myself organized because I'm
21 having -- I've had a grievance filed against me and I
22 want to make sure I'm organized. I've never had one
23 before so this is what I thought I should do.
24 Q. And you don't put down there that the union
25 tried to strong arm you to hire Shotsay?

Page 100

1  A. I did not.
2  Q. You didn't think it was significant?
3  A. It's very significant, but I didn't put it on
4  here the day that I wrote these notes.
5  Q. Why is that?
6  A. I just did not.
7  Q. And on 11-18 you put down, the company received
8  a settlement proposal on the Shotsay grievance, which you
9  considered technically over with, right?
10 A. Correct.
11 Q. But you don't put there -- anything about
12 strong arming, do you?
13 A. I do not.
14 Q. In fact, that's the first time settlement is
15 mentioned, is when you get something in writing from the
16 union on 11-18, correct?
17 A. I believe so.
18 Q. Any other previously being mentioned that you
19 got a -- any kind of proposal for settlement?
20 A. I don't see it, no.
21 Q. All right. Because this is kind of important
22 here. You made the allegation that the union was trying
23 to strong arm you, and you don't even mention that
24 settlement was discussed on 11-14 on your notes here.
25 And even on 11-18, for the first time, that a second

Page 101

1  proposal was given to you.
2     MR. EVANS: Wait until his question.
3  BY MR. LEGACKI:
4  Q. Is that correct? Am I reading that
5  correctly -- your chronology here?
6  A. I believe you are.
7  Q. And then on 11-26, you write that the union
8  sends another letter saying they have not received a
9  reply from the company on the Shotsay settlement proposal
10 of 11-18-03; is that correct?
11 A. That's correct.
12 Q. So you are admitting that you have not given
13 them a reply to their settlement proposal as of 11-26-03,
14 correct?
15 A. That's correct.
16 Q. And so therefore they're going to move it to a
17 Step III grievance procedure, correct?
18 A. Correct.
19 Q. On 11-26-03, you state the company, meaning
20 United Freight, has responded to the union's 11-18-3
21 letter as per the contract, correct?
22 A. Correct.
23 Q. And 11-18 is the settlement proposal, correct?
24 A. Correct.
25 Q. And you never put in there in that 11-26-03

### Page 102

1  letter, that the union is not going to strong arm you and
2  you're not going to push me around or anything like that?
3    A. I would not do that.
4    Q. You would not do that?
5    A. No.
6    Q. Why not?
7    A. I don't have a reason. I just wouldn't do it.
8    Q. Did you make any handwritten notes or anything
9  saying that the union came in to strong arm you?
10   A. No.
11   Q. Did you put it in a diary or anything?
12   A. I don't have a diary.
13   Q. Let's go down to 1-30-04. The union sends the
14 company a letter to say they're moving this grievance to
15 arbitration? Do you see that?
16   A. I do.
17   Q. And then you have "(but I was verbally told
18 this is only a formality, that they were doing this and
19 had to wait on him to help resolve)."
20   A. That's correct.
21   Q. What did you mean by that?
22   A. Mike Jones told me that.
23   Q. That we're just going through a sham thing
24 here. We're not really going to have an arbitration.
25 We're just going to resolve it. Wink, wink, nod, nod,

### Page 103

1  kind of a thing?
2        MR. EVANS: Objection to the characterization.
3        THE WITNESS: I would never use those words.
4  BY MR. LEGACKI:
5    Q. You would never use it, but that's basically
6  what you understood it to be, right?
7    A. No, absolutely not. As was stated earlier he
8  never saw -- well, I think it's important to back up and
9  read the dates prior to that in reference to Mike Jones.
10   Q. Sure. I have no problem with that.
11   A. Because I think it leads to that point in time
12 we're discussing now.
13   Q. The 11-26 -- let's go back to 11-26. "The
14 union sent a letter stating they had not received a reply
15 from the company on the settlement proposal of 11-18-03,
16 right?
17   A. That's correct.
18   Q. And we're moving this to a Step III grievance
19 procedure. This grievance, by all rights of contract,
20 had elapsed due to time on the union's part and at one
21 time had been formally dropped?
22   A. That's correct.
23   Q. 11-26, the company responded to the union's
24 11-18 letter as per contract. And that's where you say
25 we're not going to settle this thing, correct?

### Page 104

1    A. That's correct.
2    Q. 12-3-04, "Mike Jones called me regarding the
3  Shotsay issue and was requesting a 30-day extension to do
4  their homework on United Freight's hiring practices both
5  past and present."
6    A. That's correct.
7    Q. Do you know if he ever did that?
8    A. Yes, he did.
9    Q. He did?
10   A. And I allowed him to do it. I had nothing to
11 hide, so I allowed him to do it.
12   Q. And you know that he went back and looked at
13 the other hiring practices?
14   A. Well, I can't say he physically did it because
15 I wasn't with him, but he told me he was doing that.
16   Q. He told you he did it or was going to do it?
17   A. Did it -- well, no, at this time, going to do
18 it. That's the reason for asking for an extension.
19   Q. Okay. 12-12, "A formal letter from the union
20 (see union letter) came requesting that Shotsay grievance
21 be postponed until 1-12-04;" is that correct?
22   A. Correct.
23   Q. Was there any oral conversations around this
24 time with Mike Jones?
25   A. Nothing other than what was said earlier, that

### Page 105

1  he still had not finished his homework and needed more
2  time. And I again allowed it.
3    Q. January 21st, "Mike Jones called to say he
4  still needs more time to pursue grievance internally with
5  union people above him. He's telling them this is not a
6  valid grievance and he's looking at the hiring practice
7  of Weaver Brothers and Lynden Transport. He will get
8  back to me on Monday the 26th." Do you recall that
9  conversation?
10   A. I do.
11   Q. Tell me about that, please.
12   A. That's it. That's what he said. Those are not
13 exactly his exact words, but that's what he said in that
14 conversation.
15   Q. Who was he telling about that that's not a
16 valid grievance?
17   A. That I do not know. I don't know what his
18 hierarchy is and where he goes with that. I don't know.
19   Q. Do you know if it was with Nancy Shaw?
20   A. No, sir, I do not know.
21   Q. Were you aware that Nancy Shaw thought this was
22 discriminatory conduct only?
23   A. I have no knowledge of that.
24        MR. EVANS: Objection; facts not in evidence.
25 BY MR. LEGACKI:

Frank Monfrey                               Deposition                         December 9, 2005

Page 106

1   Q.  Then we go to 1-30. "The union sends the
2   company a letter to say they are moving this grievance to
3   arbitration. But I was verbally told this was only a
4   formality, and that they're doing this to wait on him to
5   help resolve." Can you tell me about that, please?
6   A.  It's a timing issue in the sequence of events
7   that occur in filing a grievance, Step I and Step II.
8   And since I allowed him to extend this, that was the next
9   step.
10  Q.  "But I was verbally told," I'm kind of
11  interested in that. "I was verbally told this was only a
12  formality."
13  A.  Correct. Because he still maintained that it
14  wasn't a valid grievance and that he wanted to finish
15  his homework. The panel was a formality in the process
16  by sending me a letter to move it to arbitration.
17  Q.  And to wait on him to help resolve, meaning?
18  A.  Wait on him to get back to me.
19  Q.  2-3-04, "Mike Jones and John Synder met with me
20  to discuss the issue further. Both parties, Mike and
21  John agreed that there was not a grievance here and
22  suggested we move to a Step III grievance procedure,
23  (backwards)." What does that mean?
24  A.  We were going from the arbitration phase
25  backward to the grievance panel -- to the grievance

Page 107

1   panel.
2   Q.  And do a three member panel. He talked to you
3   about that, right?
4   A.  He did.
5   Q.  And why did he say he was going to do that?
6   A.  Well, I don't really recall, other than it was
7   a step since there's three or four steps -- I have to
8   refer back to the contract in that grievance procedure --
9   that step was skipped, as you can see through here. And
10  because of his timelines that he has -- and I don't know
11  those off the top of my head either -- this -- on 1-30
12  the letter was supposed to be coming to me to move this
13  to arbitration, which that didn't happen. So since they
14  skipped that grievance procedure -- grievance panel
15  portion, they wanted to go back and go through that
16  process before they went to arbitration, if they were
17  going to go to arbitration.
18  Q.  Did they say why they wanted to do that, rather
19  than just go to arbitration?
20  A.  Just because they skipped it and it needed to
21  be adhered to.
22  Q.  Did they say that they wanted to use it for
23  leverage to try to get that to where people would dismiss
24  the --
25  A.  Oh, absolutely not. As I explained earlier

Page 108

1   today, those contracts are pretty black and white. It
2   was a procedural thing that he had skipped.
3   Q.  Well, if they skipped it, why didn't you say
4   it's over with, dismissed, it's done?
5   A.  Well, sir, I should have done that maybe. But
6   I all along felt that I had nothing to hide here. I was
7   not -- I was not guilty of discrimination, so I allowed
8   him to do his job, I guess, to go through his procedures.
9   And I did allow him time to do that because I was certain
10  that I was not at wrong.
11  Q.  And you had a chance to have this thing just
12  dropped completely and you said you wanted your day in
13  court to prove that you're innocent?
14      MR. EVANS: Objection. Lack of foundation;
15  facts not in evidence.
16  BY MR. LEGACKI:
17  Q.  You could have said, hey, look, if you skipped
18  a procedure we're done, right -- according to the
19  contract?
20  A.  That's right I could have. But I didn't do
21  that. This is new to me. This is a new process to me.
22  And if they come and tell me this is what we're going to
23  do, in most cases -- most all cases, I have to adhere to
24  that.
25  Q.  You already had an attorney, right? Didn't you

Page 109

1   hire a law firm to help you by this time?
2   A.  No, they helped me with some language and
3   things, but they weren't really consulting with me on
4   this grievance letter. I mean, I'm learning this
5   on-the-job training with Mike Jones.
6   Q.  Didn't anybody tell you, did Mike Jones, or
7   anybody tell you, hey look, since I made a mistake and I
8   didn't do it timely, we skipped it, we just drop the
9   whole thing?
10  A.  Did anybody tell me what? Would you please say
11  that again?
12  Q.  Didn't you talk to anybody and say -- either
13  Mike Jones or your attorneys or somebody in the company
14  and say, hey, if they skipped that then they waived it?
15  A.  No.
16  Q.  Then you put down here, Mike Jones told you the
17  results of the panel go a long way to eliminate the need
18  for further action by definition, moving on to formal
19  arbitration proceedings. What did you understand that to
20  mean?
21  A.  Well, if we were successful in the panel
22  process then that, in fact, would kill the grievance --
23  end the grievance. That's my understanding.
24  Q.  Couldn't it go to arbitration after that?
25  A.  Not according to the contract. I don't believe

### Page 110

1  so. I think once that has been satisfied and if it's
2  done in a satisfactory manner, that's where it ends.
3  That's my understanding.
4     Q.  So you had already agreed to go to arbitration,
5  but then you agreed to step backwards and go through the
6  panel, which would kill the arbitration?
7     A.  Yes.
8     Q.  "It was decided to set a date of Wednesday,
9  February 11, 2004 at 800 a.m. I sent an e-mail to Mike at
10 his request outlining this proposal."
11       Why did he request you to send an e-mail for
12 that?
13    A.  I believe to agree to the -- that step process
14 in the grievance procedure. That's my recollection.
15    Q.  He wanted you to request it, right?
16    A.  No, he wanted me to agree to do it, I believe.
17    Q.  Well, I guess "I sent an e-mail to Mike," now
18 "I", that means you personally rather than the company,
19 right?
20    A.  That's correct.
21    Q.  I sent an e-mail to Mike at his request
22 outlining this proposal. So what he wanted to put in
23 writing was that the proposal was coming from you to go
24 back to the panel, right?
25    A.  I believe that to be correct, yeah.

### Page 111

1     Q.  That's what it was. He wanted you to do it so
2  he can go to his boss and say, he's requesting a panel,
3  so he looks good, right?
4     A.  Perhaps.
5     Q.  But it was his suggestion to do that, right?
6     A.  Yes.
7     Q.  Mike Jones called the next day -- 2-9. "Mike
8  Jones called to let me know he had received my e-mail and
9  that it was okay." What was okay, the e-mail or what?
10    A.  Contents of the e-mail, I would suggest.
11    Q.  So you did it exactly as he wanted you to do
12 it, right?
13    A.  Apparently he said it was okay.
14    Q.  "Also, he wanted me to call John Synder and
15 have him draw four names for the meeting panel; is that
16 correct?
17    A.  That's what it says.
18    Q.  And John Snyder had already, according to you,
19 made a decision that this grievance didn't have any
20 merit, right?
21    A.  He made that comment, yes.
22    Q.  And he and Mike Jones said this is all BS,
23 right?
24    A.  I wouldn't use those words, no. They didn't
25 believe that it had merit based on what they knew.

### Page 112

1     Q.  So the same guy that said it didn't have merit
2  was the one that was going to pick the names to sit on
3  the panel, right?
4     A.  That's his job. In the procedures process,
5  that's the shop steward's job to draw those names. They
6  come out of a -- you can't see the name. They're all
7  folded up and they come out randomly.
8     Q.  "Draw four names and Mike would strike one when
9  we came in on 2-11-04." Now, Mike strikes one of the
10 union members, or you strike them?
11    A.  No, I have no place in any of this. This has
12 nothing to do with me.
13    Q.  So Mike -- let me make sure I understand this
14 correctly, and we have to do it for the record, of
15 course. Mike, who has already told you we're going to
16 try to get rid of this grievance here, but I'm getting
17 pressure from above, is now going to decide who sits on
18 the panel by striking one of the names, right?
19    A.  No, sir, he's not deciding who's on the panel.
20 He's just taking one of them out.
21    Q.  And he notified you that the union organizing
22 team was going to get a new business agent?
23    A.  That's correct.
24    Q.  Do you understand why he was leaving?
25    A.  I believe they were moving him to a new role.

### Page 113

1     Q.  Let's look at the next page. These are your
2  notes here, right?
3     A.  Yes, those are my notes.
4     Q.  12-12-03. Mike Jones. Shotsay issue. "He",
5  meaning Mike Jones, said his goal is to make the
6  grievance go away, right?
7     A.  That's correct.
8     Q.  So when he asked for the 30-day extension, and
9  the investigation, he was trying to find ways to make
10 this grievance go away?
11    A.  I believe that to be true.
12    Q.  Okay. What it says -- could you read that for
13 me -- the paragraph down?
14    A.  Underneath the arrow?
15    Q.  Yeah.
16    A.  It said, "If this were the case, then all
17 people rejected would have a case against United Freight
18 as though he is not in favor of pursuit of this issue."
19    Q.  And then we have the 02-03-04 notes, "Go to
20 panel, 3 members," right?
21    A.  Right.
22    Q.  And this is where his idea -- and this is the
23 note you took of the conversation where he says, hey,
24 this is what I want you to do?
25       MR. EVANS: Lack of foundation.

### Page 114

```
 1        THE WITNESS: No, that's incorrect.
 2   BY MR. LEGACKI:
 3     Q.   I'm sorry?
 4     A.   It's not what he wanted me to do.
 5     Q.   He wants you to request it, right?
 6     A.   We already established that early on.
 7     Q.   So this is the conversation where he wanted you
 8   to ask for a panel?
 9        MR. EVANS: Lack of foundation.
10   BY MR. LEGACKI:
11     Q.   And it says, "Send letter to set." Is that
12   what he's telling you to do, is send a letter to set up
13   the panel?
14     A.   Yes, we discussed that.
15     Q.   So he told you to send letter to set, right?
16     A.   Yes.
17     Q.   What is the "man, 1 for 4, Weaver 1 for 4,
18   United Freight 2 for 3?"
19     A.   I don't have any idea. I have no idea what
20   that is.
21     Q.   And could you read that paragraph underneath
22   those numbers?
23     A.   It says, "Janice told Shotsay she was not going
24   to be hired at this time. Shotsay told Mike that Janice
25   said she was not hired. Dan Tullis" -- I can't read what
```

### Page 115

```
 1   I wrote there.
 2     Q.   So you have there Janice said that she told
 3   Shotsay she was not going to be hired at this time, but
 4   would be hired in the future?
 5     A.   No, that's not what that says.
 6     Q.   Janice told Shotsay she was not going to be
 7   hired at this time?
 8     A.   That's where it ends.
 9     Q.   But she could have been hired in the future?
10     A.   It didn't say that.
11     Q.   It doesn't say that, but is that --
12     A.   It says that she could be hired in the future.
13     Q.   And the next page -- is there a date on this --
14   meeting of 11-13, November 13th. Mike Jones, Mike
15   Killian?
16     A.   Yes.
17     Q.   So it could either be 11-13 or 11-14, right?
18   We're talking about the same meeting. Killian only met
19   with you once, right?
20     A.   That's correct.
21     Q.   So it's either 11-13 or 11-14, right?
22     A.   Right.
23     Q.   "Issues grievance." What do you mean by that?
24     A.   I don't know. It's just -- it's just what it
25   says, issues grievance.
```

### Page 116

```
 1     Q.   "Step 1 on Shotsay" -- what's that word there?
 2     A.   Letter.
 3     Q.   "On October 2nd 2003. My response on
 4   October 6, 2003." Something -- what's that word there?
 5     A.   It's abbreviation for approximately.
 6     Q.   "October 14th, 2003, Mike Jones verbally told
 7   me my response was acceptable and the issue would go
 8   away;" is that right?
 9     A.   That's correct.
10     Q.   And then what's the next one there?
11     A.   Furthermore -- sorry. On the same paragraph.
12     Q.   Yes.
13     A.   Furthermore is the first word.
14     Q.   Furthermore?
15     A.   Yes.
16     Q.   "Shotsay had passed." Is that what that says?
17     A.   No, sir.
18     Q.   What does it say?
19     A.   "Furthermore, 10 days had passed, making this
20   further null and void."
21     Q.   Is this your notes from the meeting that
22   occurred between you two on that day -- what was
23   discussed? These were the issues that were discussed in
24   that meeting?
25     A.   Let me read through, please.
```

### Page 117

```
 1     Q.   Sure.
 2     A.   That's correct.
 3     Q.   And then at the bottom, "Today 11-14-03 meeting
 4   with MJ and FSM." Who's FSM?
 5     A.   Me, Frank Monfrey.
 6     Q.   And then the items -- "review this together,"
 7   or something?
 8     A.   It says resolution to grievance.
 9     Q.   Resolution to grievance?
10     A.   Dispatch procedures.
11     Q.   "Temporary employees, Tom Galloway between
12   first of year."
13     A.   "Ship days work only."
14     Q.   I don't see anywhere where you said that you
15   got strong armed by the union.
16     A.   I did not write that.
17     Q.   In fact, there's nothing negative here about
18   Mike Killian or Mike Jones, is there?
19     A.   Not written on this page, no.
20     Q.   Is there a reason why you didn't write
21   something that important; why you didn't write it down?
22     A.   Not that I can remember.
23     Q.   So these are contemporaneous notes taken of the
24   meeting and you never wrote down that the union is trying
25   to strong arm you.
```

Page 118

1   MR. EVANS: Objection; lack of foundation.
2   THE WITNESS: They were not taken at the
3   meeting.
4   BY MR. LEGACKI:
5   Q. What was not taken at the meeting?
6   A. The notes.
7   Q. When were these notes written?
8   A. Probably after the meeting.
9   Q. Contemporaneous with the meeting?
10  A. Next day. I don't know.
11  Q. And you don't mention anywhere that you were
12  being strong armed by the union?
13  A. Not on this page.
14  Q. Anywhere, did you write anywhere that you were
15  being strong armed by the union?
16  A. No, I did not.
17  Q. And then "2-11-04, union grievance outline,
18  7:45 a.m., Mike Jones, John Synder and I meet to discuss
19  grievance panel procedure." Mike told you how it was
20  going to be done, right?
21  MR. EVANS: Objection; lack of foundation;
22  facts not in evidence.
23  BY MR. LEGACKI:
24  Q. "Mike said she would start the process by
25  stating the facts which" -- do you see that there?

Page 119

1   A. "Which would lead."
2   Q. "Which would lead to the point we are at
3   today."
4   A. I'm sorry. It's supposed to mean led to the
5   point we are today.
6   Q. "And then I would have the opportunity to state
7   the company's position. After that point the
8   three-member panel would vote. And John Synder was asked
9   to stay for the meeting by Mike."
10  A. Correct.
11  Q. So he had John Synder and Jones at that meeting
12  in front of the panel?
13  A. What I can't remember is if John was actually
14  in there, but I know he was there. But he had no role,
15  no voice role. Mike was there representing Shotsay.
16  Q. "Both Mike and John told me that as far as they
17  were concerned, regardless of the outcome, they were both
18  recommending to the union hall this matter had no merit;"
19  is that right?
20  A. They said that.
21  Q. So they told you before the panel, that they
22  were going to -- that it didn't have no merit?
23  A. They said that.
24  Q. And on the panel was Dave Rafter, Dave Miller
25  and Dave Alexander?

Page 120

1   A. That's correct.
2   Q. The three Daves. And you concluded that
3   because they found no merit, there was no discrimination?
4   A. They did, not me.
5   Q. Did they specifically say there was no
6   discrimination, or did they just say it had no merit?
7   A. No, I don't think they said either. I think
8   they referred to the grievance in whole, and said that it
9   ended the whole procedure.
10  Q. And the grievance included not only the hiring
11  procedure of not hiring Shotsay and hiring Tullis, and
12  also the discrimination against Shotsay, right?
13  A. I would have to go back and review that.
14  Q. In fact, on Page UFT1170, "A grievance was
15  filed by union. Step 1 for violation of hiring hall
16  practices and discrimination."
17  A. Where are you reading?
18  Q. I'm sorry. UFT1170. At the very top,
19  10-12-03.
20  A. Correct.
21  Q. And so we had the three Daves trying to decide
22  whether or not discrimination occurred; is that right?
23  A. Correct.
24  Q. And Shotsay was not there?
25  MR. EVANS: I'm going to object to lack of

Page 121

1   foundation.
2   BY MR. LEGACKI:
3   Q. His notes on UFT-01167, at the very last
4   sentence, "Therefore no discrimination existed. This is
5   their decision." Did you write that? That's how you
6   interpreted the decision?
7   MR. EVANS: Do you want to ask him that? If
8   that's how he interpreted the decision?
9   MR. LEGACKI: Yes.
10  THE WITNESS: Correct.
11  BY MR. LEGACKI:
12  Q. And was this three days -- according to you, it
13  was the three Daves that were making the decision that
14  there was no discrimination?
15  A. They did.
16  Q. And Shotsay was not there to present her case?
17  A. No, Mike was there.
18  Q. A guy who already admitted that he didn't
19  believe in the grievance?
20  A. Business agent.
21  Q. But the question is he did not believe in the
22  grievance and had already told you he was trying to get
23  rid of it, right -- trying to resolve it?
24  A. Correct.
25  MR. EVANS: Can we take a break?

## Page 122

1   MR. LEGACKI: Sure.
2   (Break was had.)
3   (Exhibit 39 marked.)
4   BY MR. LEGACKI:
5   Q. This is an interview that was taken 10-22-04.
6   Do you recall him calling you up and talking to you?
7   A. I remember.
8   Q. Have you seen this document before?
9   A. I believe I have, but it's been --
10  Q. Is there anything that stands out in there that
11  is inaccurate?
12  A. I would have to go through the whole thing.
13  I'm sorry. It's been quite some time since I've read
14  through this.
15  Q. Well, when you first read it, did anything say
16  that this guy --
17  A. I would have to reread. It's been quite some
18  time since I've read it.
19  Q. I guess what I'm asking you first is, when you
20  first read it, was there any impression in your mind like
21  this guy, gee, what was he smoking or anything like that?
22  Is there anything like, I didn't say that? Did any of
23  those feelings come up or anything?
24  A. I would have to read through it. I would have
25  to read through it again. I'm sorry. I can't remember

## Page 123

1   that.
2   Q. My question was: At the time you first read
3   it.
4   A. I can't remember that.
5   Q. Was there any emotions that you had that said
6   this is inaccurate or this guy is blowing smoke or
7   whatever?
8   A. I would have to reread it. I don't remember
9   that.
10  MR. LEGACKI: Could we go off record for a
11  couple of minutes. Go ahead and read it.
12  (Off record.)
13  BY MR. LEGACKI:
14  Q. Sir, you've had the chance to review the
15  statement taken. I guess the record of interview that
16  was taken by the EEOC; is that correct?
17  A. Yes.
18  Q. The statement was taken 10-22-2004. And
19  present was your attorney at that time, Mr. Wang, and the
20  office manager Janice Mansfield, right?
21  A. Yes.
22  Q. Is there anything in there that is inaccurate?
23  A. I believe there is.
24  Q. Would you mind telling me?
25  A. I'm not real sure how to word part of this

## Page 124

1   but -- where it states that I said possible knowledge of
2   the city is incorrect. I wouldn't have said that.
3   Q. That would be on?
4   A. Page 2, or the second page.
5   Q. Why is that incorrect?
6   A. Because I wouldn't have said possible knowledge
7   of the city. I probably would have said knowledge of the
8   city. More than likely it's on my job description.
9   Further, on the last paragraph here, I wouldn't
10  have said union hall does not have female drivers.
11  That's knowledge that I wouldn't have. Other than in
12  context, what I'm saying is that they have never
13  dispatched one to me.
14  This third page, third paragraph -- and I
15  can't -- I'm not sure how to explain it, but
16  specifically, I mean, in this case it's out of context
17  with what I said.
18  I mean, I believe I'm being asked -- well, I am
19  being asked if other companies employed female truck
20  drivers. I really don't have, you know, obviously enough
21  knowledge at that time to say yes or no, other than what
22  I am saying is I have seen female truck drivers around
23  town; driving a variety of different kinds of trucks.
24  So, yes, there are, but not to me. They haven't been to
25  me historically.

## Page 125

1   Q. You reference UPS and Fed Ex trucks?
2   A. Yes, because they come to my office sometimes
3   to deliver packages.
4   Q. And I know some of them will come in?
5   A. Yes. And I have seen -- probably the most I've
6   seen has been hauling dirt because I travel the Valley
7   road every day and I see lots of them in the summertime.
8   Q. Bobby Jack Trucking is run by a woman?
9   A. Yes, correct. I don't know this -- the fifth
10  paragraph down, I'm not -- I'm not sure where the hooking
11  and unhooking comes up. I don't -- I mean, there would
12  really be no reason for me to say that. I would have
13  never known that anyway. It was never discussed with me
14  with Bill Smith. So I don't really understand that part.
15  I mean, I now, after reading it, remember that
16  when I received my copy of it, I thought it was for the
17  seriousness of what was being, you know, alleged of me.
18  This was quite possibly the worst interview and document
19  I have ever seen. That's my general impression of it.
20  For such a serious violation to have this
21  mischaracterized and misspelled and not necessarily in
22  context and so short, I found it to be unuseful.
23  Q. How long did the interview last?
24  A. I don't know unless it's stated on here. I
25  don't remember that. I don't see it here. But I know it

Page 126

1  was not very long. I don't know. I just have a sense
2  that it wasn't very long. I don't remember doing this
3  very long because it does come back to me that, you know,
4  after receiving this back and then the process of
5  investigation goes to a full lawsuit, and I know that
6  this is the only thing that I ever said in my life, or
7  only opportunity that I ever had to defend myself, that
8  this was horrible. This was horrible.
9      Q.  Well, did you ever -- at that time, Mr. Wang
10 was your attorney. Did you discuss this matter with him
11 about something is wrong here?
12     A.  Well, of course, I did. You mean this report?
13     Q.  Yeah.
14     A.  Yeah, I discussed that with him, but at that
15 point it's already in.
16     Q.  Did your attorney or anybody write back and
17 say --
18     A.  I believe he did. I don't remember right off
19 the top of my head what was said or what he did, but I
20 believe he did. There was other correspondence from him
21 to Mr. Verduzco.
22     Q.  So you told your -- you and your attorney
23 talked about this, like this is a bad statement and
24 there's some inaccuracies in here?
25     A.  Certainly, yes, but more so that it seemed like

Page 127

1  a very -- a very shallow attempt and investigation, you
2  know, for such a serious allegation, which inevitably led
3  to our company being sued. So that was, you know, in
4  just the conversation.
5      Q.  Is that the only criticism -- I mean specific
6  details that are wrong about your statement that he
7  recorded?
8      A.  Would you like me to study it further? Because
9  I will.
10     Q.  Absolutely, sir. This is a document that we
11 need to get it clarified about whether or not -- what he
12 wrote down was inaccurate or not. So I'm assuming if you
13 don't tell me -- if you don't me tell me that it's
14 inaccurate, I'm going to assume that it's accurate.
15 That's what I'm trying to do. You should really go
16 through this.
17     A.  Yes, I understood that I had told you that, but
18 if you want me to be more detailed I will try to do that.
19     Q.  Sure. Please. Do you want to take a couple of
20 minutes?
21     A.  Do you want me to point out misspelled words
22 and things of that nature? How far do you want me to go?
23     Q.  I'm sorry?
24     A.  How far do you want me to go? You want me to
25 talk about context, right, not grammar?

Page 128

1      Q.  Right. Do you want to -- in fact, why don't
2  you put "X"s -- read it and put "X"s next to it. We'll
3  take a break again.
4      A.  That might be helpful to me to go through it
5  some more.
6          (Break was had.)
7  BY MR. LEGACKI:
8      Q.  Go ahead.
9      A.  Thanks for the time. Some of this is little,
10 but the first sentence there, I wouldn't have said towing
11 business because I'm not a towing business. I have a
12 trucking business. In the third paragraph again,
13 probably here, the first two or three sentences, it's in
14 the context of the company; not me physically doing it,
15 but in the context of the company, when it says that I'm
16 the one that contacts the union, and I'm the one that
17 makes the decision on the number of people. It's in the
18 context of the company. I wanted to clarify that.
19     Q.  You should put that in the third person, right?
20     A.  Yes, sir.
21     Q.  And this part here, about six lines down, "lead
22 driver comes back and gives his recommendation to Janice
23 on how fast the driver is," would never have been said.
24 It would have been -- I just don't think that would have
25 been said. And, "at this time, the decision is made to

Page 129

1  hire or move on," would apply only if there was a single
2  application.
3          And stating here that I would not deviate from
4  the guidelines because I would get in trouble by the
5  union, that's out of context as well. It's just -- what
6  should have been there is I have a union contract which I
7  have to follow. I discussed that one already.
8          I wouldn't have said that the union hall was
9  not -- I think I've already said that -- have truck
10 drivers there because I wouldn't know that. And I
11 wouldn't have said, "I don't know why that is" to my
12 knowledge. And on this third line, where it says -- I
13 stated, "that there are women in the union hall, but
14 they're not applying for truck driving positions with my
15 company." That should have been in there?
16         This is -- Paragraph 2 here where it says,
17 "Monfrey states that he has a great deal of experience
18 hiring minorities." That's completely incorrect. What
19 was said there is it relates back to my past employer,
20 that I had a great deal of hiring and training Inupiat
21 minorities -- Native Americans because they ran our
22 corporation.
23     Q.  Which you say "Monfrey," in that context, it's
24 the first person, rather than the third person?
25     A.  Yes, sir, because that's talking directly about

**Page 130**

1  me. He was asking me, as I remember, about what
2  experience I've had working with minorities. And I was
3  pointing out to him that I had -- well, essentially
4  10 years of experience in hiring and training of Inupiat
5  Native Americans.
6      Q.  What was that company?
7      A.  Arctic Slope Regional Corporation.
8      Q.  How long did you work for them?
9      A.  10 years -- 9 years and some months. I already
10 covered the third paragraph.
11     Q.  Does Arctic Slope own Tesoro?
12     A.  No, Arctic Slope owned Petro Star. Tesoro is
13 an individual.
14         Again, Paragraph 4 uses my name, made the phone
15 request to the union for two drivers to interview. That
16 was in the context of the company, not me personally.
17 And again on Paragraph 5, my name is in the context of
18 the company giving the recommendation, not me personally,
19 because we've already established how that works.
20         I've already mentioned the issue of hooking and
21 unhooking. I'm still mystified about that. And I
22 believe that's all of it, sir.
23     Q.  Would you mind signing that last page with
24 those corrections you made. It's in the record. Would
25 you mind signing that?

**Page 131**

1      MR. EVANS: Are all the corrections that you've
2  referred to, Frank, written on that?
3      THE WITNESS: No, sir, I put an "X" like he
4  told me. I just made some little notes so I would remind
5  myself when I came back in here. I just put "X"s on most
6  of it. I just put like little one-word pieces to remind
7  me what I was going to tell you.
8      MR. LEGACKI: Sure. But I thought we'd have a
9  record of it.
10     MR. EVANS: That's fine. I just want to make
11 sure that we're not mischaracterizing what his signature
12 meant.
13 BY MR. LEGACKI:
14     Q.  Just sign the bottom of that, please.
15     A.  (Witness complies.)
16     Q.  We've already established you initially had
17 Mr. Wang at Bankston, Gronning, O'Hara Sedor, Mills,
18 Givens and Heaphey.
19     (Exhibit 40 marked.)
20 BY MR. LEGACKI:
21     Q.  And this is a letter written by your attorneys
22 back to Omar on December 8, 2004; is that correct?
23     A.  Yes, sir, that's what it says.
24     Q.  So this -- I take it you saw your statement and
25 it was given back to you and this was your response back?

**Page 132**

1      A.  I would say that's probably correct, yes.
2      Q.  And they don't mention anything in here that
3  the statement that you gave was incorrect in material
4  part?
5      A.  May I read this, too?
6      Q.  Sure. Go ahead, please.
7      A.  It's been quite some time since I've seen it.
8      Q.  I rather you do it than not.
9          So nowhere in this letter does it state that
10 statements that you gave are inaccurate or anything like
11 that, does it?
12     A.  No, sir, it doesn't.
13     Q.  Okay. And, in fact, they include a statement
14 from Mr. Smith; is that correct?
15     A.  I'm sorry?
16     Q.  And it talks about an affidavit of William
17 Smith attached to this?
18     A.  I don't believe this, from memory, to be in
19 response to this. I believe this to be something to ask
20 because there had been no communication back and forth to
21 say, maybe to find out where we were at. I don't have
22 any knowledge of it being a response to that.
23     Q.  So where would Omar get the idea of the hooking
24 and unhooking if it was not mentioned to him during the
25 interview?

**Page 133**

1      A.  I don't know, unless -- unless it was mentioned
2  here later where we talked about Tullis, and it was said
3  that he hooked and unhooked and had experience doing it.
4  That's the only thing I can think of. I still, as I
5  maintained before, we're not really sure if that was ever
6  said. That's not a term I even use on a regular basis.
7  I never talk about hooking and unhooking. We talk about
8  landing gear and different things. But we don't -- it's
9  not like a buzz word of ours, you know, hooking and
10 unhooking. I can't remember a time that we talked about
11 that as a general thing around the office. That's why
12 I'm concerned about that.
13     Q.  This is an EEOC investigator. I'm assuming
14 it's not part of his jargon either.
15     A.  Oh, quite understandably.
16     Q.  It had to come from somewhere. Do you have any
17 idea where it came from?
18     A.  Sir, I can't say.
19     Q.  And at the back page on the last paragraph,
20 they were talking about an individual who was out of
21 state until December 19th, who has knowledge of
22 Ms. Posciri being a slow driver.
23     A.  I believe we had stated earlier that that had
24 no merit to any of this. That was hearsay and it's
25 been -- essentially, at that time -- afterwards we found

## Page 134

1  it to be hearsay and threw it away.
2      Q.  And, in fact, they write back and confirm --
3  just for the record -- they write back and confirm that
4  there is nobody to give evidence.  There was no other
5  worker.  And this is a letter from your attorney on
6  December 28, 2004.
7          (Exhibit 41 marked.)
8  BY MR. LEGACKI:
9      Q.  It states, "The other potential witness we
10 discussed does not have any first-hand knowledge that
11 would be useful to the Commission's decision-making
12 process."  How did that ever come up?  Do you know how
13 that came up?
14     A.  Sir, I do not.  I assume it was just some
15 hearsay somewhere, but I have no knowledge of where it
16 came from.
17     Q.  So finally, on December 28, 2004, the record is
18 finally made clear, the employee who said that Shotsay
19 was a slow driver, a co-worker, is now found to be
20 unfounded, almost a year after she was not hired?
21     A.  Correct.
22         MR. LEGACKI:  Can I check my notes for a couple
23 of minutes?  I'd like to check my notes for a couple of
24 minutes.
25         MR. EVANS:  Sure.  Do you want to go off the

## Page 135

1  record?
2          MR. LEGACKI:  Sure.  If you don't mind.
3          (Off record.)
4  BY MR. LEGACKI:
5      Q.  Sir, can we go back to this document, the
6  events leading to grievance that you wrote.  Do you have
7  that exhibit there?  And that is exhibit what again?
8      A.  38.
9      Q.  If you look at Page UFT01154, you have the name
10 Jack Slana circled.  What's that reference to?
11     A.  If I recall, Mike -- Mike had spoke to Jack
12 about this I think, but I don't really remember because I
13 think he's been like retired and gone for a long time.
14     Q.  From the company?
15     A.  From the union.
16     Q.  From the union?
17     A.  Yeah.  I don't even know where he is.  I think
18 he's been gone for years, as far as I know.  So I don't
19 even know why -- I don't know why that would be -- I
20 mean, there's got to be some connection between Mike and
21 that, but I don't know what it is.
22     Q.  Do you know Jack Slana personally?
23     A.  I met him once many, many years ago.  It would
24 go back to a dozen years to 15 years ago.
25     Q.  Okay.  Do you know if he was a business agent

## Page 136

1  or anything like that to the union?
2      A.  I believe at one time he was the actual
3  secretary/treasurer of the union -- the head of the union
4  many, many years ago.
5      Q.  Was he United Freight's business agent?  Do you
6  know?
7      A.  I have no knowledge of that -- not since I've
8  been around.  I don't know that.
9          MR. LEGACKI:  I don't have any further
10 questions.
11             EXAMINATION
12 BY MS. HEALY:
13     Q.  When you spoke earlier, you spoke about your
14 daughters.  How old are they?
15     A.  19, 17, 15, 14 and 7 and 3.
16     Q.  Any in college right now?
17     A.  No.
18     Q.  And what does your wife do for a living?
19     A.  She's a homemaker.
20     Q.  Not in the workforce?
21     A.  Not at this time.
22     Q.  Has she been in the past?
23     A.  Oh, yes.  She's done several different things.
24     Q.  Truck driving?
25     A.  No.  She worked road construction, but not as a

## Page 137

1  truck driver.  She drove the big steam roller thing that
2  smashes down the asphalt, and a flagger when she started
3  and -- but got bumped.
4      Q.  Was that here in Alaska?
5      A.  Yes, ma'am.
6      Q.  You said before that you have worked with 150
7  women?
8      A.  I've had that many under employ through --
9  as -- under an umbrella as chief operating officer, yes,
10 ma'am.
11     Q.  Okay.  And how many of those women were truck
12 drivers?
13     A.  None.
14     Q.  Have you ever worked with a female truck
15 driver?
16     A.  I never have.
17     Q.  Another thing that you testified earlier to was
18 that you were trained and versed on all discrimination
19 issues; is that accurate?
20     A.  For 18 years of my corporate life we had
21 ongoing training, if you will.
22     Q.  Can you tell me about that?
23     A.  Not in detail.  I just know that it was an
24 ongoing process in each of the companies that I worked
25 for.  And we had what you call routine meetings about

Page 138

1  that subject and, of course, many, many others in
2  reference to hiring.
3      Q.  Would you say it's like a training that the
4  company provides to all of the employees?
5      A.  Yes, ma'am.
6      Q.  And those were trainings that you would sit in,
7  too?
8      A.  Absolutely.
9      Q.  Did you, at those other companies, were you
10 provided as the COO, training?
11     A.  When I was a COO?
12     Q.  Let me back up.  I'm trying to understand when
13 you received the training.  I thought I understood you to
14 say it was while you were the COO.  That might be
15 incorrect.
16     A.  That is incorrect.
17     Q.  You tell me then when you received the
18 training.
19     A.  From the time I started my corporate life in
20 1983, to the year 2000 when I resigned, essentially.
21     Q.  So tell me, from 1983 on, what jobs you had
22 where you received training on discrimination issues?
23     A.  Let me ask, if I may, the company name or the
24 title of my position?
25     Q.  Both.

Page 139

1      A.  Okay.  Starting in 1983 with Tesoro, Tesoro
2  Alaska -- let me see, how do I -- I became a manager in
3  my second year there, 1985.  So sometime in that time
4  frame we had training courses of that nature.  I was in
5  progress to Harbor Enterprises.  I was there for a short
6  while as well, whereby which we had that kind of training
7  provided to us.  And then progressing from there to
8  Arctic Slope for 10 years.  It was an ongoing thing.
9      Q.  And when you started you said when you worked
10 for -- is it Tesoro?
11     A.  Tesoro, T-E-S-O-R-O.
12     Q.  You said, "When I became the manager in 1985"
13 is when you got training?
14     A.  Roughly.  I started in -- it might have been --
15 yeah, roughly.
16     Q.  Was that training specific to managers on how
17 to deal with discrimination issues that might come up in
18 the workplace?
19     A.  For 1985 it was a manager's training course
20 relative to that subject, as well as others.
21     Q.  And that company had a discrimination policy?
22     A.  I believe they did.
23     Q.  And what about Harbor Enterprises?
24     A.  As far as the policy, I can't recall that.
25     Q.  But they provided training to managers?

Page 140

1      A.  We had management training, yes, on that
2  subject and others as well.
3      Q.  How to deal with those issues if they arise in
4  the workplace?
5      A.  Sure.
6      Q.  And how to --
7      A.  To prevent them.
8      Q.  Prevent them?
9      A.  Yes, ma'am.
10     Q.  And Arctic Slope?
11     A.  The very same.
12     Q.  And after that is when you went to United
13 Freight?
14     A.  Yes, ma'am.
15     Q.  And United Freight doesn't have any sort of
16 anti-discrimination policy?
17     A.  No, we do not, other than what's in the
18 contract.  And I think what -- the poster that we put in
19 the shop and the office workplace.  We don't have a
20 policy at this time, no.
21     Q.  When you refer to a poster, you're talking
22 about the EEOC poster?
23     A.  Yes, ma'am.
24     Q.  You don't provide at United Freight any
25 training to your employees on discrimination issues?

Page 141

1      A.  I do not at this time.
2      Q.  And you don't provide any training to your
3  managers on discrimination issues?
4      A.  I have only one, so no, ma'am.
5      Q.  And the only manager, you mean Janice?
6      A.  Yes.
7      Q.  You have other individuals, for example, the
8  lead drivers, who have the responsibility to screen
9  candidates for employment; is that right?
10     A.  No, only for driving test purposes.
11     Q.  Right.  But their screening during the driving
12 test process has an impact on whether or not they are
13 employed at the company?
14     A.  It does.
15     Q.  And those employees aren't given any
16 discrimination training?
17     A.  No.
18     Q.  Now, earlier when you talked about it, you said
19 that there's no way that discrimination could happen on
20 your watch.  So what I'm trying to understand is how you,
21 as the president of the company and general manager,
22 ensure that discrimination doesn't happen on your watch?
23     A.  I'm not sure how to phrase that.  I'm sorry.
24 It may be that my statement is in reference to
25 discrimination whereby which females are involved, and

Frank Monfrey                        Deposition                        December 9, 2005

**Page 142**

1    there's only three of us in the entire office. So I just
2    don't ever -- I don't see that ever being an issue.
3         Q.    But by your own admission, you're not really
4    involved in the hiring process?
5         A.    Correct.
6         Q.    And you don't provide any training to those who
7    are involved in the hiring process?
8         A.    Not at this time.
9         Q.    Okay. What way would an employee who is
10   experiencing discrimination at United Freight be able to
11   resolve that?
12        A.    Union or nonunion?
13        Q.    Either.
14        A.    Union, their first step in procedures is to go
15   to their shop steward and from there, it goes to the
16   union. That's something that, unless there is an actual
17   grievance filed, would never come to my desk.
18        Q.    And you employ nonunion employees?
19        A.    We have two and a half, excluding myself, of
20   course.
21        Q.    And those people are who?
22        A.    Janice Mansfield and Robin Robinson. And a
23   part time young lady by the name of Veronica. And I'm
24   sorry, I don't know her last name.
25        Q.    And Robin and Veronica are in the office?

**Page 143**

1         A.    Yes, ma'am.
2         Q.    And those are the only nonunion people?
3         A.    Yes, ma'am.
4         Q.    How would they deal with a discrimination
5    complaint?
6         A.    It would have to be brought to me.
7         Q.    Do you have any nonunion truck drivers?
8         A.    No, ma'am.
9         Q.    Are you familiar with the company's finances?
10   Is that something that you deal with as part of your --
11        A.    Yes, ma'am.
12        Q.    Are you aware that the EEOC sent out
13   interrogatories requesting information about your
14   financial status about the company?
15        A.    No, ma'am.
16        Q.    Were you ever requested to compile documents
17   about the company's financial status?
18        A.    No, ma'am.
19        Q.    Do you know whether or not Ms. Mansfield was
20   ever asked to compile documents for the company's
21   financial status?
22        A.    I do not know.
23        Q.    Would she have the access to that type of
24   information?
25        A.    She would not, but she would not be able to

**Page 144**

1    send it without my approval.
2         Q.    Without your approval. Did she ask you whether
3    or not she could have your approval?
4         A.    No, ma'am.
5         Q.    Okay. I'll represent to you that your
6    attorneys have objected and not turned over any financial
7    documentation and the EEOC has notified them of our
8    opposing that decision to object. What I would like for
9    you to do right now is look over some files, which I'll
10   have marked as the exhibit in sequential order.
11             (Exhibits 42 and 43 marked.)
12   BY MS. HEALY:
13        Q.    Do you recognize either of these printouts?
14             MR. EVANS: Can I ask a question? Were these
15   documents produced to us at all?
16             MS. HEALY: No, I just -- no, they weren't.
17             THE WITNESS: No.
18   BY MS. HEALY:
19        Q.    These are printed from two different databases.
20   One is done on Brad Street and the one is on a LEXUS
21   database. And they are publically available company
22   records. Would you mind looking through them and see if
23   you know if they are accurate? And you're the person to
24   ask about the financial information about the company; is
25   that right?

**Page 145**

1         A.    Yes, ma'am.
2              MR. EVANS: Can we go off the record so he can
3    look at them?
4    BY MS. HEALY:
5         Q.    Sure. Just before we go off the record, let me
6    just ask you a couple of other questions. Do you know
7    how many employees United Freight has right now?
8         A.    35.
9         Q.    Is that a guess?
10        A.    It's not accurate. I have to go through my
11   mind and count my roster and count my mechanics. If you
12   can give me a minute I can do it.
13        Q.    Okay. So number of employees and then if you
14   want to look at those documents.
15             (Off record.)
16   BY MS. HEALY:
17        Q.    I see that on top of document number --
18        A.    42.
19        Q.    42. You wrote some calculations?
20        A.    I was adding.
21        Q.    Number of employees?
22        A.    I think it's 35 and a half.
23        Q.    Okay. And that's including Veronica who's the
24   half?
25        A.    Yes.

Page 146

1  Q.  And did you have a chance to review the
2  documents?
3  A.  I looked through them, yes.
4  Q.  And is the information in those documents
5  accurate?
6       MR. EVANS: I'm going to object and instruct
7  the witness not to answer the question.
8       MS. HEALY: Not to answer the question on what
9  basis?
10      MR. EVANS: On the basis that we have a pending
11 objection as to status of United Freight's financial
12 information. We advised you of that objection. We told
13 you we would seek a protective order, and to let us know
14 if you wanted us to do so. You didn't respond, and now
15 you're asking him questions that lead to uncovering that
16 financial information in the deposition. So I'm going to
17 instruct him not to answer.
18      MS. HEALY: And I will respond. The objection
19 that was stated was to the company providing me any
20 financial information. This information was obtained by
21 another source. You are correct that we have a current
22 dispute over whether or not the EEOC at this time, in a
23 federal law suit, not a state court action, is entitled
24 to financial information, which goes directly to punitive
25 damages in this case.

Page 147

1  Because you're instructing the witness not to
2  answer, for the record, I will open -- keep open this
3  deposition pending the outcome of any motions filed in
4  court. And I would appreciate you to reconsider your
5  objection to this witness testifying on documents of
6  public record.
7       MR. EVANS: Okay.
8       MS. HEALY: Are you instructing the witness not
9  to answer any questions based on the public records,
10 which were presented today?
11      MR. EVANS: I'm instructing him not answer any
12 questions that would reveal United Freight's financial
13 information.
14      MS. HEALY: Are you instructing him not to
15 answer the pending question, and that is, whether or not
16 these documents are accurate?
17      MR. EVANS: With respect to the financial
18 information contained therein, yes.
19      MS. HEALY: Okay. I don't have any further
20 questions then.
21      MR. LEGACKI: I don't have any further
22 questions.
23      MS. KUCUK: I have no further questions.
24      MR. EVANS: I don't have any questions.
25      (Proceedings concluded at 3:18 p.m.)
        (Signature reserved.)

Page 148

1            REPORTER'S CERTIFICATE
2       I, ROSIE S. SCOTT, CSR, hereby certify:
3       That I am a Certified Shorthand Reporter
4  for Alaska Stenotype Reporters and Notary Public for the
5  State of Alaska; that the foregoing proceedings were
6  taken by me in computerized machine shorthand and
7  thereafter transcribed by me; that the transcript
8  constitutes a full, true and correct record of said
9  proceedings taken on the date and time indicated therein.
10      Further, that I am a disinterested person to
11 said action.
12      IN WITNESS WHEREOF, I have hereunto
13 subscribed my hand and affixed my official seal this
14 ____ day of _____, 2006.
15
16
17
18 _____
19 ROSIE S. SCOTT
   Certified Shorthand Reporter
20 My Commission Expires
   8/16/08

Page 149

1            WITNESS CERTIFICATE
2  EEOC and Shotsay Posciri v. United Freight,
   Case No. A05-0122 CV (JWS)
3
4  FRANK MONFREY         Taken December 9, 2005
5  I hereby certify that I have read the foregoing
   deposition and accept it as true and correct, with the
6  following exceptions:
7  ==========================================
8  Page  Line  Description  Reason for Change
9  ==========================================
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
   (Date read)    (Sign name here)
24
   (Use additional paper to note corrections as needed,
25 dating and signing each one.) (RS)