# EXHIBIT 4

Case 3:05-cv-00122-TMB   Document 31-6   Filed 02/06/2006   Page 2 of 3

Frank Monfrey                          Deposition                          December 9, 2005

Page 6

1  or what we did, or who we rejected. But all of a sudden
2  I have two Teamster's representatives in my office, one
3  questioning my "hiring hall practices." I felt we
4  resolved that fairly easily. I asked him what he wanted
5  and he gave me a list and I said, okay. Now we have
6  something new. I told him I'd never seen a policy. He
7  said, "Well, it should have been this way all the time."
8  I asked, "Where is that at? I don't know anything about
9  that. We've been doing it this way for 20 years."
10        Anyway, we resolved that issue. But in the
11  process, they bring me a letter to point out how they
12  want me to hire Shotsay. And, you know, it probably --
13  the union, in my history, some 17, 18 years of contract,
14  has predominately done things along that nature where
15  they, you know, "strong arm" you into doing things for
16  them that -- you know, favors or whatever they are. And
17  it's a holdout from 25 years or 30 years ago when Jesse
18  Carr was running the state of Alaska and that's the way
19  it was, and that's fine. But this is, you know, the 21st
20  Century here and business isn't done that way anymore --
21  not around me anyhow.
22        Essentially, they said that Ms. Shotsay was a
23  friend of Mr. Kenny's newly elected secretary/treasurer,
24  that they needed me very badly to bring her on and they
25  gave me a letter that said we want you to do this and

Page 7

1  you're going to do it and here's how you're going to do
2  it. You're going to give her her job back, her seniority
3  ahead of Mr. Tullis, you're going to give her backpay and
4  she'll be here with no probation. I said absolutely not.
5  And I refused to do it.
6     Q.  So it was not a phone call?
7     A.  It was in my office.
8     Q.  It was in your office.
9     A.  They came together. The first time in --
10  actually, in my history, ever that I had ever seen a
11  dispatcher come into my office with an issue. This was
12  just unheard of. That's business agent work. It's their
13  job to manage me and my contract and make sure things are
14  smooth between the two people.
15     Q.  So you're saying that Mr. Jones and Mr. Killian
16  came into your office and said because Ms. Posciri --
17  Shotsay here -- knew Mike Kenny and that you had to hire
18  her?
19     A.  Absolutely.
20     Q.  When was the election?
21     A.  Somewhere in that time frame. It had been big
22  stuff. It was a big deal. There was a whole new change
23  in guard there. It means absolutely nothing to me. I
24  don't deal with those people. As a matter of fact I've
25  seen Kenny one time in my life. You know, I saw Jerry

Page 8

1  Hood twice in my life. That stuff doesn't mean anything
2  in my daily business, you know, none.
3     Q.  Okay. So was that meeting in the office that
4  you had in November is when this conversation occurred?
5     A.  I think so.
6     Q.  Okay. Let's go -- can I get your background?
7     A.  How far do you want to go?
8     Q.  Let's go all the way. You mentioned --
9     A.  I went to Catholic Military school for nine
10  years. I was raised in San Antonio, Texas. I graduated
11  with honors from college. I was an all American athlete
12  in college. I worked 17 -- almost 18 years in the
13  petroleum refining business. I resigned as a senior
14  level manager. I've got over 20 years in management
15  experience.
16        I've been trained, versed and rehearsed on all
17  issues of discrimination. I have no record of ever doing
18  that, no desire, no care.
19        I have been with this company as president for
20  five years. My owner that I work for wanted to retire.
21  I took a lighter load in my life. I didn't want to have
22  that big one at 45. And if I make it three more weeks
23  here until Christmas Day I'm going to have it made.
24  Okay? So that's my background.
25        Largely management, largely negotiations,

Page 9

1  largely merger acquisitions, hiring. I've hired hundreds
2  of people. I've fired hundreds of people. I've had as
3  many as 150 women working under myself in various jobs.
4  Fantastic.
5     Q.  So you're going to be 45 on Christmas?
6     A.  Yes, sir, Christmas Day. I'm going to quit
7  smoking that day. It's going to be a good day for me.
8     Q.  Do you want to take a bet on that one?
9     A.  You know, I'm really -- I've got a three-year
10  old. I'm really serious about this.
11     Q.  Okay.
12     A.  Discrimination is not a part of my life, sir.
13  I'm going to tell you why. I have -- essentially was
14  raised with three sisters, a lovely mother who today,
15  turned 82-years old. I spoke with her this morning. I
16  have a lovely wife, six daughters and one son who's grown
17  and gone. Sensitivity training is in my life every
18  minute of every day, and I love those girls. And so
19  that's how I was raised.
20        I was also raised a very staunch Catholic
21  Italian. Italian men always respect, always respect
22  their mothers and their wives. That's how I was raised.
23  I want to put that to rest right now.
24     Q.  So you were raised in San Antonio, Texas?
25     A.  Yes, sir.

3 (Pages 6 to 9)

Alaska Stenotype Reporters

EXHIBIT 4 - Page 1 of 4

Frank Monfrey | Deposition | December 9, 2005

### Page 74

1  A.  Where are you reading that?
2  Q.  Para 1 is his rebuttal to your letter.  And
3  it's down here.  "I engaged in the discussion encouraging
4  settlement."  This is what Mike Killian wrote in response
5  to your letter.  "Frank did not tell us he would not
6  accept the proposal.  Frank did not make any statements
7  regarding the validity of the grievance."  He's
8  contradicting your letter.
9       And he goes on to say, "I engaged in the
10 discussion encouraging settlement.  Further, I was under
11 the impression that he was strongly considering settling,
12 however, under lesser terms.  Frank told us he would wait
13 for our written proposal (you intended to personally
14 deliver it that day) and would respond back to us the
15 following Monday.  Frank expressed a personal concern in
16 that he would have to retract his current position on the
17 grievance and announce it among his employees, stating
18 that in his position as president running the company,
19 that would not be an easy thing to do."
20 A.  That's not true.
21 Q.  That's not true?
22 A.  No, sir.
23 Q.  Let's go back.  At the meeting, did you make
24 any comments regarding the validity of the grievance on
25 that November 14th meeting?

### Page 75

1  A.  I'm sure I did.
2  Q.  And what did you say?
3  A.  I can't recall.
4  Q.  Okay.  And then -- but there was discussion of
5  settlement of Shotsay's grievance, correct?
6  A.  It was brought to my attention, yes.
7  Q.  I'm sorry?
8  A.  They brought it with them, yes.
9  Q.  Was it in writing at that time, or was it --
10 A.  I can't say for sure if it was in writing at
11 that time.  I believe it was, but it might not have been.
12 Q.  "I was under the impression that he was
13 strongly considering settling."  Were you considering
14 settling?
15 A.  Absolutely not.
16 Q.  Why is that?
17 A.  Because of the manner in which it was presented
18 to me.
19 Q.  What do you mean?
20 A.  Well, we discussed earlier, the manner in which
21 it was presented to me was not in a -- it was more of a
22 "you're going to do this" manner.  Is that clear?
23 Q.  You mean they were trying to strong arm you?
24 A.  Exactly.  But I didn't use that word.  It was
25 "you need to do this."  You're going to do this, and this

### Page 76

1  is how we're going to do this.  I never strongly -- to
2  say I strongly was considering it was never an option.
3  Q.  Well, if they didn't try to strong arm you,
4  would you consider it -- settling this grievance?
5  A.  It would have had a different tone.  I can't
6  answer that for sure.  It was a long time ago -- but not
7  under these terms.
8  Q.  What do you mean the terms?
9  A.  The terms that were presented to me that day.
10 Q.  And he says, "I was under the impression that
11 he was strongly considering settling, but under lesser
12 terms."  Would you have settled under lesser terms?
13 A.  Well, there's two answers to that question.  I
14 would say that had not there been this forceful nature
15 taking place in my office, and we -- there was -- if that
16 element didn't exist at all, then there might have been
17 other conversation.  But I can't say for sure because
18 none of that occurred.
19 Q.  Now, there was another call in October; is that
20 correct?
21 A.  Say again, please.
22 Q.  There was another call in October?
23 A.  I think there was, yes.
24 Q.  October 20th?
25 A.  I think there was.

### Page 77

1  Q.  And two guys were sent over, were actually
2  hired by the company, Mr. Merck and Mr. Lemons; is that
3  correct?
4  A.  I'm not going to say because I don't know for
5  sure.
6  Q.  You don't know if they worked for you or not?
7  I thought Janice said, yeah, we hired the two of them?
8  A.  Okay.  Then we hired them.
9  Q.  So I guess what we did is, the application of
10 Merck and Lemons was marked 35 and 36.  And I went
11 through these applications yesterday with Janice.
12 A.  Yes, sir.
13 Q.  And one had no port experience and did not --
14 well, Merck was 34 and Lemons was 35.  They are
15 applications, and we went through them.  And we talked
16 about Mr. Merck only being in Anchorage for two months;
17 is that correct?
18 A.  I remember that, yes.
19 Q.  And Mr. Lemons -- it's even questionable
20 whether or not he had ever been in the Port before.  He
21 worked for a moving company.  It was not clear whether or
22 not if he worked in the Port system.
23 A.  I remember your conversation, yes.
24 Q.  And this is the call in October.  It looks like
25 Mr. Lemons filled out the application the 17th and