Page 86

1  two-step grievance about Shotsay; is that correct?
2     A.  That's correct.
3     Q.  11-2, terminated Craig Merck and asked the hall
4  to bring me in a candidate from the 10-16 call, Perry
5  Lemons. They again said okay, correct?
6     A.  Correct.
7     Q.  Why is it that you didn't ask for Shotsay, but
8  you wanted Perry Lemons?
9     A.  She wasn't a candidate.
10    Q.  Well, she passed your test before. She showed
11 up on the call before and passed the test.
12    A.  It was a whole different call.
13    Q.  I guess I'm confused here. So maybe it's my
14 confusion here. I'm sorry. The 10-16 call on which
15 Lemons initially -- Perry Lemons was a second good
16 prospect, that call was closed, correct?
17    A.  Yes.
18    Q.  And that was closed on 10-17, correct?
19    A.  Yes.
20    Q.  But then on 10-31 -- strike that. On 11-02,
21 you call the hall and say -- you didn't ask to open up
22 the call, you just say can we hire this guy named Perry
23 Lemons who we tested on 10-17, right?
24    A.  Correct.
25    Q.  My question is: Why did you not ask for

Page 87

1  Shotsay? Why did you ask for Perry Lemons?
2     A.  Perry Lemons was on the last call.
3     Q.  But Shotsay was on the call before, wasn't she?
4     A.  That would be correct.
5     Q.  Why didn't you ask for her?
6     A.  We didn't.
7     Q.  I know you didn't. My question is why didn't
8  you?
9     A.  We didn't. I mean, it was a Dan Tullis and
10 Shotsay comparison. Dan Tullis was the better candidate
11 for Janice and we moved forward from there. And there
12 was another open call. And Shotsay never showed back up.
13 She had the opportunity to do that.
14    Q.  Well, why didn't you call back and say -- you
15 had a grievance pending, right?
16    A.  Yeah, we would have, uh-huh.
17    Q.  And the grievance was pending and Shotsay --
18 and this is before the "strong arm tactics" in November,
19 correct?
20    A.  That would be correct.
21    Q.  So this is before any offer to settle or any,
22 what you consider strong arm tactics, you could have
23 said, hey, yeah, Shotsay passed. We can solve this
24 grievance. Bring her over. She passed the test. She
25 was good.

Page 88

1     A.  I have no answer.
2     Q.  And you knew from the union that she had an
3  impeccable driving record with over 20,000 hours
4  experience in the last 10 years, right?
5     A.  At that time I may have known that.
6     Q.  And you knew that you had a candidate who
7  wanted to work there, who had a lot of experience in
8  Anchorage, who had a great driving record. Why didn't
9  you ask for her rather than Perry Lemons?
10    A.  The candidates that went to work there, once
11 they have come through there, and if they don't get hired
12 or we don't hire at that time, never stop asking.
13    Q.  I'm sorry. I misunderstood that.
14    A.  Candidates that come through there, whether
15 they're hired or not and they try, they never stop asking
16 if they truly want to work there. They never stop
17 calling and asking.
18    Q.  Well, what does a grievance tell you? Does the
19 grievance tell you that a person wants to work there?
20    A.  Absolutely not. The grievance had nothing to
21 do with her wanting to work there.
22    Q.  Well, you can resolve the grievance -- what
23 would be the remedy for the grievance? You have a
24 grievance. What's the remedy?
25       MR. EVANS: Objection. Vague and ambiguous.

Page 89

1        THE WITNESS: I don't know how to answer that.
2  BY MR. LEGACKI:
3     Q.  If the union files a grievance and is saying,
4  hey look, you didn't hire this person and you should
5  have, what's the remedy?
6     A.  The grievance was filed in light that it is
7  saying that I discriminated is incorrect.
8     Q.  Okay. So what's the remedy for discrimination?
9     A.  I can't answer that. What do you mean?
10    Q.  How do you cure the discrimination? By hiring
11 a person, right?
12    A.  No, I don't think so.
13    Q.  What do you mean?
14    A.  I think you have to go through and see the
15 grievance through. I mean, I've never been presented
16 with this kind of a problem in my life, ever, in any
17 contract I've ever had. As a matter of fact, in 18 years
18 this is only the second grievance I ever had filed on me
19 from any company I worked for. Grievances are brand new
20 to me in this environment.
21    Q.  Well, did you consult with somebody. Did you
22 consult with Fitzpatrick since we got this grievance
23 filed what do we do?
24       MR. EVANS: Who's Fitzpatrick?
25 BY MR. LEGACKI:

Page 118

```
 1      MR. EVANS:  Objection; lack of foundation.
 2      THE WITNESS:  They were not taken at the
 3  meeting.
 4  BY MR. LEGACKI:
 5   Q.  What was not taken at the meeting?
 6   A.  The notes.
 7   Q.  When were these notes written?
 8   A.  Probably after the meeting.
 9   Q.  Contemporaneous with the meeting?
10   A.  Next day.  I don't know.
11   Q.  And you don't mention anywhere that you were
12  being strong armed by the union?
13   A.  Not on this page.
14   Q.  Anywhere, did you write anywhere that you were
15  being strong armed by the union?
16   A.  No, I did not.
17   Q.  And then "2-11-04, union grievance outline,
18  7:45 a.m., Mike Jones, John Synder and I meet to discuss
19  grievance panel procedure."  Mike told you how it was
20  going to be done, right?
21      MR. EVANS:  Objection; lack of foundation;
22  facts not in evidence.
23  BY MR. LEGACKI:
24   Q.  "Mike said she would start the process by
25  stating the facts which" -- do you see that there?
```

Page 119

```
 1   A.  "Which would lead."
 2   Q.  "Which would lead to the point we are at
 3  today."
 4   A.  I'm sorry.  It's supposed to mean led to the
 5  point we are today.
 6   Q.  "And then I would have the opportunity to state
 7  the company's position.  After that point the
 8  three-member panel would vote.  And John Synder was asked
 9  to stay for the meeting by Mike."
10   A.  Correct.
11   Q.  So he had John Synder and Jones at that meeting
12  in front of the panel?
13   A.  What I can't remember is if John was actually
14  in there, but I know he was there.  But he had no role,
15  no voice role.  Mike was there representing Shotsay.
16   Q.  "Both Mike and John told me that as far as they
17  were concerned, regardless of the outcome, they were both
18  recommending to the union hall this matter had no merit;"
19  is that right?
20   A.  They said that.
21   Q.  So they told you before the panel, that they
22  were going to -- that it didn't have no merit?
23   A.  They said that.
24   Q.  And on the panel was Dave Rafter, Dave Miller
25  and Dave Alexander?
```

Page 120

```
 1   A.  That's correct.
 2   Q.  The three Daves.  And you concluded that
 3  because they found no merit, there was no discrimination?
 4   A.  They did, not me.
 5   Q.  Did they specifically say there was no
 6  discrimination, or did they just say it had no merit?
 7   A.  No, I don't think they said either.  I think
 8  they referred to the grievance in whole, and said that it
 9  ended the whole procedure.
10   Q.  And the grievance included not only the hiring
11  procedure of not hiring Shotsay and hiring Tullis, and
12  also the discrimination against Shotsay, right?
13   A.  I would have to go back and review that.
14   Q.  In fact, on Page UFT1170, "A grievance was
15  filed by union.  Step 1 for violation of hiring hall
16  practices and discrimination."
17   A.  Where are you reading?
18   Q.  I'm sorry.  UFT1170.  At the very top,
19  10-12-03.
20   A.  Correct.
21   Q.  And so we had the three Daves trying to decide
22  whether or not discrimination occurred; is that right?
23   A.  Correct.
24   Q.  And Shotsay was not there?
25      MR. EVANS:  I'm going to object to lack of
```

Page 121

```
 1  foundation.
 2  BY MR. LEGACKI:
 3   Q.  His notes on UFT-01167, at the very last
 4  sentence, "Therefore no discrimination existed.  This is
 5  their decision."  Did you write that?  That's how you
 6  interpreted the decision?
 7      MR. EVANS:  Do you want to ask him that?  If
 8  that's how he interpreted the decision?
 9      MR. LEGACKI:  Yes.
10      THE WITNESS:  Correct.
11  BY MR. LEGACKI:
12   Q.  And was this three days -- according to you, it
13  was the three Daves that were making the decision that
14  there was no discrimination?
15   A.  They did.
16   Q.  And Shotsay was not there to present her case?
17   A.  No, Mike was there.
18   Q.  A guy who already admitted that he didn't
19  believe in the grievance?
20   A.  Business agent.
21   Q.  But the question is he did not believe in the
22  grievance and had already told you he was trying to get
23  rid of it, right -- trying to resolve it?
24   A.  Correct.
25      MR. EVANS:  Can we take a break?
```