# EXHIBIT 6

## Page 74

1    that at all?
2    A. No.
3    Q. Are you aware of any -- are you aware of how
4    the union proceeded in Shotsay's grievance?
5    A. I am not. I did participate in a meeting
6    explaining the hire hall process, but I don't know the
7    integral movements of the grievance.
8    Q. In Shotsay's situation, would it have been the
9    normal course for her grievance to be sent to a panel?
10    A. Well, again, this is a contract grievance for
11    hire -- you know, the hire hall circumvention. I would
12    say it would go to a panel, yes, if that's what's in
13    their contract.
14    Q. And the union normally doesn't -- or does base
15    its decision on how to proceed to arbitration on that?
16    A. I can't speak for everybody. I would
17    certainly take it to consideration if I were handling the
18    panel.
19    Q. How does a panel of people who have never
20    worked with an employee before understand the issues in
21    the grievance?
22    A. I don't know.
23    Q. Have you ever been on a panel or coordinated
24    with a panel that is convened for an employee that hasn't
25    yet been hired?

## Page 75

1    A. No.
2    Q. Is it a general practice during these panels
3    for the business agent to make some kind of presentation
4    or inform the employee of facts of the case?
5    A. I need clarification.
6    Q. Let me try to clarify. The panel is convened
7    of union members who are employees of the company,
8    correct?
9    A. No.
10    Q. No?
11    A. In most cases, both union and company
12    employees.
13    Q. You mean union employees that work for
14    Teamsters.
15    A. Teamsters represented members who are employed
16    and employer management people.
17    Q. And so what I'm trying to figure out is, how do
18    they know how to vote? How are they informed of the
19    issues in the grievance?
20    A. I would say a general overview of what the
21    issue is from the business agent in comparison to the
22    contract.
23    Q. Does the employee have the right to be present
24    at this panel?
25    A. Certainly.

## Page 76

1    Q. Is it your practice as a business agent to
2    notify the employee of the convening of the panel?
3    A. Yes.
4    Q. Sitting in front of you there is Exhibit 7 --
5    or is it 6? I had that wrong in my notes.
6    Do you recall receiving this letter from United
7    Freight?
8    A. I did not receive it from United Freight.
9    Q. Okay. How did you receive that letter then?
10    A. I believe that I had inquired about the
11    company's response to a meeting that had taken place in
12    explaining the hire hall process, and I was copied on it.
13    Q. And after receiving this letter you then wrote
14    a response to the letter. Do you recall that?
15    A. I wrote a memo to Mike Jones, not a response to
16    Frank.
17    Q. Okay. So tell me what the difference is.
18    A. Well, if I had received the letter from Frank,
19    a response would be my reply to Frank. I had asked for a
20    copy of this out of our files because I had heard that it
21    had been received, so I wrote a memo to Mike Jones.
22    Q. And what did you tell -- just for
23    clarification, your letter is stapled to the back of this
24    exhibit; is that right?
25    A. Yes. It's a memo not a letter.

## Page 77

1    Q. I'm sorry. Your memo. And what was your --
2    and why did you write a memo to Michael about this
3    letter?
4    A. I believe during the meeting that I
5    participated in, when we were discussing the hire hall
6    and how the employer and the dispatcher could proceed,
7    that the grievance that was in play over the hire hall
8    circumvention was discussed during part of the meeting.
9    Not in great detail, but enough to where I felt like
10    Frank had made a commitment to Mike that he was going to
11    settle the grievance. And --
12    Q. And how -- go ahead. I'm sorry.
13    A. And when I received the letter and I read
14    through it, I was very disappointed to see that that was
15    not the case.
16    Q. How did you think that the grievance was going
17    to be resolved?
18    A. I believed that they were going to hire
19    Shotsay.
20    Q. And after receiving this letter, you didn't
21    believe they were going to settle the grievance in that
22    way?
23    A. Obviously.
24    Q. Was it your understanding that United Freight
25    was then refusing to hire Shotsay?

**Page 206**

1 working in there; Tom Evans, and Steve Trosberg
2 (phonetic) and Scott Bridges.
3     MR. EVANS: We'll mark this as Exhibit 21.
4     (Exhibit 21 marked.)
5 BY MR. EVANS:
6     Q. Can you take a look at what's marked as Exhibit
7 21. Is this a dispatch log that you created?
8     A. Yes.
9     Q. Under the number open, there's nothing listed.
10 There's nothing I see.
11     A. Appears that way, yes.
12     Q. And under the number of people to be dispatched
13 it says four?
14     A. Yes.
15     Q. Is there a reason why there would be nothing in
16 the number open?
17     A. I missed it.
18     Q. And down below it says how many people -- can
19 you determine from this how many people were dispatched?
20     A. Five.
21     Q. Okay. And can you tell me what dates they were
22 dispatched on?
23     A. Looks like April 1st.
24     MR. EVANS: If we could take five minutes, I
25 may have no more questions.

**Page 207**

1     (Off record.)
2 BY MR. EVANS:
3     Q. Mr. Killian, did you have any role in
4 negotiating United Freight's collective bargaining
5 agreement?
6     A. No.
7     Q. Have you ever served as a business agent for
8 United Freight's contracting?
9     A. Only relieving business agents while on
10 vacation.
11     Q. But you were never the primary assigned
12 business agent?
13     A. No.
14     Q. Did you have any other role that -- any
15 substantial role in interpreting or creating United
16 Freight's collective bargaining agreement?
17     A. No.
18     Q. Earlier in your testimony you mentioned that
19 there's a map of the Port of Anchorage in the dispatch
20 office. Do you recall if you -- and you indicated that
21 sometimes you give some people being dispatched some
22 guidance as to how the Port operates.
23     Do you recall if you gave Ms. Posciri any
24 guidance using that map?
25     A. No, I don't recall the Port issue coming up

**Page 208**

1 between us.
2     Q. If, in your checking her background, you would
3 have found that she had no Port of Anchorage experience
4 before you dispatched her, would you have -- normally,
5 would you have attempted to try to bring her up to speed
6 a little bit on the Port?
7     A. I don't know that I would have. I look at
8 these dispatches and I don't believe any of those people
9 had that. And I just don't think it was an issue in the
10 hire hall at that time.
11     Q. Okay. When you had the meeting with
12 Mr. Monfrey to go over the hiring hall practices that
13 you just described, and Mr. Monfrey -- I guess you came
14 to some kind of a resolution, you believed, that were the
15 hiring hall practices?
16     Do you recall talking about that meeting? Was
17 Mr. Jones at that meeting as well?
18     A. Yes.
19     Q. Was Ms. Posciri's particular situation
20 discussed at that meeting?
21     A. There was some of the issues raised that they
22 were talking back and forth about and that's what I
23 referred to earlier.
24     Q. Do you recall Mr. Jones asking Mr. Monfrey to
25 hire back Ms. Posciri -- hire Ms. Posciri as a favor to

**Page 209**

1 him because of political reasons?
2     A. No.
3     Q. Indicating that -- there was no discussion at
4 that meeting about Ms. Posciri's husband supporting
5 Mr. Kenny?
6     A. No. There was some pleading about hiring her
7 and, you know, restoring the situation, for a better
8 word. And there was some pleading from Mike, but I don't
9 recall that coming up when I was in the room.
10     Q. Okay. Where did that conversation take place?
11     A. It seems to me we were upstairs in their
12 building -- their office building.
13     Q. At United Freight?
14     A. Yes.
15     MR. EVANS: I don't have any more questions.
16     FURTHER EXAMINATION
17 BY MS. HEALY:
18     Q. I have one follow-up question. Mr. Killian, is
19 it your belief that the reason that Mr. Monfrey refused
20 to hire Shotsay was because of her gender?
21     A. I believe that at the time I thought that that
22 had part to do with it, yes.
23     Q. And has your belief changed?
24     A. No.
25     MS. HEALY: Okay.

# EXHIBIT 7



# General Teamsters Local 959 State of Alaska
*Affiliated with International Brotherhood of Teamsters*

ANCHORAGE, AK 99503, 520 E. 34TH AVE   (907) 565-8122   FAX (907) 565-8265   GERALD L. HOOD, Secretary-Treasurer
www.akteamsters.com

FAIRBANKS, ALASKA 99701, 751 Old Richardson Hwy., Suite 127   (907) 452-2959   FAX (907) 452-5051
JUNEAU, ALASKA 99801, 306 Willoughby   (907) 586-3225   FAX (907) 586-1227
KENAI, ALASKA 99611, P.O. Box 3150   (907) 283-4498   FAX (907) 283-8030

October 2, 2003

Mr. Frank Monfrey
President
United Freight & Transport, Inc.
1701 E. First Avenue
Anchorage, AK 99501

Re:   Shotsay Breaux, Refusal to Hire

Dear Frank:

Please consider this letter a formal notice of a Step 1 grievance being filed by Teamsters Local 959. The Company is in violation of Article 5, Sections 5.01 and 5.02, of the Collective Bargaining Agreement.

Ms. Shotsay Breaux was dispatched on September 19, 2003, to fill the second of three driver openings the Company had requested be filled through the Union's hiring hall. The Company, however, refused to hire her.

Ms. Breaux's work history is impeccable. It includes experience driving tractor-trailers and pulling freight. She has logged over twenty thousand hours of driving time over the past ten years and has a clean driving record. Her work history is extensive in comparison to the three members who were recently dispatched to the Company. Her driving time exceeds that of both other candidates referred.

There are currently no female drivers in the employ of the Company. Further, the Company has a history of not hiring female drivers. In dispatching Ms. Breaux, the Union furnished a qualified worker to fill the Company's available position. The Company has a contractual obligation to select an applicant on a non-discriminatory basis.

Please call me to schedule a meeting to resolve this issue. My office telephone number is 565-8272.

Sincerely,

TEAMSTERS LOCAL 959

Michael Jones
Business Representative

MJ\03sep24UFATSBreauxGrv1

Δπ EXHIBIT 7
Deponent M. Jones
Date 12-7-05
WWW.DEPOBOOK.COM



UFT-01426

EXHIBIT 7 - Page 1 of 1